# Exhibit A

EFiled:  Mar 04 2022 06:16PM EST
Transaction ID 67368809
Case No. 2022-0210-

## SUPPLEMENTAL INFORMATION PURSUANT TO RULE 3(A)
## OF THE RULES OF THE COURT OF CHANCERY

The information contained herein is for the use by the Court for statistical and administrative purposes only.  Nothing stated herein shall be deemed an admission by or binding upon any party.

1.  Caption of Case:  **GORDIAN MEDICAL, INC. d/b/a AMERICAN MEDICAL TECHNOLOGIES and AMT ULTIMATE HOLDINGS, L.P., Plaintiffs v. MISTY VAUGHN AND CURITEC, LLC, Defendants**

2.  Date Filed:   **March 4, 2022**

3.  Name and address of counsel for plaintiff(s):
    **Andrew L. Cole, Jack Dougherty, Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, DE  19801; (302) 652-3131**

4.  Short statement and nature of claim asserted:   **Claim to enforce non-compete, non-solicitation and confidentiality provisions of equity and employment agreements.**

5.  Substantive field of law involved (check one):

☐ Administrative law       ☐ Labor law              ☐ Trusts, Wills and estates
☐ Commercial law           ☐ Real Property          ☐ Consent trust petitions
☐ Constitutional law       ☐ 348 Deed Restriction   ☐ Partition
☐ Corporate law            ☐ Zoning                 ☐ Rapid Arbitration (Rules 96,97)
☒ Trade secrets/trade mark/or other intellectual property  ☐ Other

6.  Related cases, including any Register of Wills matters (this requires copies of all documents in this matter to be filed with the Register of Wills):  **None.**

7.  Basis of court's jurisdiction (including the citation of any statute(s) conferring jurisdiction):  **General equity jurisdiction.**

8.  If the complaint seeks preliminary equitable relief, state the specific preliminary relief sought:  **Plaintiff seeks a preliminary injunction enjoining Defendant Vaughn's violation of contractual non-compete, non-solicitation, confidentiality and other provisions.**

9.  If the complaint seeks a TRO, summary proceedings, a Preliminary Injunction, or Expedited Proceedings, check here  ☒ (If #9 is checked, a Motion to Expedite <u>must</u> accompany the transaction.)

10.  If the complaint is one that in the opinion of counsel should not be assigned to a Master in the first instance, check here and attach a statement of good cause.  ☐

*/s/ Andrew L. Cole*
Andrew L. Cole (No. 5712)

**EFiled:  Mar 04 2022 06:16PM EST**
**Transaction ID 67368809**
**Case No. 2022-0210-**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GORDIAN MEDICAL, INC.           :
*d/b/a* AMERICAN MEDICAL         :
TECHNOLOGIES and AMT            :
ULTIMATE HOLDINGS, L.P.,         :
                                :
          Plaintiffs,           :
                                :    C.A. No. 2022-_____-_____
      v.                        :
                                :
MISTY VAUGHN and               :
CURITEC, LLC,                   :
                                :
          Defendants.           :

## VERIFIED COMPLAINT

Plaintiffs Gordian Medical, Inc., *d/b/a* American Medical Technologies ("AMT") and   AMT Ultimate Holdings, L.P. ("Holdings") (collectively, "Plaintiffs") by and through their undersigned counsel, file this Complaint against Misty Vaughn ("Vaughn") and Curitec, LLC ("Curitec") (collectively, "Defendants").  In support thereof, Plaintiffs state as follows:

## I.     INTRODUCTION

1.     This action stems from Vaughn's breaches of her Employment Agreement ("Agreement") with AMT, and her Incentive Unit Grant Agreement with AMT and Holdings, a Delaware limited partnership (the "Equity Agreement").

2.     A true and correct copy of the Agreement is attached hereto as Exhibit A.

3.      Plaintiffs seek, among other things, to prevent Vaughn and her new employer, Curitec, one of AMT's largest and most direct competitors, from violating the Agreement and the Equity Agreement and thereby causing further irreparable harm to AMT's business.

4.      Founded in 1994, AMT is a senior care company focused on delivering outcome-driven programs to health care providers in the long-term care and post-acute environments.  With over 25 years of industry experience, AMT is the leading independent provider of wound care solutions for long-term care facilities in the United States.

5.      Misty Vaughn had been an employee of AMT since 2001.  During that time, she held a number of senior leadership roles throughout the organization, including as Senior Vice President, Clinical Programs and Senior Vice President, Product Management and Clinical Services.

6.      Since June 14, 2021, Vaughn held one of AMT's most important and strategic positions—Senior Vice President of Post-Acute Operations & Clinical Services.

7.      Holdings is AMT's indirect parent.

8.      Plaintiffs seek the relief described herein to enforce their contractual rights and prevent Defendants from causing further irreparable harm to AMT.

9.     Plaintiffs will suffer irreparable harm if Vaughn's contractual duties are not enforced because she already has shown complete disregard for her post-employment obligations to AMT, and she possesses AMT confidential, proprietary, and trade secret information.

## II.     THE PARTIES

10.     Holdings is a limited partnership organized in the State of Delaware.

11.     AMT was incorporated in the State of Nevada and has its corporate headquarters in Irvine, California.

12.     Defendant Misty Vaughn is an adult individual who resides at 133 Circle Slope Drive, Simpsonville, SC 29681, and is a citizen of South Carolina.

13.     Vaughn is currently an employee of Curitec.

14.     Defendant Curitec is a limited liability company organized in the State of Florida, with its corporate headquarters in The Woodlands, Texas.

15.     Curitec conducts business throughout the United States, including, upon information and belief, in Delaware.

## III.     JURISDICTION

16.     This Court has subject-matter jurisdiction over this action pursuant to 10 Del. C. § 341, because AMT seeks equitable relief.

17.     This Court has personal jurisdiction over Vaughn because she has contractually consented to the jurisdiction of the courts of the State of Delaware.

This Court has personal jurisdiction over Curitec because, upon information and belief, Curitec conducts business in Delaware and/or has delivered products to individuals located in Delaware.

## IV.  FACTUAL ALLEGATIONS

### A.  AMT's Business.

18.    Founded in 1994, AMT is a senior care company focused on delivering outcome-driven programs to health care providers in the long-term care and post-acute environments.  AMT is the leading independent provider of wound care solutions for long-term care facilities in the United States.

19.    The success of AMT's business is directly linked to developing and maintaining relationships with its clients.

20.    AMT has expended considerable time, expense, and resources developing its client base throughout the United States.

### B.  Vaughn's Employment with AMT.

21.    Vaughn joined AMT on or about December 15, 2001.  Over the years, she worked her way up through the AMT, ultimately becoming Senior Vice President of Post-Acute Operations & Clinical Services in 2021.

22.    As Senior Vice President of Post-Acute Operations & Clinical Services, Vaughn played a key role in negotiating AMT's supply agreements and is aware of the formulary, pricing, payment, and other terms that AMT was able to negotiate. This pricing and payment information is one of AMT's trade secrets.

4

23.     Vaughn also worked on numerous strategic initiatives on behalf of AMT, including some that were ongoing or under development at the time of her departure from AMT.   While working on these initiatives, Vaughn developed relationships with vendors and other strategic business partners.   Much of the information Vaughn obtained regarding these strategic initiatives, vendors and strategic partners is a trade secret of AMT's.

24.     In addition, during her tenure with AMT, Vaughn played a leading role in developing the pricing-related formulary used by AMT's clinicians in the field. Much of this information regarding the formulary is a trade secret of AMT's.

25.     During her tenure with AMT, Vaughn also worked on developing the metrics and reporting systems used within AMT for the purpose of assessing performance, evaluating employees, and improving financial performance.   These metrics and reporting systems are trade secrets of AMT's.

26.     During her tenure with AMT, Vaughn was the clinical lead in developing a new software program for AMT.   This program has been a significant, years-long initiative and investment, and its components include product selection, billing compliance, and other items that are trade secrets of AMT's.

27.     During her tenure with AMT, Vaughn played a key role in designing and overseeing AMT's training and ongoing clinical education program for its clinicians who service nursing home customers.   The specifics and particulars of this

in-depth training and education provided by AMT to its field employees gives AMT a competitive advantage and is a trade secret of AMT's.

28.    As part of its services to nursing facilities, AMT conducts regular business and clinical reviews with clients.  During her tenure with AMT, Vaughn was a key part of these meetings with customer executives and was presented as AMT's lead clinical and product specialist.  This involvement gave Vaughn extensive knowledge of AMT's largest customers.  Such knowledge constitutes AMT confidential information and could be used or exploited to Curitec's competitive advantage and to AMT's disadvantage in the market.

29.    AMT provides clinical education to its customers as part of its services. This clinical education is a key market differentiator that AMT uses to establish and maintain customer relationships.  During her tenure with AMT, Vaughn led the clinical education department and designed or oversaw AMT's clinical education programs.  These programs are also one of AMT's trade secrets.

## C.    __The Agreement.__

30.    On June 30, 2020, Vaughn executed an employment agreement (the "Original Agreement") naming her as a Senior Vice President of the AMT.  The Original Agreement contained a retention bonus payable over 5 years, as well as confidentiality, noncompetition, and non-solicitation provisions.

6

31.     Following a change in management, AMT decided to accelerate the retention bonus in the Original Agreement, giving Vaughn a substantial lump sum payment in June and July of 2021.  AMT gave Vaughn additional responsibilities, including oversight of AMT's clinical delivery team, which has over 150 employees. To reflect these changes, AMT prepared, and Vaughn executed, the Agreement that is the subject of this litigation.  The restrictive covenant contained in the Agreement, and at issue in this litigation, is identical to the restrictive covenant contained in the Original Agreement.

32.     On June 10, 2021, Vaughn executed the Agreement.  The Agreement contained substantially similar restrictive covenants as were contained in her prior Original Agreement.  See Exhibit A.

33.     Vaughn acknowledged that, as part of her employment with AMT, she would have access to Confidential Information, defined in Section 9(a) of the Agreement to include, by way of example:

> all data, information, ideas, concepts, discoveries, trade secrets, inventions (whether or not patentable or reduced to practice), innovations, improvements, know-how, developments, techniques, methods, processes, treatments, drawings, sketches, specifications, designs, patterns, models, plans and strategies, and all other confidential or proprietary information or trade secrets in any form or medium (whether merely remembered or embodied in a tangible or intangible form or medium) whether now or hereafter existing, relating to or arising from the past, current or potential business, activities and/or operations of the Company Group, including, without limitation, any such information relating to or concerning finances, sales, marketing,

7

> advertising, transition, promotions, pricing, personnel, customers, suppliers, vendors, raw partners and/or competitors.

(Ex. A, § 9(a)).

34.     Section 9 of the Agreement prohibits Vaughn from using or disclosing AMT's Confidential Information to any person or entity except as necessary to perform her duties at AMT.  (Ex. A, § 9(a)).

35.     The Agreement requires Vaughn to, upon the termination of her employment with AMT, return to AMT all Confidential Information and other AMT property in her possession.  (Ex. A, § 9(f)).

36.     In the Agreement, Vaughn specifically acknowledges that, because of her high-level position and her access to AMT's Confidential Information, AMT could suffer irreparable harm if Vaughn provided similar services for an AMT competitor after her separation from AMT.  (Ex. A, § 9(b)).

37.     Accordingly, Vaughn agreed that, while employed at AMT and for twenty-four (24) months following the end of her employment she would not:

> directly or indirectly, own, manage, operate, control, be employed by (whether as an employee, consultant, independent contractor or otherwise, and whether or not for compensation) or render services to any person, firm, corporation or other entity, in whatever form, engaged in the business of providing wound care supplies or related wound care evaluation, treatment and management services, ostomy, urological or tracheostomy services and training and education in any setting, whether in a facility, a clinic, in home-based care or otherwise (the "Restricted Business"), within (A) the United States or (B) any other

8

country in which the Company Group conducts the Restricted Business during the Executive's employment or service with the Company Group during the Restricted Period.

(Ex. A, § 9(b)).

38.     Additionally, Vaughn agreed that for twenty-four (24) months following termination of her employment, she would not:

directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, (i) solicit, aid or induce any Person (as defined below) who is, as of the Executive's termination date, or was, during the eighteen (18)-month period immediately preceding the Executive's termination date, a customer of the Company Group to purchase goods or services related to the Restricted Business from another person, firm, corporation or other entity or assist any other person or entity in identifying or soliciting any such customer, (ii) solicit, aid or induce any Person who is, as of the Executive's termination date, or was, within the eighteen (18)-month period prior to such solicitation, aid or inducement, an employee, representative or agent of the Company Group to leave such employment or retention or to accept employment with or render services to or with any other person, firm, corporation or other entity unaffiliated with the Company Group or hire or retain any such Person who is, as of the Executive's termination date, or was, within the eighteen (18)-month period prior to such hiring or retainer, an employee, representative or agent, or take any action to materially assist or aid any other person, firm, corporation or other entity in identifying, hiring or soliciting any such employee, representative or agent; or (iii) intentionally interfere, or intentionally aid or induce any other person or entity in interfering, with the relationship between the Company

9

> Group and any of their respective vendors, joint venturers
> or licensors which causes harm to the Company Group.

(Ex. A, § 9(c)).

39.     Pursuant to the Agreement, Vaughn agreed that any violation of the non-competition, non-solicitation, or confidentiality provisions would cause AMT irreparable harm and AMT would be entitled to injunctive relief, in addition to other remedies.  (Ex. A, § 11).

40.     The Agreement is governed by the laws of the State of Delaware.  (Ex. A, § 18).

41.     Vaughn and AMT consented to the exclusive jurisdiction of the courts of the State of Delaware and the federal courts of the United States of America located in the District of Delaware.  (Ex. A, § 18).

42.     The Agreement makes clear that Vaughn's contractual duties survive the termination of her employment with AMT.  (Ex. A, § 9(j)).

**D.     <u>The Equity Agreement.</u>**

43.     On July 31, 2021, AMT's indirect equity holder, AMT Ultimate Holdings, L.P., a Delaware limited partnership, issued Vaughn equity in the Company.  Only a limited number of senior executives of AMT received such equity.  Vaughn executed an Equity Agreement which contained, among other things, restrictive covenants to which she agreed to comply.  The restrictive covenants mirror that of the Agreement.

10

44.     Vaughn acknowledged that, as part of her employment with AMT and Holdings, she would have access to Confidential Information, defined in Annex A of the Equity Agreement to include, by way of example:

> all data, information, ideas, concepts, discoveries, trade secrets, inventions (whether or not patentable or reduced to practice), innovations, improvements, know-how, developments, techniques, methods, processes, treatments, drawings, sketches, specifications, designs, patterns, models, plans and strategies, and all other confidential or proprietary information or trade secrets in any form or medium (whether merely remembered or embodied in a tangible or intangible form or medium) whether now or hereafter existing, relating to or arising from the past, current or potential business, activities and/or operations of the Affiliated Companies, including, without limitation, any such information relating to or concerning finances, sales, marketing, advertising, transition, promotions, pricing, personnel, customers, suppliers, vendors, raw partners and/or competitors.

(Equity Agreement, Annex A, § 1).

45.     Annex A, § 1 of the Equity Agreement prohibits Vaughn from using or disclosing the Confidential Information of Holdings and its subsidiaries (the "Affiliated Companies") to any person or entity except as necessary to perform her duties at the Affiliated Companies. (Equity Agreement, Annex A, § 1).

46.     The Equity Agreement requires Vaughn to, upon the termination of her employment with the Affiliated Companies, return to the Affiliated Companies all Confidential Information and other Affiliated Companies property in her possession. (Equity Agreement, Annex A, § 8).

11

47.     In the Equity Agreement, Vaughn specifically acknowledges that, because of her high-level position and her access to the Affiliated Companies' Confidential Information, the Affiliated Companies could suffer irreparable harm if Vaughn provided similar services for a competitor of the Affiliated Companies after her separation from the Affiliated Companies.  (Equity Agreement, Annex A, § 2).

48.     Accordingly, Vaughn agreed that, while employed at the Affiliated Companies and for twenty-four (24) months following the end of her employment she would not:

> directly or indirectly, own, manage, operate, control, be employed by (whether as an employee, consultant, independent contractor or otherwise, and whether or not for compensation) or render services to any person, firm, corporation or other entity, in whatever form, engaged in the business of providing wound care supplies or related wound care evaluation, treatment and management services, ostomy, urological or tracheostomy services and training and education in any setting, whether in a facility, a clinic, in home-based care or otherwise (the "Restricted Business"), within (A) the United States or (B) any other country in which the Affiliated Companies conduct the Restricted Business during Grantee's employment or service with the Affiliated Companies during the Restricted Period.

(Equity Agreement, Annex A, § 2).

49.     Additionally, Vaughn agreed that for eighteen (18) months following termination of her employment, she would not:

> directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, (i) solicit,

12

aid or induce any Person (as defined below) who is, as of Grantee's termination date, or was, during the eighteen (18)-month period immediately preceding Grantee's termination date, a customer of the Affiliated Companies to purchase goods or services related to the Restricted Business from another person, firm, corporation or other entity or assist any other person or entity in identifying or soliciting any such customer, (ii) solicit, aid or induce any Person who is, as of Grantee's termination date, or was, within the eighteen (18)-month period prior to such solicitation, aid or inducement, an employee, representative or agent of the Affiliated Companies to leave such employment or retention or to accept employment with or render services to or with any other person, firm, corporation or other entity unaffiliated with the Affiliated Companies or hire or retain any such Person who is, as of Grantee's termination date, or was, within the eighteen (18)-month period prior to such hiring or retainer, an employee, representative or agent, or take any action to materially assist or aid any other person, firm, corporation or other entity in identifying, hiring or soliciting any such employee, representative or agent; or (iii) intentionally interfere, or intentionally aid or induce any other person or entity in interfering, with the relationship between the Affiliated Companies and any of their respective vendors, joint venturers or licensors which causes harm to the Affiliated Companies.

(Equity Agreement, Annex A, § 3)

50.    The Equity Agreement is governed by the laws of the State of Delaware. (Equity Agreement, § 10(f)).

51.    Vaughn and AMT consented to the exclusive jurisdiction of the courts of the State of Delaware and the federal courts of the United States of America located in the District of Delaware.  (Equity Agreement, § 10(f)).

52.     The Equity Agreement makes clear that Vaughn's contractual duties survive the termination of her employment with AMT.  (Equity Agreement, § 6(f)).

**E.     AMT Entrusted Vaughn with its Confidential, Proprietary, and/or Trade Secret Information.**

53.     As Senior Vice President of Post-Acute Operations & Clinical Services, AMT entrusted Vaughn with its trade secret, confidential, and proprietary information.

54.     This information included, but was not limited to, employee training and evaluation methods, clients' contact information, clients' purchase history, ordering habits, preferences, and needs, payor reimbursement and audit activity, AMT's business and marketing strategies, vendor information and related pricing, and other information concerning the methods and systems used by AMT to design, develop, market, and sell products and services to customers and perspective customers.

55.     AMT expended significant time, effort, and resources to develop this information and AMT considers it an extremely valuable asset.

56.     The aforementioned information is not known to the public or readily ascertainable.

57.     As such, competitors could easily exploit this information to gain a competitive advantage to the detriment of AMT.

58.    AMT has implemented safeguards to maintain the confidentiality of this information, including storing its trade secret, confidential, and proprietary information on a secure server, password-protecting access to databases that contain such information, and limiting access to Confidential Information to only those employees with a specific need for such information.

59.    AMT also requires that certain employees who may be privy to trade secret, confidential, and proprietary information execute agreements containing confidentiality, non-solicitation, and non-disclosure provisions.

**F.    Vaughn's Resignation from AMT, Employment with Curitec, and Breaches of the Agreement.**

60.    On January 12, 2022, Vaughn resigned from her employment with AMT, to, in her own words, pursue her passion for travel and birdwatching, manage rental properties she owned, and spend time with friends and family.

61.    Despite her representation that she was merely planning to travel and pursue other personal interests, on February 7, 2022, Vaughn herself confirmed to AMT that she had immediately taken a position with Curitec.

62.    AMT is aware that, since Vaughn's resignation and taking a position with Curitec, she has been in active communication with current employees of AMT.

63.    On February 11, 2022, AMT sent Vaughn a letter, informing her that her employment with Curitec violated the Agreement, including its non-compete provisions.

64.     AMT demanded that Vaughn cease and desist any further unlawful activity, and asked Vaughn to confirm in writing, that Vaughn has resigned her employment with Curitec.

65.     To date, neither Curitec nor Vaughn has provided confirmation that Vaughn is no longer violating the Agreement.

## G.     Defendants' Actions Violate the Contractual and Legal Rights of AMT and Holdings.

66.     Upon information and belief, despite being aware of her contractual obligations prohibiting employment by a competitor for two years, upon leaving AMT Vaughn immediately sought employment with one of AMT's biggest competitors—Curitec.

67.     Upon information and belief, Vaughn has contacted AMT's vendors.

68.     Curitec has been aware, at all relevant times, of Vaughn's former employment with AMT and her post-employment obligations to AMT and Holdings in the Agreement and Equity Agreement described above.

69.     Indeed, Curitec's communications to AMT specifically referenced its awareness of the Agreement.

70.     Nonetheless, Curitec knowingly and intentionally continues to employ Vaughn in a position that violates the noncompetition obligations in the Agreement.

71.     AMT believes, and therefore avers, that unless the relief requested herein is granted by the Court, Defendants will continue their unlawful conduct.

16

72.     Therefore, Plaintiffs seek preliminary injunctive relief to: (1) enforce Vaughn's contractual obligations, including, but not limited to, the noncompetition and non-solicitation restrictions; and (2) prevent Vaughn's use and disclosure of Plaintiffs' trade secrets, confidential, and proprietary information.

73.     Defendants' actions are intentional, willful, and malicious.

74.     Defendants' actions threaten to cause Plaintiffs imminent, irreparable harm and injury, including without limitation, the loss of clients, profits, business reputation, market share, the disclosure and misuse of trade secret, confidential and/or proprietary business information, and loss of goodwill.

75.     Plaintiffs have no adequate remedy at law, and will suffer irreparable harm if Vaughn's contractual obligations are not enforced.

<u>COUNT I</u>
**BREACH OF CONTRACT**
**(Defendant Vaughn)**

76.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs as though set forth fully herein.

77.     The Agreement is a valid, enforceable contract between Vaughn and AMT.

78.     The Equity Agreement is a valid, enforceable contract between Vaughn, AMT and Holdings.

17

79.     AMT has satisfied all of its obligations under the terms and conditions of the Agreement.

80.     AMT and Holdings have satisfied all of their obligations under the terms and conditions of the Agreement and Equity Agreement.

81.     By working for a competitor of AMT (Curitec) within twenty-four (24) months of Vaughn ending her employment with AMT and her working in a position that has similar, if not identical, duties and responsibilities to those she had with AMT, Vaughn breached the Agreement and the Equity Agreement.

82.     In doing so, Vaughn has caused and continues to cause Plaintiffs immediate and irreparable harm for which Plaintiffs have no adequate remedy at law.

83.     Vaughn will continue such wrongful conduct unless enjoined.

84.     As a result of this breach, Plaintiffs are entitled to preliminary and permanent injunctive relief enforcing the terms of the Agreement and the and the Equity Agreement, together with damages in an amount to be proven at trial.

## COUNT II
## TORTIOUS INTERFERENCE WITH CONTRACT
### (Defendant Curitec, LLC)

85.     Plaintiffs incorporate herein by reference the allegations of the preceding paragraphs.

86.     The Agreement is an enforceable contract between Vaughn and AMT.

87.     The Equity Agreement is a valid, enforceable contract between Vaughn, AMT and Holdings.

88.     Before it offered employment to Vaughn, Curitec knew that Vaughn worked for AMT and Vaughn was bound by the Agreement and Equity Agreement, which contain restrictive covenants.

89.     Upon information and belief, Curitec intentionally and without justification solicited Vaughn in order to directly compete with AMT.

90.     As a result of Curitec's intentional acts, Vaughn has breached the Agreement and Equity Agreement.

91.     By such action, Curitec caused and continues to cause Plaintiffs immediate and irreparable harm for which it has no adequate remedy at law.

92.     Curitec will continue such wrongful conduct unless enjoined.

93.     As a result of Curitec's tortious interference, Plaintiffs are entitled to preliminary and permanent injunctive relief and damages in an amount to be proven at trial.

94.      As a result of Vaughn's actions, Plaintiffs are entitled to damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully requests this Court:

a.     Temporarily, preliminarily, and permanently enjoin Vaughn for a period of twenty-four (24) months from the date of this

Court's order from directly or indirectly owning, managing, operating, controlling, being employed by (whether as an employee, consultant, independent contractor or otherwise, and whether or not for compensation) or rendering services to any person, firm, corporation or other entity, in whatever form, engaged in the business of providing wound care supplies or related wound care evaluation, treatment and management services, ostomy, urological or tracheostomy services and training and education in any setting, whether in a facility, a clinic, in home-based care or otherwise (the "Restricted Business"), within (A) the United States or (B) any other country in which AMT conducts the Restricted Business during Vaugn's employment or service with AMT.

b.      Otherwise order Vaughn to comply with the terms of the Agreement and Equity Agreement, and the restrictive covenants contained therein;

c.      Direct Vaughn to return all AMT and Affiliated Companies information, documents, data, files, and materials, including electronically stored information, in her possession, custody, and/or control;

d.      Award damages for all Defendants' wrongful conduct in an amount to be proved at trial;

40000/0785-42649379

e.      Award Plaintiffs their attorneys' fees, costs, and expenses,

as well as pre-and post-judgment interests; and

f.      Grant such other and further relief as the Court may deem

just, equitable, and proper.

**COLE SCHOTZ P.C.**

Of Counsel

Ryan J. Morley*
John W. Hofstetter*
LITTLER MENDELSON, P.C.
Key Tower
127 Public Square, Suite 1600
Cleveland, OH 44114
(216) 696-7600 (Phone)
(216) 696-2038 (Fax)
rmorley@littler.com
jhofstetter@littler.com

*Motion for Admission Pro Hac Vice Forthcoming*

/s/ Andrew L. Cole
Andrew L. Cole (Bar No. 5712)
Jack M. Dougherty (Bar No. 6784)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
(302) 652-3131 (Phone)
(302) 652-3117 (Fax)
acole@coleschotz.com
jdougherty@coleschotz.com

*Counsel for Plaintiffs,*
*Gordian Medical, Inc.,*
*d/b/a American Medical Technologies*
*and  AMT Ultimate Holdings, L.P.*

Dated:  March 4, 2022

21

**EFiled:  Mar 04 2022 06:16PM EST**
**Transaction ID 67368809**
**Case No. 2022-0210-**

# EXHIBIT A

# EMPLOYMENT AGREEMENT

This **EMPLOYMENT AGREEMENT** (this "Agreement"), dated as of June 10, 2021 (the "Effective Date"), is by and among Gordian Medical, Inc., a Nevada corporation (the "Company"), Misty Vaughn (the "Executive"), and, solely for purposes of Section 5(e),   AMT Ultimate Holdings, LP, a Delaware limited partnership ("AMT").

# W I T N E S S E T H

**WHEREAS**, the Company and the Executive are party to that certain executive employment agreement, dated as of July 31, 2020 (as amended, the "Prior Agreement");

**WHEREAS**, the Company desires to continue the employment of the Executive by entering into the terms of this Agreement, which shall supersede the terms and conditions of the Prior Agreement in its entirety, and the Executive desires to enter into this Agreement and to accept such continued employment, subject to the terms and conditions of this Agreement, and by entering into this Agreement, the Executive waives any and all claims the Executive may have to terminate the Executive's employment for Good Reason (as defined in the Prior Agreement or this Agreement) on the basis of the Executive's entry into this Agreement, it being understood and agreed by the parties hereto that such waiver does not extend to any such claims arising on or after the Effective Date.

**NOW, THEREFORE**, in consideration of the foregoing, of the mutual promises contained herein and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.   **POSITION AND DUTIES.**

(a)   **GENERAL.** The Company shall continue to employ the Executive, and the Executive accepts such continued employment, upon the terms and conditions set forth in this Agreement. During the Employment Term (as defined in Section 2 hereof), the Executive shall serve as the Company's Senior Vice President, Post Acute. In this capacity, the Executive shall have the duties, authorities and responsibilities commensurate with the duties, authorities and responsibilities of persons in similar capacities in similarly sized companies, and such other duties, authorities and responsibilities as may reasonably be assigned to the Executive from time to time by the Executive Vice President, Operations and Clinical Services of the Company. The Executive shall report to the Executive Vice President, Operations and Clinical Services, or such other person as may be designated from time to time by the Chief Executive Officer or the Board of the Company.

(b)   **OTHER ACTIVITIES.** During the Employment Term, the Executive shall devote all of the Executive's reasonable business time and best efforts to the performance of the Executive's duties with the Company; provided, that, the foregoing shall not prevent the Executive from, (i) with prior written notice to the Board of Directors of the Company (the "Board"), serving on the boards of directors or as a member of a committee of non-profit or industry organizations

and, with the prior written approval of the Board, which approval will not be unreasonably denied, of other for-profit companies; (ii) participating in charitable, civic, educational, professional, community or industry affairs; and (iii) managing the Executive's passive personal investments, so long as such activities, either individually or in the aggregate, do not interfere or conflict with the Executive's duties hereunder or create an actual, or reasonably likely, business or fiduciary conflict.

2.     **EMPLOYMENT TERM.** The Company agrees to continue to employ the Executive pursuant to the terms of this Agreement, and the Executive agrees to such continued employment, commencing as of the Effective Date and continuing until the Executive's employment hereunder is terminated in accordance with <u>Section 6</u> hereof, subject to the provisions of <u>Section 7</u> hereof. The period of time between the Effective Date and the termination of the Executive's employment hereunder shall be referred to herein as the "<u>Employment Term</u>."

3.     **BASE SALARY.** During the Employment Term, the Company agrees to pay the Executive a base salary at an annual rate equal to $240,000, payable in accordance with the regular payroll practices of the Company, but not less frequently than monthly. The Executive's Base Salary shall be subject to annual review by the Board (or a committee thereof) and may be adjusted from time to time by the Board, except that the Executive's Base Salary may not be decreased during the Employment Term, other than as part of across-the-board base-salary reductions made in connection with an economic downturn or to further the financial needs of the Company that apply in substantially the same manner to all senior executive employees of the Company. The base salary as determined herein and adjusted from time to time shall constitute "<u>Base Salary</u>" for purposes of this Agreement.

4.     **ANNUAL PERFORMANCE BONUS.** During each fiscal year of the Employment Term (prorated for partial years of service), the Executive shall be eligible to participate in the Company's annual performance bonus program as may be in effect from time to time, pursuant to which the Executive may be eligible to receive an annual performance bonus (the "<u>Annual Performance Bonus</u>"), with a target Annual Performance Bonus opportunity equal to at least 40% of the Executive's Base Salary, based upon the attainment of one or more performance goals established by the Board (or a committee thereof), as determined by the Board (or a committee thereof) in its sole discretion. Any Annual Performance Bonus payable hereunder, if any, will be earned by the Executive if the Executive is employed by the Company as of the first business day of the fiscal year immediately following the fiscal year to which such Annual Performance Bonus relates, and shall be paid (if and to the extent earned) in the same fiscal year in which the Annual Performance Bonus is earned, at the same time as annual performance bonuses are paid to other senior executives of the Company, but in no event later than thirty (30) days following the Company's receipt of the audited financials with respect to such fiscal year. The Executive's Annual Performance Bonus for the portion of the 2021 fiscal year commencing April 1, 2021 and ending on December 31, 2021 shall be pro-rated, with such proration effected by multiplying (a) the Annual Performance Bonus that would be due for the entire 2021 fiscal year, if any, by (b) a fraction, (i) the numerator of which is the number of days the Executive is employed by the Company in the 2021 fiscal year between April 1, 2021 and December 31, 2021, and (ii) the denominator of which is three hundred sixty-five (365).

5.     **EMPLOYEE BENEFITS.**

(a)     **BENEFIT PLANS.** During the Employment Term, the Executive shall be eligible to participate in any employee benefit plan that the Company has adopted or may adopt, maintain or contribute to for the benefit of its employees generally, subject to satisfying the applicable eligibility requirements, except to the extent such plans are duplicative of the benefits otherwise provided hereunder (unless expressly provided herein). Notwithstanding the foregoing, the Company may modify or terminate any employee benefit plan at any time.

(b)     **BUSINESS EXPENSES.** During the Employment Term, the Company shall reimburse the Executive promptly for all costs and expenses reasonably incurred by the Executive in the performance of the Executive's duties for the Company Group (as defined below), in accordance with policies which may be adopted from time to time by the Company, following presentation by the Executive of reasonable documentation of such expenses in accordance with then-current Company policy related to such documentation.

(c)     **VACATION; SICK LEAVE.** During the Employment Term, the Executive shall be entitled to take vacation time and sick leave in accordance with the Company's standard policy in effect from time to time, with vacation time to be taken as the Executive reasonably deems appropriate consistent with past practice and subject to the business needs of the Company and the Company's policies as in effect from time to time.

(d)     **HOLIDAYS.** During the Employment Term, the Executive shall be entitled to all Company holidays in accordance with the Company's standard policy in effect from time to time.

(e)     **GRANT OF CLASS B UNITS.** As soon as practicable following the Effective Date, and in any event no later than sixty (60) days following the Effective Date, AMT Ultimate Holdings, LP ("Parent") shall grant the Executive an equity grant or grants representing Class B Units (as defined in the Agreement of Limited Partnership, dated as of July 31, 2020, by and among AMT, OEP VII General Partner, L.P., a Delaware limited partnership, as general partner, and the other persons admitted to AMT as limited partners (as amended, the "Parent LPA")) of Parent that shall constitute "profits interests" for U.S. federal income tax purposes (the "Parent Units"). The Parent Units will be subject to an award agreement substantially in the form attached hereto as Exhibit A, the Parent LPA and any other restrictions and limitations imposed by law, and 20% of the Parent Units will vest on each of the first five (5) anniversaries of the grant date, subject to the Executive's continued employment on each applicable vesting date.

6.     **TERMINATION.** The Executive's employment and the Employment Term shall terminate on the first of the following to occur:

(a)     **DUE TO THE EXECUTIVE'S DISABILITY.** Upon ten (10) days' prior written notice by the Company to the Executive of a termination due to Disability. For purposes of this Agreement, "Disability" shall be defined as the inability of the Executive to have performed the Executive's material duties hereunder after reasonable accommodation due to a physical or mental injury, infirmity or incapacity for one hundred twenty (120) days (including weekends and holidays) in any three hundred sixty-five (365)-day period as determined by the Board in its reasonable discretion. The Executive (or the Executive's representative) shall cooperate in all

respects with the Company if a question arises as to whether the Executive has become disabled (including, without limitation, submitting to reasonable examinations by one or more independent, disinterested medical doctors and other independent, disinterested health care specialists selected by the Company and authorizing such medical doctors and other health care specialists to discuss the Executive's condition with the Company).

(b)      **DUE TO THE EXECUTIVE'S DEATH.** Automatically upon the date of death of the Executive.

(c)      **BY THE COMPANY FOR CAUSE.** Immediately upon written notice by the Company to the Executive of a termination for Cause. "Cause" shall mean:

(i)      an intentional tort committed by Executive (other than any such tort covered by Section 6(c)(ii)) which causes substantial loss, damage or injury to the property or reputation of the Company or any of its direct or indirect subsidiaries (collectively, the "Company Group"), in all cases, as determined by a court of competent jurisdiction;

(ii)      any act of moral turpitude or intentional, material act of fraud or dishonesty against the Company, or misappropriation of the Company Group's property (other than other *de minimis* use of Company property for personal purposes), which is not cured (to the extent susceptible to cure) within twenty (20) days after the Company's written notice to the Executive; the indictment for, conviction of, or pleading of guilty or nolo contendere to, a felony or misdemeanor that results in material harm to the Company Group's business, property or reputation;

(iii)      habitual neglect, willful misconduct or gross negligence in the performance of the Executive's duties as set forth herein (for a reason other than the Executive's death or Disability), which, in each case, could be reasonably expected to cause material loss, damage or injury to the property or reputation of the Company Group, which is not cured within twenty (20) days after written notice to the Executive;

(iv)      the willful disregard of written, material policies of the Company Group which causes material loss, damage or injury to the property or reputation of the Company Group, which is not cured within twenty (20) days after written notice by the Company to the Executive; or

(v)      any Willful Breach (as defined below) of the Executive's ongoing obligation not to disclose confidential information of the Company Group, any Willful Breach by the Executive of this Agreement, any restrictive covenant agreement with a member of the Company Group by which the Executive is bound, or a material violation of the Company Group's code of conduct or other written policy, which, if capable of being cured, is not cured within twenty (20) days after written notice by the Company to the Executive. For purposes of this Agreement, "Willful Breach" shall mean a material breach by the Executive that is a consequence of an act or failure to act by the Executive, so long as the Executive knew or should have known that the taking of such act or failure to take such act by the Executive would cause a material breach by the Executive of any

representation, warranty, covenant or other agreement of the Executive set forth in the applicable agreement, code or other written policy.

(d)     **BY THE COMPANY WITHOUT CAUSE.** Immediately upon written notice by the Company to the Executive of an involuntary termination without Cause (other than for death or Disability).

(e)     **BY THE EXECUTIVE WITHOUT GOOD REASON.** Upon thirty (30) days' prior written notice by the Executive to the Company of the Executive's voluntary termination of employment for any or no reason (which the Company may, in its sole discretion, make effective earlier than any notice date, <u>provided</u>, that, the Company continues to pay the Executive's Base Salary for the full period of the Executive's notice).

(f)     **BY THE EXECUTIVE FOR GOOD REASON.** The Executive may terminate the Executive's employment hereunder upon written notice of a termination for Good Reason. A termination of employment by the Executive for "Good Reason" means the occurrence of any of the following, in each case, without Executive's written consent: (i) any material diminution of the Executive's duties, title, responsibilities or authority (which, for the avoidance of doubt, shall not include a change in the Executive's reporting structure pursuant to Section 1(a) of this Agreement); (ii) a material reduction of (or a failure to pay or to provide) the Executive's annual Base Salary, other than as part of across-the-board base salary reductions made in connection with an economic downturn or to further the financial needs of the Company that apply in the same manner to all senior executive employees of the Company; (iii) a relocation of the Executive's principal office location more than thirty (30) miles from its then-current location (except for required travel on the Company's business to an extent substantially consistent with the Executive's business travel obligations as of the date hereof); or (iv) a material breach by the Company of a material provision of this Agreement. In order to terminate the Executive's employment for Good Reason, each of the following conditions must be satisfied: (A) the Executive must provide written notice to the Company within thirty (30) days of the first occurrence of the alleged event; (B) the Company must fail to cure such occurrence in all material respects within thirty (30) days following receipt of such written notice described in clause (A); and (C) if the Company fails to cure as described in clause (B), the Executive must actually terminate employment within the thirty (30)-day period following the expiration of the Company's thirty (30)-day cure period.

7.     **CONSEQUENCES OF TERMINATION.**

(a)     **TERMINATION BY THE COMPANY FOR CAUSE, BY THE EXECUTIVE WITHOUT GOOD REASON, OR DUE TO THE EXECUTIVE'S DEATH OR DISABILITY.** In the event that the Executive's employment and the Employment Term are terminated (x) by the Company for Cause, (y) by the Executive without Good Reason, or (z) due to the Executive's death or Disability, the Executive or the Executive's estate, as the case may be, shall be entitled to the following (with the amounts due under Sections 7(a)(i) through 7(a)(iv) hereof to be paid within sixty (60) days following termination of employment, or such earlier date as may be required by applicable law):

(i)     any earned and unpaid Base Salary through the date of termination;

(ii)     any Annual Performance Bonus earned but unpaid with respect to the fiscal year ending on or preceding the date of termination (<u>provided</u>, that, the Executive shall not be entitled to any payment under this <u>Section 7(a)(ii)</u> in the event of the Executive's termination (A) by the Company for Cause or (B) by the Executive without Good Reason);

(iii)     reimbursement for any unreimbursed business expenses incurred through the date of termination;

(iv)     any accrued but unused vacation time in accordance with Company policy; and

(v)     all other accrued and vested payments, benefits or fringe benefits to which the Executive shall be entitled under the terms of any applicable compensation arrangement or benefit, equity or fringe benefit plan or program or grant or this Agreement (collectively, <u>Sections 7(a)(i)</u> through <u>7(a)(v)</u> hereof shall be hereafter referred to as the "<u>Accrued Benefits</u>").

(b)     **TERMINATION BY THE COMPANY WITHOUT CAUSE OR BY THE EXECUTIVE FOR GOOD REASON.** If the Executive's employment and the Employment Term are terminated by (x) the Company other than for Cause (and not due to the Executive's death or Disability) or (y) the Executive for Good Reason, then the Company shall pay or provide the Executive with the following:

(i)     the Accrued Benefits;

(ii)     subject to the Executive's continued compliance with the obligations in <u>Sections 8</u>, <u>9</u> and <u>10</u> hereof, the following payments and benefits (collectively, the "<u>Severance Payments</u>"); <u>provided</u>, that, to the extent that the payment of any amount constitutes "nonqualified deferred compensation" for purposes of "Code Section 409A" (as defined in <u>Section 21</u> hereof), any such payment scheduled to occur during the first sixty (60) days following such termination shall not be paid until the first regularly scheduled pay period following the sixtieth (60th) day following such termination and shall include payment of any amount that was otherwise scheduled to be paid prior thereto.

(A)     an amount equal to twelve (12) months of the Executive's Base Salary (but not as an employee and disregarding any reduction thereof that may constitute Good Reason hereunder), paid monthly in accordance with the Company's payroll practices in effect on the date of termination for a period of twelve (12) months following such termination (the "<u>Severance Period</u>");

(B)     a pro-rata portion of the Annual Performance Bonus for the fiscal year in which the Executive's termination occurs, determined by multiplying (x) the Annual Performance Bonus for the year of termination that the Executive would have received for such fiscal year, based on actual performance, by (y) a fraction, the numerator of which is the number of calendar days that the Executive was employed by the Company during the fiscal year in which such termination occurs, and the denominator of which is three hundred sixty-five (365), which

DocuSign Envelope ID: C7985EA4-875E-42E3-8E53-082B0D2227E0

amount shall be paid in accordance with the timing set forth in Section 4; provided, however, that, for the avoidance of doubt, the requirement set forth in Section 4 that payment of the Annual Performance Bonus is subject to the Executive's continued employment with the Company through the payment date shall not apply; and

               (C)     subject to the Executive timely electing to continue the Executive's coverage, reimbursement for the full amount of the monthly cost of maintaining medical, dental and/or vision benefits for the Executive under a group health plan of the Company for purposes of the Consolidated Omnibus Budget Reconciliation Act of 1985 (as amended, "COBRA"), payable each month for a period of twelve (12) months following the Executive's termination; provided, however, that in the event the Executive becomes eligible for substantially equivalent health insurance coverage in connection with new employment or self-employment, such subsidization of COBRA continuation coverage by the Company shall immediately cease; and provided, further, that the Company may modify the continuation coverage contemplated herein to the extent reasonably necessary to avoid the imposition of any excise taxes on the Company for failure to comply with the nondiscrimination requirements of the Patient Protection and Affordable Care Act of 2010, as amended, and/or the Health Care and Education Reconciliation Act of 2010, as amended (to the extent applicable).

During such time that the Executive is receiving Severance Payments, if, (I) within one hundred twenty (120) days immediately following the Executive's termination date, the Company, acting reasonably and in good faith, discovers grounds constituting Cause existed prior to the Executive's termination of employment, or (II) the Company, acting reasonably and in good faith, discovers the Executive breached any of the restrictive covenants set forth in Section 9 below (and provided, that, such breach is not cured by the Executive (to the extent susceptible to cure) within twenty (20) days after the Company's written notice of such asserted breach to the Executive), then the Executive's right to receive any then-unpaid Severance Payments shall immediately cease and be forfeited, and any payment of the Severance Payments previously paid to the Executive (less amounts previously paid) shall be immediately repaid by the Executive to the Company. For the avoidance of doubt, the Executive shall have the opportunity to cure any grounds constituting Cause under clause (I) above (to the extent susceptible to cure), in accordance with Section 6(c); provided, that, any period during which the Executive has the opportunity cure such grounds shall not count toward the one hundred twenty (120)-day period set forth in clause (I).

Any Severance Payments provided in this Section 7(b) shall be in lieu of any termination or severance payments or benefits for which the Executive may be eligible under any of the plans, policies or programs of the Company or under the Worker Adjustment Retraining Notification Act of 1988 or any similar state statute or regulation.

For the avoidance of doubt, in the event that the Executive dies while receiving Severance Payments under this Section 7(b), the remainder of any amounts owed to the Executive shall be paid to the beneficiary designated in the Company's 401(k) plan, and, if no such designation has been made, to the Executive's estate.

(c)     **OTHER OBLIGATIONS.** Upon any termination of the Executive's employment with the Company, the Executive shall be deemed to have resigned from any position as an officer, director or fiduciary of any Company-related entity.

(d)     **EXCLUSIVE REMEDY.** The amounts payable to the Executive following termination of employment and the Employment Term hereunder pursuant to Section 7 hereof shall be in full and complete satisfaction of the Executive's rights under this Agreement and any other claims that the Executive may have in respect of the Executive's employment with the Company, and the Executive acknowledges that such amounts are fair and reasonable, and are the Executive's sole and exclusive remedy, in lieu of all other remedies at law or in equity, with respect to the termination of the Executive's employment hereunder or any breach of this Agreement.

8.      **RELEASE; SET-OFFS.** Any and all amounts payable and benefits or additional rights provided pursuant to Section 7(b) of this Agreement beyond the Accrued Benefits (other than any payments under Section 7(a)(ii), which shall be subject to this Section 8) shall only be payable if the Executive executes, delivers to the Company and does not revoke a general release of claims in substantially the form attached hereto as Exhibit B. Such release shall be executed and delivered (and no longer subject to revocation, if applicable) within thirty (30) days following termination (or such longer period as may be required to obtain a full and valid release of claims under applicable law). Subject to the provisions of Section 21(b)(v) hereof, the Company's obligations to pay the Executive amounts hereunder shall be subject to set-off, counterclaim or recoupment of amounts determined by a court of competent jurisdiction to be owed by the Executive to the Company which are directly related to the Executive's employment by the Company.

9.      **RESTRICTIVE COVENANTS.**

(a)     **CONFIDENTIALITY.** During the course of the Executive's employment and service with the Company, the Executive has had and will continue to have access to Confidential Information. For purposes of this Agreement, "Confidential Information" means the Company Group's confidential and/or proprietary information and/or trade secrets that have been developed or used and/or will be developed or used during the Executive's employment and/or service with the Company Group and that cannot be obtained readily by third parties from outside sources, including, by way of example and without limitation, all data, information, ideas, concepts, discoveries, trade secrets, inventions (whether or not patentable or reduced to practice), innovations, improvements, know-how, developments, techniques, methods, processes, treatments, drawings, sketches, specifications, designs, patterns, models, plans and strategies, and all other confidential or proprietary information or trade secrets in any form or medium (whether merely remembered or embodied in a tangible or intangible form or medium) whether now or hereafter existing, relating to or arising from the past, current or potential business, activities and/or operations of the Company Group, including, without limitation, any such information relating to or concerning finances, sales, marketing, advertising, transition, promotions, pricing, personnel, customers, suppliers, vendors, raw partners and/or competitors. The Executive agrees that the Executive shall not, directly or indirectly, use, make available, sell, disclose or otherwise communicate to any person, other than in the course of the Executive's assigned duties and for the benefit of the Company Group, either during the period of the Executive's employment or service or at any time thereafter, any Confidential Information or other confidential or proprietary

information received from third parties subject to a duty on the Company Group's part to maintain the confidentiality of such information, and to use such information only for certain limited purposes, in each case, which shall have been obtained by the Executive during the Executive's employment by or service to the Company (or any predecessor). The foregoing shall not apply to information that (i) was disclosed (through no fault, action or inaction of the Executive) or known to the public prior to its disclosure to the Executive; (ii) becomes generally known to the public subsequent to disclosure to the Executive through no act of the Executive or any representative of the Executive in violation of this Agreement or any other written agreement between the Executive and a member of the Company Group; or (iii) the Executive is required to disclose by applicable law, regulation or legal process (provided, that, the Executive provides the Company with prior notice of the contemplated disclosure and reasonably cooperates with the Company at the Company's sole cost and expense in seeking a protective order or other appropriate protection of such information). The terms and conditions of this Agreement shall remain strictly confidential, and, except as required by applicable law, regulation or legal process or in connection with any Claim (as defined below) or the Executive's exercise of any rights or remedies hereunder, the Executive hereby agrees not to disclose the terms and conditions hereof to any person or entity, other than immediate family members, legal advisors or personal tax or financial advisors, or prospective future employers, as to the latter, solely for the purpose of disclosing the limitations on the Executive's conduct imposed by the provisions of this Section 9 who, in each case, the Executive agrees to instruct to keep such information confidential.

(b)     **NON-COMPETITION.** The Executive acknowledges that (i) the Executive performs services of a unique nature for the Company Group, and that the Executive's performance of such services to a competing business may result in irreparable harm to the Company Group, (ii) the Executive has had and will continue to have access to Confidential Information which, if disclosed, may unfairly and inappropriately assist in competition against the Company Group, (iii) in the course of the Executive's employment by a competitor, the Executive may inevitably use or disclose such Confidential Information, (iv) the Company Group has substantial relationships with its customers and the Executive has had and may continue to have access to these customers, (v) the Executive has received and will receive specialized training from the Company Group, and (vi) the Executive has generated and will continue to generate goodwill for the Company Group in the course of the Executive's employment and service. Accordingly, during the Executive's employment or service with the Company Group and for a period of twenty four (24) months thereafter (the "Restricted Period"), the Executive agrees that the Executive will not, directly or indirectly, own, manage, operate, control, be employed by (whether as an employee, consultant, independent contractor or otherwise, and whether or not for compensation) or render services to any person, firm, corporation or other entity, in whatever form, engaged in the business of providing wound care supplies or related wound care evaluation, treatment and management services, ostomy, urological or tracheostomy services and training and education in any setting, whether in a facility, a clinic, in home-based care or otherwise (the "Restricted Business"), within (A) the United States or (B) any other country in which the Company Group conducts the Restricted Business during the Executive's employment or service with the Company Group during the Restricted Period. Notwithstanding the foregoing, nothing herein shall prohibit the Executive from holding for investment as a passive owner up to five percent (5%) of the equity securities or other securities of a publicly traded corporation engaged in a business that is in

competition with the Company Group, so long as the Executive has no active participation in the business operations of such corporation.

(c)      **NON-SOLICITATION; NON-INTERFERENCE.** During the Restricted Period, the Executive agrees that the Executive shall not, except in the furtherance of the Executive's duties hereunder, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, (i) solicit, aid or induce any Person (as defined below) who is, as of the Executive's termination date, or was, during the eighteen (18)-month period immediately preceding the Executive's termination date, a customer of the Company Group to purchase goods or services related to the Restricted Business from another person, firm, corporation or other entity or assist any other person or entity in identifying or soliciting any such customer, (ii) solicit, aid or induce any Person who is, as of the Executive's termination date, or was, within the eighteen (18)-month period prior to such solicitation, aid or inducement, an employee, representative or agent of the Company Group to leave such employment or retention or to accept employment with or render services to or with any other person, firm, corporation or other entity unaffiliated with the Company Group or hire or retain any such Person who is, as of the Executive's termination date, or was, within the eighteen (18)-month period prior to such hiring or retainer, an employee, representative or agent, or take any action to materially assist or aid any other person, firm, corporation or other entity in identifying, hiring or soliciting any such employee, representative or agent; or (iii) intentionally interfere, or intentionally aid or induce any other person or entity in interfering, with the relationship between the Company Group and any of their respective vendors, joint venturers or licensors which causes harm to the Company Group. An employee, representative or agent shall be deemed covered by this Section 9(c) while so employed or retained and for a period of twelve (12) months thereafter. Notwithstanding the foregoing, the provisions of this Section 9(c) shall not be violated by general advertising or solicitation not specifically targeted at Company Group-related persons or entities. For purposes of this Section 9(c), "Person" means any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, joint venture, joint stock company, governmental agency or instrumentality or other entity of any kind.

(d)      **NON-DISPARAGEMENT.** The Executive agrees not to, at any time, make any negative comments or statements or otherwise disparage the Company Group or its officers, directors, employees, shareholders, members, agents or products, other than in the good faith performance of the Executive's duties to the Company Group. Notwithstanding the foregoing provisions of this Section 9(d), nothing in this Section 9(d) shall be deemed to (i) restrict or impede the Executive from exercising the Executive's protected rights (to the extent that such rights cannot be waived by contract) or complying with any applicable law, regulation or legal process, provided, that, (A) such compliance does not exceed the level or extent required by such law, regulation or legal process, and (B) the Executive promptly provides written notice thereof to the Company, to the extent permitted by applicable law, regulation or legal process; or (ii) limit the Executive's right under applicable law, regulation or legal process to make reports to, or cooperate with, any Government Agency (as defined and set forth in more detail in Section 12). Statements made in the course of any such cooperation and statements that are required by applicable law, regulation or legal process (by way of example and not of limitation, sworn statements given in depositions as set forth in Section 9(e)(iii) or Section 12) shall not be subject to this Section 9(d),

DocuSign Envelope ID: C7985EA4-875E-42F3-8E53-082B0D2227E0

provided, that, the Executive makes any such statement with a good-faith belief as to its truthfulness.

(e)    **INVENTIONS.** (i) The Executive acknowledges and agrees that all ideas, methods, inventions, discoveries, improvements, work products, developments, software, know-how, processes, techniques, methods, works of authorship and other work product, whether patentable or unpatentable, (A) that are reduced to practice, created, invented, designed, developed, contributed to, or improved with the use of any Company Group resources and/or within the scope of the Executive's work with the Company Group and that are made or conceived by the Executive, solely or jointly with others, during the period of the Executive's employment or service with the Company Group (or any of its predecessors in interest), whether before or after the Effective Date, or (B) reasonably suggested by any work that the Executive performs in connection with the Company Group (or any of its predecessors in interest), either while performing the Executive's duties with the Company Group (or any of its predecessors in interest) or on the Executive's own time, but only insofar as the Inventions are related to the Executive's work as an employee or other service provider to the Company Group (or any of its predecessors in interest), shall belong exclusively to the Company Group (or its designee), whether or not patent or other applications for intellectual property protection are filed thereon (the "Inventions"). The Executive will keep full and complete written records (the "Records"), in the manner reasonably prescribed by the Company Group, of all Inventions, and will promptly disclose all Inventions completely and in writing to the Company Group. The Records shall be the sole and exclusive property of the Company Group, and the Executive will surrender them upon the termination of the Employment Term, or upon the Company Group's request. The Executive will assign to the Company Group the Inventions and all patents or other intellectual property rights that may issue thereon in any and all countries, whether during or subsequent to the Employment Term, together with the right to file, in the Executive's name or in the name of the Company Group (or its designee), applications for patents and equivalent rights (the "Applications"). The Executive will, at any time during and subsequent to the Employment Term, make such applications, sign such papers, take all rightful oaths, and perform all other acts as may be reasonably requested from time to time by the Company Group to perfect, record, enforce, protect, patent or register the Company Group's rights in the Inventions, all without additional compensation to the Executive from the Company Group, but entirely at the Company Group's sole cost and expense. The Executive will also execute assignments to the Company Group (or its designee) of the Applications, and give the Company Group and its attorneys all reasonable assistance (including the giving of testimony) to obtain the Inventions for the Company Group's benefit, all without additional compensation to the Executive from the Company Group, but entirely at the Company Group's sole cost and expense.

(ii)    In addition, copyrightable works within the Inventions will be deemed Work for Hire, as such term is defined under the copyright laws of the United States, on behalf of the Company Group and the Executive agrees that the Company Group will be the sole owner of the such copyrightable works, and all underlying rights therein, in all media now known or hereinafter devised, throughout the universe and in perpetuity without any further obligations to the Executive. If the Inventions, or any portion thereof, are deemed not to be Work for Hire, or the rights in such Inventions do not otherwise automatically vest in the Company Group, the Executive hereby irrevocably conveys, transfers and assigns to the Company Group, all rights, in all media now known or hereinafter devised, throughout the universe and in perpetuity, in and to the

Inventions, including, without limitation, all of the Executive's right, title and interest in the copyrights (and all renewals, revivals and extensions thereof) to the Inventions, including, without limitation, all rights of any kind or any nature now or hereafter recognized, including, without limitation, the unrestricted right to make modifications, adaptations and revisions to the Inventions, to exploit and allow others to exploit the Inventions and all rights to sue at law or in equity for any infringement, or other unauthorized use or conduct in derogation of the Inventions, whether known or unknown as of the Effective Date, including, without limitation, the right to receive all proceeds and damages from any of the foregoing. In addition, the Executive hereby waives any so-called "moral rights" with respect to the Inventions. To the extent that the Executive has any rights in the results and proceeds of the Executive's service to the Company Group that cannot be assigned in the manner described herein, the Executive agrees to unconditionally waive the enforcement of such rights. The Executive hereby waives any and all currently existing and future monetary rights in and to the Inventions and all patents and other registrations for intellectual property that may issue thereon, including, without limitation, any rights that would otherwise accrue to the Executive's benefit by virtue of the Executive being an employee of or other service provider to the Company Group (or any of its predecessors in interest).

(iii)    18 U.S.C. §1833(b) provides: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement is intended to conflict with 18 U.S.C. §1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. §1833(b). Accordingly, the parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

(f)    **RETURN OF COMPANY PROPERTY.** On the date of the Executive's termination of employment with the Company Group for any reason (or at any time prior thereto at the Company Group's request), the Executive shall return all property within the Executive's possession and/or under the Executive's control and belonging to the Company Group (including, but not limited to, any Company Group-provided laptops, computers, cell phones, wireless electronic mail devices or other equipment, or documents and property belonging to the Company Group).

(g)    **REASONABLENESS OF COVENANTS.** In signing this Agreement, the Executive gives the Company Group assurance that the Executive has carefully read and considered all of the terms and conditions of this Agreement, including the restraints imposed under this <u>Section 9</u>. The Executive agrees that these restraints are necessary for the reasonable and proper protection of the Company Group and its Confidential Information and that each and every one of the restraints is reasonable in respect of subject matter, length of time and geographic area, and that these restraints, individually or in the aggregate, will not prevent the Executive from obtaining other suitable employment during the period in which the Executive is bound by the

restraints. The Executive acknowledges that each of these covenants has a unique, very substantial and immeasurable value to the Company Group and that the Executive has sufficient assets and skills to provide a livelihood while such covenants remain in force. The Executive further covenants that the Executive will not challenge the reasonableness or enforceability of any of the covenants set forth in this <u>Section 9</u>. It is also agreed that each of the Company Group's affiliates will have the right to enforce all of the Executive's obligations to that affiliate under this Agreement, including, without limitation, pursuant to this <u>Section 9</u>.

(h)     **REFORMATION.** If it is determined by a court of competent jurisdiction in any state that any restriction in this <u>Section 9</u> is excessive in duration or scope or is unreasonable or unenforceable under applicable law, it is the intention of the parties that such restriction may be modified or amended by such court to render it enforceable to the maximum extent permitted by the laws of that state.

(i)     **TOLLING.** In the event of any violation of the provisions of this <u>Section 9</u> by the Executive (as determined by a court of competent jurisdiction), the Executive acknowledges and agrees that the post-termination restrictions contained in this <u>Section 9</u> shall be extended by a period of time equal to the period of such violation, it being the intention of the parties hereto that the running of the applicable post-termination restriction period shall be tolled during any period of such violation.

(j)     **SURVIVAL OF PROVISIONS.** The obligations contained in this <u>Section 9</u> and <u>Section 10</u> hereof shall survive the termination or expiration of the Employment Term and the Executive's employment or service with the Company Group and shall be fully enforceable thereafter.

10.     **COOPERATION.** Upon the receipt of notice in accordance with <u>Section 14</u> from the Company Group (including its outside counsel), the Executive agrees that while employed by, or providing services to, the Company Group and thereafter, the Executive will respond and provide information with regard to matters in which the Executive has knowledge as a result of the Executive's employment or service with the Company Group, and will provide reasonable assistance, at the Company Group's sole cost and expense, to the Company Group and its respective representatives in defense of all claims that may be made against the Company Group, and will assist the Company Group in the prosecution of all claims that may be made by the Company Group, to the extent that such claims may relate to the period of the Executive's employment or service with the Company Group. The Executive agrees to promptly inform the Company Group if the Executive becomes actually aware of any lawsuit involving such claims that is explicitly threatened in writing, or of which threat the Executive has actual knowledge, or is filed against the Company Group or its affiliates. The Executive also agrees to promptly inform the Company Group (to the extent that the Executive is legally permitted to do so) if the Executive is asked to assist in any investigation of the Company Group (or their actions), regardless of whether a lawsuit or other proceeding has then been filed against the Company Group with respect to such investigation, and shall not do so unless legally required. Upon presentation of reasonably satisfactory documentation, the Company shall promptly (but in any event, within thirty (30) days of the Company's receipt of such reasonably satisfactory documentation) reimburse the Executive for all reasonable costs and expenses the Executive incurs in connection with the Executive's

performance under this <u>Section 10</u>, and, to the extent the Executive's cooperation under this <u>Section 10</u> occurs following the Executive's termination of employment, the Company shall compensate the Executive for any services performed in connection with the Executive's cooperation under this <u>Section 10</u> at an hourly rate equal to (a) the Executive's Base Salary (at the rate in effect on the employment termination date), divided by (b) 2,080; <u>provided</u>, that, the Executive's performance under this <u>Section 10</u> exceeds five (5) hours in any month, and <u>provided</u>, <u>further</u>, that, no such additional compensation will be required during the Severance Period, to the extent that the Executive is receiving Severance Payments.

11.  **EQUITABLE RELIEF AND OTHER REMEDIES.** The Executive acknowledges and agrees that the Company Group's remedies at law for a breach or threatened breach of any of the provisions of <u>Sections 9</u> or <u>10</u> hereof would be inadequate and, in recognition of this fact, the Executive agrees that, in the event of such a breach or threatened breach, in addition to any remedies at law, the Company Group shall be entitled to seek equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available, without the necessity of showing actual monetary damages or the posting of a bond or other security. In the event that the Company, acting reasonably and in good faith, determines that the Executive has violated <u>Sections 9</u> or <u>10</u> hereof, and provided, that, the Executive does not cure such asserted violation (to the extent susceptible to cure) within twenty (20) days after the Company's written notice of such asserted violation to the Executive, any severance being paid to the Executive pursuant to <u>Section 7(b)</u> of this Agreement or otherwise shall immediately cease, and any Severance Payment previously paid to the Executive shall be immediately repaid to the Company Group in accordance with <u>Section 7(b)</u>, above.

12.  **WHISTLEBLOWER PROTECTION.** The Executive understands that nothing contained in this Agreement limits the Executive's ability to file a charge or complaint with the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission or any other federal, state or local governmental agency or commission ("<u>Government Agencies</u>"). The Executive further understands that this Agreement does not limit the Executive's ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to the Company Group. This Agreement does not limit the Executive's right to receive an award for information provided to any Government Agencies. The Company, on behalf of each member of the Company Group, further agrees that this Agreement does not limit the Executive's right to discuss unlawful acts in the Company Group's workplace, including, but not limited to, sexual harassment, or report possible violations of law or regulation with any federal, state or local government agency.

13.  **NO ASSIGNMENTS.** This Agreement is personal to each of the parties hereto. Except as provided in this <u>Section 13</u> hereof, no party may assign or delegate any rights or obligations hereunder without first obtaining the written consent of the other party hereto. The Company may assign this Agreement to its controlled affiliate or to any successor to all or substantially all of the business and/or assets of the Company; <u>provided</u>, that, the Company shall require such controlled affiliate or successor to expressly assume and agree to perform this

Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place. As used in this Agreement, "Company" shall mean the Company and any controlled affiliate or successor to its business and/or assets, which assumes and agrees to perform the duties and obligations of the Company under this Agreement by operation of law or otherwise.

14. **NOTICE.** For purposes of this Agreement, notices and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given only if delivered by hand or via email (in each case, with confirmation of transmission), and any such notices or other communications shall be deemed to have been delivered (a) on the date of delivery, if delivered by hand, (b) on the date of transmission, if delivered by email, (c) on the first business day following the date of deposit, if delivered by guaranteed overnight delivery service, or (d) on the fourth business day following the date delivered or mailed by United States registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

> If to the Executive:
>
> At the address shown in the books and records of the Company.
>
> With a copy contemporaneously by like means, which shall not constitute notice to:
>
> Employee Counsel-
> Nixon Peabody LLP
> One Citizens Plaza, Suite 500
> Providence, RI 02903-1345
> Attention- Andrew B. Prescott, Senior Counsel
> Email: aprescott@nixonpeabody.com
>
> If to the Company:
> Gordian Medical, Inc.
> 17595 Cartwright Road
> Irvine, CA 92614
> Attention: Kelly Skeat, General Counsel
> Email: Kelly.Skeat@amtwoundcare.com
>
> With a copy contemporaneously by like means, which shall not constitute notice to:
> Kirkland & Ellis LLP 300 North LaSalle
> Chicago, Illinois 60654 Attention: Jeffrey P. Swatzell
> Email: jeffrey.swatzell@kirkland.com

or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

15.     **SECTION HEADINGS; INCONSISTENCY.** The section headings used in this Agreement are included solely for convenience and shall not affect, or be used in connection with, the interpretation of this Agreement. In the event of any inconsistency between the terms of this Agreement and any form, award, plan or policy of the Company Group, the terms of this Agreement shall govern and control.

16.     **SEVERABILITY.** The provisions of this Agreement shall be deemed severable. The invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by applicable law.

17.     **COUNTERPARTS.** This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

18.     **GOVERNING LAW; JURISDICTION.** This Agreement, the rights and obligations of the parties hereto, and all claims or causes of action (whether at law or in equity, in contract, in equity, in statute, in tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the Executive's employment by the Company or any member of the Company Group, or the negotiation, execution or performance thereof, or the transactions contemplated hereby (any such claim or cause of action, a "Claim"), shall be governed by and construed solely and exclusively in accordance with the internal laws of the State of Delaware, including its statutes of limitations, but without regard to the choice of law provisions thereof. Each of the parties agrees that any dispute between the parties shall be resolved solely and exclusively in the courts of the State of Delaware or the United States District Court for the District of Delaware and the appellate courts having jurisdiction of appeals in such courts (the foregoing courts, collectively, the "Chosen Courts"). In that context, and without limiting the generality of the foregoing, each of the parties hereto irrevocably and unconditionally (a) submits in connection with any proceeding relating to any Claim to the sole and exclusive jurisdiction of the Chosen Courts, and agrees that all Claims shall be heard and determined solely and exclusively in the Chosen Courts; (b) consents that any such Claim may and shall be brought solely and exclusively in the Chosen Courts and waives any objection that the Executive or the Company may now or thereafter have to the venue or jurisdiction of any such Claim in any such Chosen Court or that such Claim was brought in an inconvenient court and agrees not to plead or claim the same; (c) WAIVES ALL RIGHT TO TRIAL BY JURY IN CONNECTION WITH ANY CLAIM; (d) agrees that service of process in connection with any such Claim may be effected by delivering a copy of such process to such party as provided in Section 14 hereof; and (e) agrees that nothing in this Agreement shall affect the right to effect service of process in any other manner permitted by the laws of the State of Delaware. Each party shall pay all of its own costs and expenses, including, without limitation, its own legal fees and expenses.

19.     **MISCELLANEOUS.** No provision of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing and signed by

DocuSign Envelope ID: C7985EA4-875E-42F3-9FE3-082B0D2227F0

the Executive and an authorized representative of the Company. No waiver by either party hereto at any time of any breach by the other party hereto of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. This Agreement, together with all exhibits hereto, as well as any additional agreements, certificates, documents or instruments referenced herein, sets forth the entire agreement of the parties hereto in respect of the subject matter contained herein and supersedes any and all prior agreements, covenants, representations, warranties or understandings, oral or written, express or implied, between the Executive and the Company with respect to the subject matter hereof (including, without limitation, the Prior Agreement). No agreements, covenants, representations, warranties or understandings, oral or written, express or implied, in respect of the subject matter contained herein have been made by either party which are not expressly set forth in this Agreement.

20.     **REPRESENTATIONS.** Each party hereby represents and warrants to the other party, as of the Effective Date, that (a) the representing party has the legal right to enter into this Agreement and to perform all of the obligations on the representing party's part to be performed hereunder in accordance with its terms, and (b) the representing party is not a party to any agreement or understanding, written or oral, and is not subject to any restriction, which, in either case, would violate any provision of this Agreement.

21.     **TAX MATTERS**.

(a)     **WITHHOLDING.** The Company Group may withhold from any and all amounts payable under this Agreement or otherwise such federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

(b)     **SECTION 409A COMPLIANCE**.

(i)     To the extent applicable, the intent of the parties is that payments and benefits under this Agreement be exempt from, or comply with, Internal Revenue Code Section 409A and the regulations and guidance promulgated thereunder (collectively "Code Section 409A") and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted accordingly. To the extent that any provision hereof is modified in order to comply with Code Section 409A, such modification shall be made in good faith and shall, to the maximum extent reasonably possible, maintain the original intent and economic benefit to the Executive and the Company of the applicable provision without violating the provisions of Code Section 409A. In no event whatsoever shall the Company Group be liable for any additional tax, interest or penalty that may be imposed on the Executive by Code Section 409A or damages for failing to comply with Code Section 409A.

(ii)     To the extent any payment or benefit hereunder is non-qualified deferred compensation for purposes of Code Section 409A and such payment or benefit is payable upon or following a termination of employment, then a termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for such payment or benefit unless and until such termination is also a "separation from service" within the meaning of Code Section 409A and, for purposes of any such provision of this Agreement, references to a

- 17 -

DocuSign Envelope ID: C7985FA4-875F-42F3-8F53-082B0D2227F0

"termination," "termination of employment" or like terms shall mean "separation from service." Notwithstanding anything to the contrary in this Agreement, if the Executive is deemed on the date of termination to be a "specified employee" within the meaning of that term under Code Section 409A(a)(2)(B), then with regard to any payment or the provision of any benefit that is considered "nonqualified deferred compensation" under Code Section 409A payable on account of a "separation from service," such payment or benefit shall not be made or provided until the date which is the earlier of (A) the expiration of the six (6)-month period measured from the date of such "separation from service" of the Executive, and (B) the date of the Executive's death, to the extent required under Code Section 409A. Upon the expiration of the foregoing delay period, all payments and benefits delayed pursuant to this Section 21(b)(ii) (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to the Executive in a lump sum, and all remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein.

(iii)     To the extent that reimbursements or other in-kind benefits under this Agreement constitute "nonqualified deferred compensation" for purposes of Code Section 409A, (A) all expenses or other reimbursements hereunder shall be made on or prior to the last day of the taxable year following the taxable year in which such expenses were incurred by the Executive, (B) any right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, and (C) no such reimbursement, expenses eligible for reimbursement, or in-kind benefits provided in any taxable year shall in any way affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year.

(iv)     For purposes of Code Section 409A, the Executive's right to receive installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments. Whenever a payment under this Agreement specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Company.

(v)     Notwithstanding any other provision of this Agreement to the contrary, in no event shall any payment or benefit under this Agreement that constitutes "nonqualified deferred compensation" for purposes of Code Section 409A be subject to offset by any other amount unless otherwise permitted by Code Section 409A.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF,** the parties hereto have executed this Employment Agreement  as of the Effective Date.

Gordian Medical, Inc.

By: _Steve McLaughlin_
_CC0CE286323943F..._           _____
Name: Steve McLaughlin
Title: Chief Executive Officer

**AMT ULTIMATE HOLDINGS, LP, solely
for purposes of <u>Section 5(g)</u>.**

By:   OEP VII General Partner, L.P.
Its:   General Partner

By: _Gregory Belinfanti_____
      DocuSigned by:
      9FA8334BAF574C0...
Name: Gregory Belinfanti
Title: Authorized Signatory

*Employment Agreement Signature Page*

**EXECUTIVE:**

_Misty Vaughn_

0E9BA969C66C464...

Name: Misty Vaughn

EFiled:  Mar 04 2022 06:16PM EST
Transaction ID 67368809
Case No. 2022-0210-

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GORDIAN MEDICAL, INC. *d/b/a*    :
AMERICAN MEDICAL    :
TECHNOLOGIES and AMT    :
ULTIMATE HOLDINGS, L.P.,    :
  :
      Plaintiffs,    :
  :     C.A. No. 2022-_____-_____
    v.    :
  :
MISTY VAUGHN and CURITEC,    :
LLC,    :
      Defendants.

## <u>VERIFICATION</u>

I, Kelly Skeat, pursuant to 10 Del. C. § 3927, hereby declare:

1.　　I am the General Counsel for Plaintiff Gordian Medical, Inc., d/b/a American Medical Technologies ("AMT").

2.　　I am authorized to make this Verification pursuant to 10 Del. C. § 3927, and in accordance with  Standing Order No. 9, dated January 28, 2022, regarding the suspension of any requirements for sworn declarations, verifications, certificates, statements, oaths, or affidavits in filings with *inter alia* the Court of Chancery.

3.　　I have reviewed Plaintiff's Verified Complaint ("Complaint").  To the extent the allegations in the Complaint concern my personal actions, or matters of which I have direct personal knowledge, I know those allegations to be true and

correct.  To the extent the allegations of the Complaint concern the actions of parties other than myself, or matters of which I do not have direct personal knowledge, I believe those allegations to be true and correct.

I declare under penalty of perjury under the laws of Delaware that the foregoing is true and correct.

Executed on the 4th day of March, 2022.

Kelly Skeat, General Counsel

EFiled:  Mar 04 2022 06:16PM EST
Transaction ID 67368809
Case No. 2022-0210-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GORDIAN MEDICAL, INC. *d/b/a* :
AMERICAN MEDICAL :
TECHNOLOGIES and AMT :
ULTIMATE HOLDINGS, L.P., :
 :
  Plaintiffs, :
 :
  v.   :  C.A. No. 2022-_____-_____
 :
MISTY VAUGHN and CURITEC, :
LLC, :
 
  Defendants.

## <u>VERIFICATION</u>

I, Kelly Skeat, pursuant to 10 Del. C. § 3927, hereby declare:

1. I am the General Counsel for Plaintiff AMT Ultimate Holdings, L.P.

("Holdings").

2. I am authorized to make this Verification pursuant to 10 Del. C. §

3927, and in accordance with  Standing Order No. 9, dated January 28, 2022,

regarding the suspension of any requirements for sworn declarations, verifications,

certificates, statements, oaths, or affidavits in filings with *inter alia* the Court of

Chancery.

3. I have reviewed Plaintiff's Verified Complaint ("Complaint").  To the

extent the allegations in the Complaint concern my personal actions, or matters of

which I have direct personal knowledge, I know those allegations to be true and

correct.  To the extent the allegations of the Complaint concern the actions of

parties other than myself, or matters of which I do not have direct personal

knowledge, I believe those allegations to be true and correct.

I declare under penalty of perjury under the laws of Delaware that the

foregoing is true and correct.

Executed on the 4th day of March, 2022.

General Counsel

EFiled:  Mar 04 2022 06:16PM EST
Transaction ID 67368809
Case No. 2022-0210-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GORDIAN MEDICAL, INC.          :
*d/b/a* AMERICAN MEDICAL        :
TECHNOLOGIES and AMT           :
ULTIMATE HOLDINGS, L.P.,       :
                               :
      Plaintiffs,     :
                               :     C.A. No. 2022-_____-_____
    v.              :
                               :
MISTY VAUGHN and               :
CURITEC, LLC,                  :
                               :
      Defendants.     :

## <u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

Pursuant to Court of Chancery Rule 65, Plaintiffs Gordian Medical, Inc., *d/b/a*

American Medical Technologies ("AMT") and AMT Ultimate Holdings, L.P.

("Holdings"), hereby requests a Preliminary Injunction, pending a final

determination on the merits, enjoining Defendant Misty Vaughn ("Vaughn") from

breaching the terms of her Employment Agreement with AMT (the "Agreement")

and from breaching the terms of her Incentive Unit Grant Agreement with AMT and

Holdings (the "Equity Agreement") by remaining employed with Defendant Curitec,

LLC ("Curitec"), possessing or using confidential, proprietary and/or trade secret

information belonging to AMT and/or Holdings, and from soliciting any employees

or clients of AMT and/or Holdings, and enjoining Defendant Curitec from

employing or otherwise engaging in any business with Vaughn, possessing or using

confidential, proprietary and trade secret information belonging to AMT and/or

Holdings, and from soliciting employees or clients of AMT and/or Holdings learned of, or through the use of, any information obtained from Vaughn. The grounds for this motion shall be set forth in greater detail in Plaintiffs' forthcoming opening brief.

COLE SCHOTZ P.C.

Of Counsel

Ryan J. Morley*
John W. Hofstetter*
LITTLER MENDELSON, P.C.
Key Tower
127 Public Square, Suite 1600
Cleveland, OH 44114
(216) 696-7600 (Phone)
(216) 696-2038 (Fax)
rmorley@littler.com
jhofstetter@littler.com

*/s/ Andrew L. Cole*
Andrew L. Cole (Bar No. 5712)
Jack M. Dougherty (Bar No. 6784)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
(302) 652-3131 (Phone)
(302) 652-3117 (Fax)
acole@coleschotz.com
jdougherty@coleschotz.com
[Words:  169]

*Counsel for Plaintiffs,*
*Gordian Medical, Inc.,*
*d/b/a American Medical Technologies*
*and  AMT Ultimate Holdings, L.P.*

*\* Motion for Admission Pro Hac Vice
Forthcoming*

Dated:  March 4, 2022

**EFiled:  Mar 04 2022 06:16PM EST**
**Transaction ID 67368809**
**Case No. 2022-0210-**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| GORDIAN MEDICAL, INC. | : |
| *d/b/a* AMERICAN MEDICAL | : |
| TECHNOLOGIES and AMT | : |
| ULTIMATE HOLDINGS, L.P., | : |
| | : |
| Plaintiffs, | : |
| | :     C.A. No. 2022-_____-_____ |
| v. | : |
| | : |
| MISTY VAUGHN and | : |
| CURITEC, LLC, | : |
| | : |
| Defendants. | : |

### PLAINTIFFS' MOTION FOR EXPEDITED PROCEEDINGS

Plaintiffs Gordian Medical, Inc., d/b/a American Medical Technologies ("AMT") and AMT Ultimate Holdings, L.P., by and through their undersigned counsel move this Court for an Order expediting these proceedings by requiring prompt responses to the Verified Complaint (the "Complaint"), setting dates for expedited discovery and an expedited date for presentation of Plaintiffs' Motion for Preliminary Injunction,[1] and setting a schedule for the presentation of further injunction proceedings as may be required under Rule 65.  In support of this Motion for Expedited Proceedings ("Motion"), Plaintiffs aver as follows:

---

[1] Plaintiffs' Complaint and Motion for Preliminary Injunction are being filed contemporaneously with this Motion.

## I.   FACTUAL BACKGROUND

1.     Plaintiffs have commenced an action for injunctive relief by way of a Verified Complaint ("Complaint") filed contemporaneously herewith against Defendants Misty Vaughn ("Vaughn") and Curitec, LLC ("Curitec") (collectively, "Defendants").  Plaintiffs requests a preliminary injunction to, *inter alia*, to prevent Vaughn and her new employer, Curitec, one of AMT's largest and most direct competitors, from causing further irreparable harm to AMT's business.

2.     Founded in 1994, AMT is a senior care company focused on delivering outcome-driven programs to health care providers in the long-term care and post-acute environments.  With over 25 years of industry experience, AMT is the leading independent provider of wound care solutions for long-term care facilities in the United States. (Compl., ¶ 4).

3.     As set forth more fully in Plaintiff's Complaint, Vaughn had been an employee of AMT since 2001.  Leading up to her abrupt resignation on January 12, 2022, Vaughn held one of AMT's most important positions – Senior Vice President of Post-Acute Operations & Clinical Services.  (Compl., ¶ 5).

4.     As Senior Vice President of Post-Acute Operations & Clinical Services, Vaughn played a key role in negotiating the Company's supply agreements and is aware of the formulary, pricing, payment, and other terms that AMT was able to

negotiate.  Vaughn also worked on numerous strategic initiatives on behalf of AMT. (Compl., ¶¶ 22, 23).

5.     In addition, during her tenure with AMT, Vaughn played a leading role in developing the formulary used by AMT's clinicians in the field.  This formulary is one of AMT's trade secrets. (Compl., ¶ 24).

6.     During her tenure with AMT, Vaughn also worked on developing the metrics and reporting systems used within AMT, which assess performance, evaluate employees, and improve financial performance.  These are also some of AMT's trade secrets. (Compl., ¶ 25).

7.     During her tenure with AMT, Vaughn was the clinical lead in developing a new software program for AMT.  This program has been a significant, years-long initiative and investment, and its components include product selection, billing compliance, and other items that are also some of AMT's trade secrets. (Compl., ¶ 26).

8.     As part of its services to nursing facilities, AMT conducts regular business and clinical reviews with clients.  During her tenure with AMT, Vaughn was a key part of these meetings with customer executives and was presented as the company's lead clinical and product specialist.   This has also given her extensive knowledge of AMT's largest customers.  Such knowledge could be used or exploited to Curitec's competitive advantage. (Compl., ¶ 28).

9.     On June 10, 2021, Vaughn executed the Agreement.  (Compl., ¶ 32).

10.     Vaughn acknowledged that, as part of her employment with AMT, she would have access to Confidential Information. (Compl., ¶ 33).

11.     Section 9(a) of the Agreement defines the term "Confidential Information" to include, by way of example:

> all data, information, ideas, concepts, discoveries, trade secrets, inventions (whether or not patentable or reduced to practice), innovations, improvements, know-how, developments, techniques, methods, processes, treatments, drawings, sketches, specifications, designs, patterns, models, plans and strategies, and all other confidential or proprietary information or trade secrets in any form or medium (whether merely remembered or embodied in a tangible or intangible form or medium) whether now or hereafter existing, relating to or arising from the past, current or potential business, activities and/or operations of the Company Group, including, without limitation, any such information relating to or concerning finances, sales, marketing, advertising, transition, promotions, pricing, personnel, customers, suppliers, vendors, raw partners and/or competitors.

(Compl., ¶ 33).

12.     Section 9 of the Agreement prohibits Vaughn from using or disclosing AMT's Confidential Information to any person or entity except as necessary to perform her duties at AMT.  (Compl., ¶ 34).

13.     The Agreement requires Vaughn to, upon the termination of her employment with AMT, return to AMT all Confidential Information and other AMT property in her possession.  (Compl., ¶ 35).

14.     In the Agreement, Vaughn specifically acknowledges that, because of her high-level position and her access to AMT's Confidential Information, AMT could suffer irreparable harm if Vaughn provided similar services for an AMT competitor after her separation from AMT.  (Compl., ¶ 36).

15.     Accordingly, Vaughn agreed that, while employed at AMT and for twenty-four (24) months following the end of her employment she would not:

> directly or indirectly, own, manage, operate, control, be employed by (whether as an employee, consultant, independent contractor or otherwise, and whether or not for compensation) or render services to any person, firm, corporation or other entity, in whatever form, engaged in the business of providing wound care supplies or related wound care evaluation, treatment and management services, ostomy, urological or tracheostomy services and training and education in any setting, whether in a facility, a clinic, in home-based care or otherwise (the "Restricted Business"), within (A) the United States or (B) any other country in which the Company Group conducts the Restricted Business during the Executive's employment or service with the Company Group during the Restricted Period.

(Compl., ¶ 37).

16.     Additionally, Vaughn agreed that for twenty-four (24) months following termination of her employment, she would not:

> directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, (i) solicit, aid or induce any Person (as defined below) who is, as of the Executive's termination date, or was, during the eighteen (18)-month period immediately preceding the Executive's termination date, a customer of the Company

5

Group to purchase goods or services related to the Restricted Business from another person, firm, corporation or other entity or assist any other person or entity in identifying or soliciting any such customer, (ii) solicit, aid or induce any Person who is, as of the Executive's termination date, or was, within the eighteen (18)-month period prior to such solicitation, aid or inducement, an employee, representative or agent of the Company Group to leave such employment or retention or to accept employment with or render services to or with any other person, firm, corporation or other entity unaffiliated with the Company Group or hire or retain any such Person who is, as of the Executive's termination date, or was, within the eighteen (18)-month period prior to such hiring or retainer, an employee, representative or agent, or take any action to materially assist or aid any other person, firm, corporation or other entity in identifying, hiring or soliciting any such employee, representative or agent; or (iii) intentionally interfere, or intentionally aid or induce any other person or entity in interfering, with the relationship between the Company Group and any of their respective vendors, joint venturers or licensors which causes harm to the Company Group.

(Compl., ¶ 38).

17.     Pursuant to the Agreement, Vaughn agreed that any violation of the non-competition, non-solicitation, or confidentiality provisions would cause AMT irreparable harm and AMT would be entitled to injunctive relief, in addition to other remedies.  (Compl., ¶ 39).

18.     The Agreement is governed by the laws of the State of Delaware. (Compl., ¶ 40).

19.     Vaughn and AMT consented to the exclusive jurisdiction of the courts of the State of Delaware and the federal courts of the United States of America located in the District of Delaware.  (Compl., ¶ 41).

20.     The Agreement makes clear that Vaughn's contractual duties survive the termination of her employment with AMT.  (Compl., ¶ 42).

21.     On July 31, 2021, AMT's indirect equity holder, AMT Ultimate Holdings, L.P., a Delaware limited partnership, issued Vaughn equity in the Company.   Only a limited number of senior executives of AMT received such equity.   Vaughn executed an Equity Agreement which contained, among other things, restrictive covenants to which she agreed to comply.   The restrictive covenants mirror that of the Agreement. (Compl., ¶ 43).

22.     Vaughn acknowledged that, as part of her employment with Holdings, she would have access to Confidential Information, defined in Annex A of the Equity Agreement to include, by way of example:

> all data, information, ideas, concepts, discoveries, trade secrets, inventions (whether or not patentable or reduced to practice), innovations, improvements, know-how, developments, techniques, methods, processes, treatments, drawings, sketches, specifications, designs, patterns, models, plans and strategies, and all other confidential or proprietary information or trade secrets in any form or medium (whether merely remembered or embodied in a tangible or intangible form or medium) whether now or hereafter existing, relating to or arising from the past, current or potential business, activities and/or operations of the Affiliated Companies, including,

> without limitation, any such information relating to or
> concerning finances, sales, marketing, advertising,
> transition, promotions, pricing, personnel, customers,
> suppliers, vendors, raw partners and/or competitors.

(Compl., ¶ 44).

23.     Annex A, § 1 of the Equity Agreement prohibits Vaughn from using or

disclosing the Confidential Information of Holdings and its subsidiaries (the

"Affiliated Companies") to any person or entity except as necessary to perform her

duties at the Affiliated Companies. (Compl., ¶ 45).

24.     The Equity Agreement requires Vaughn to, upon the termination of her

employment with the Affiliated Companies, return to the Affiliated Companies all

Confidential Information and other Affiliated Companies property in her possession.

(Compl., ¶ 46).

25.     In the Equity Agreement, Vaughn specifically acknowledges that,

because of her high-level position and her access to the Affiliated Companies'

Confidential Information, the Affiliated Companies could suffer irreparable harm if

Vaughn provided similar services for a competitor of the Affiliated Companies after

her separation from the Affiliated Companies.  (Compl., ¶ 47).

26.     Accordingly, Vaughn agreed that, while employed at the Affiliated

Companies and for twenty-four (24) months following the end of her employment

she would not:

> directly or indirectly, own, manage, operate, control, be employed by (whether as an employee, consultant, independent contractor or otherwise, and whether or not for compensation) or render services to any person, firm, corporation or other entity, in whatever form, engaged in the business of providing wound care supplies or related wound care evaluation, treatment and management services, ostomy, urological or tracheostomy services and training and education in any setting, whether in a facility, a clinic, in home-based care or otherwise (the "Restricted Business"), within (A) the United States or (B) any other country in which the Affiliated Companies conduct the Restricted Business during Grantee's employment or service with the Affiliated Companies during the Restricted Period.

(Compl., ¶ 48).

27.     Additionally, Vaughn agreed that for eighteen (18) months following

termination of her employment, she would not:

> directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, (i) solicit, aid or induce any Person (as defined below) who is, as of Grantee's termination date, or was, during the eighteen (18)-month period immediately preceding Grantee's termination date, a customer of the Affiliated Companies to purchase goods or services related to the Restricted Business from another person, firm, corporation or other entity or assist any other person or entity in identifying or soliciting any such customer, (ii) solicit, aid or induce any Person who is, as of Grantee's termination date, or was, within the eighteen (18)-month period prior to such solicitation, aid or inducement, an employee, representative or agent of the Affiliated Companies to leave such employment or retention or to accept employment with or render services to or with any other person, firm, corporation or other entity unaffiliated with the Affiliated Companies or hire or retain any such Person

> who is, as of Grantee's termination date, or was, within the eighteen (18)-month period prior to such hiring or retainer, an employee, representative or agent, or take any action to materially assist or aid any other person, firm, corporation or other entity in identifying, hiring or soliciting any such employee, representative or agent; or (iii) intentionally interfere, or intentionally aid or induce any other person or entity in interfering, with the relationship between the Affiliated Companies and any of their respective vendors, joint venturers or licensors which causes harm to the Affiliated Companies.

(Compl., ¶ 49).

28.    The Equity Agreement is governed by the laws of the State of Delaware. (Compl., ¶ 50).

29.    Vaughn, AMT and Holdings consented to the exclusive jurisdiction of the courts of the State of Delaware and the federal courts of the United States of America located in the District of Delaware.  (Compl., ¶ 51).

30.    The Equity Agreement makes clear that Vaughn's contractual duties survive the termination of her employment with AMT.

31.    On January 12, 2022, Vaughn resigned from her employment with AMT, to, in her own words, pursue her passion for travel and birdwatching, manage rental properties she owned, and spend time with friends and family. (Compl., ¶ 59).

32.    Despite her representation that she was merely planning to travel and pursue other personal interests, on February 7, 2022, Vaughn herself confirmed to AMT that she had immediately taken a position with Curitec. (Compl., ¶ 60).

33.     On February 11, 2022, AMT sent Vaughn a letter, informing her that her employment with Curitec violated the Agreement, including its non-compete provisions. (Compl., ¶ 62).

34.     AMT demanded that Vaughn cease and desist any further unlawful activity, and asked Vaughn to confirm in writing, that Vaughn has resigned her employment with Curitec. (Compl., ¶ 63).

35.     To date, neither Vaughn nor Curitec have provided assurances that Vaughn is no longer violating her Agreement. (Compl., ¶ 63).

36.     Upon information and belief, despite being aware of her contractual obligations, Vaughn sought employment with one of AMT's and the Affiliated Companies' biggest competitors—Curitec. (Compl., ¶ 65).

37.     Curitec has been aware, at all relevant times, of Vaughn's former employment with AMT and her post-employment obligations to AMT and Holdings in the Agreement described above. (Compl., ¶ 67).

38.     Indeed, Curitec's communications to AMT specifically referenced its awareness of the Agreement. (Compl., ¶ 68).

39.     Nonetheless, Curitec knowingly and intentionally employed Vaughn in a position that violates Vaughn's noncompetition obligations. (Compl., ¶ 69).

## II.    ARGUMENT

### A.    Legal Standard

40.    This Court has broad powers to order expediting proceedings.  *See* Court of Chancery Rules 12, 26, 30, 33 and 34.  The standard for expediting proceedings is low.  Specifically, good cause exists to grant a motion to expedite where "a plaintiff ... articulate[s] a sufficiently colorable claim and show[s] a sufficient possibility of a threatened irreparable injury."  *Gomi Investors LLC v. Schimmell Holdings, Inc*., 2006 WL 2304035 (Del. Ch. July 27, 2006).

41.    "'In assessing a motion to expedite, the Court need not – and, indeed should not – make factual findings.  It is, instead, guided by the well-pled, verified allegations of the Complaint.'  At this procedural stage, the plaintiff receives the benefit of all reasonably conceivable inferences."  *Sinchareonkul v. Fahnemann*, 2015 WL 292314, at *1 (Del. Ch. Jan. 22, 2015) (quoting *Shocking Techs., Inc. v. Michael*, 2012 WL 165561, at *1 (Del. Ch. Jan. 10, 2012)).

42.    The Delaware Court of Chancery "traditionally has acted with a certain solicitude for plaintiffs" and "has followed the practice of erring on the side of more [expedited] hearing rather than fewer."  *Giammargo v. Snapple Beverage Corp*., 1994 WL 672698, at *2 (Del. Ch. Nov. 15, 1994).  As a result, "[a] party's request to schedule an application for a preliminary injunction, and to expedite the discovery related thereto, is normally routinely granted.  Exceptions to that norm are rare."  *In*

12

*re Int'l Jenson, Inc. Shareholder Litigation*, 1996 WL 422345, at *1 (Del. Ch. July 13, 1996).

**B.    Plaintiffs have Stated Colorable Claims Against Defendants.**

43.    The first requirement for expedited treatment is the existence of a "colorable claim showing that the hearing is warranted." *Sinchareonkul*, 2015 WL 292314, at *4. "[T]he standard for expedition, colorability, which simply implies a non-frivolous set of issues, is even lower than the 'conceivability' standard applied on a motion to dismiss." *Id.* at *1, n.1 (citing *In re BioClinica, Inc. Shareholder Litigation*, 2013 WL 5631233, at *1 n.1 (Del. Ch. Oct. 16, 2013)).

**1.    *Plaintiffs have Stated Colorable Claims for Breach of Contract.***

44.    Under Delaware law, the elements of a breach of contract claim are a contractual obligation, a breach of that obligation, and resulting damages. *See Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. 2005).

45.    Vaughn and AMT are parties to the Agreement. (Compl., ¶ 32).

46.    Vaughn, AMT and Holdings are parties to the Equity Agreement (Compl., ¶ 43).

47.    AMT alleges that Vaughn has breached the Agreement and the Equity Agreement by *inter alia* working for a competitor of AMT (Curitec) within twenty-four (24) months of Vaughn ending her employment with AMT and her working in

a position that has similar, if not identical, duties and responsibilities to those she had with AMT. (Compl., ¶ 80).

48.    As a result of Vaughn's breaches of the Agreement and Equity Agreement, Plaintiffs have suffered, immediate and irreparable harm for which Plaintiffs have no adequate remedy at law. (Compl., ¶ 81).

49.    For these reasons, Plaintiffs have stated colorable claims for breach of contract.

### 2.    *AMT Has Stated a Colorable Claim for Tortious Interference with Contract*

50.    Under Delaware law, the elements of a claim for tortious interference with contract are (1) a contract, (2) about which the defendant knew, and (3) an intentional act that is a significant factor in causing the breach, (4) without justification, and (5) causing injury.  *See Bhole, Inc. v. Shore Investments, Inc.*, 67 A.3d 444, 453 (Del. 2013).

51.    Vaughn and AMT are parties to the Agreement. (Compl., ¶ 32).

52.    Vaughn, AMT and Holdings are parties to the Equity Agreement (Compl., ¶ 43).

53.    Curitec was aware of the Agreements. (Compl., ¶ 87).

54.    Upon information and belief, Curitec intentionally and without justification solicited Vaughn in order to directly compete with AMT (Compl., ¶ 88).

55.    Curitec lacked justification to induce Vaughn to breach her Agreements. (Compl., ¶ 88).

56.    By such action, Curitec caused and continues to cause Plaintiffs immediate and irreparable harm for which it has no adequate remedy at law. (Compl., ¶ 90).

### C.    Plaintiffs Have Established Sufficient Harm to Support Expedited Proceedings.

57.    Plaintiffs have established that they will be subjected to imminent, irreparable harm in the event that Vaughn continues to aid Curitec in its competition with AMT and Holdings.

58.    Vaughn has knowingly, continuously, and repeatedly breached her Agreements and violated Delaware law, by taking and using AMT's confidential and proprietary information on behalf of her new employer Curitec, and by soliciting and servicing AMT clients, either directly or indirectly, for her and Curitec's benefit. *See Newell Rubbermaid Inc. v. Storm*, 2014 WL 1266827, at *11 (Del. Ch. 2014); *Deloitte & Touche USA LLP v. Lamela*, 2005 WL 2810719, at *1 (Del. Ch. 2005).

59.    Moreover, Vaughn has contractually stipulated that her breaches of the Agreement would cause AMT irreparable harm and entitle AMT to injunctive relief. (Compl., ¶ 39).  Delaware courts have repeatedly held that "contractual stipulations as to irreparable harm alone suffice to establish that element for the purpose of

issuing…injunctive relief." *See AM General Holdings LLC v. Renco Grp., Inc.*, Civ. No. 2012 WL 6681994, at *4 (Del. Ch. 2012).

60.     Consequently, Plaintiffs have suffered and will continue to suffer irreparable harm unless injunctive relief is granted.  This threat is imminent given that (1) Vaughn has been working for a direct competitor of AMT and the Affiliated Companies (Curitec) within the Restrictive Periods following her employment with AMT and Holdings, and her working in a position that has similar, if not identical, duties and responsibilities to those she had with AMT and Holdings, in violation of the Agreement and the Equity Agreement, and (2) there is no indication that Vaughn and Curitec will cease these efforts unless enjoined.

## CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the Court enter an order in the form submitted herewith setting this case for expedited resolution.  A proposed form of order is presented with this motion for the Court's consideration.

COLE SCHOTZ P.C.

/s/ Andrew L. Cole

Of Counsel

Andrew L. Cole (Bar No. 5712)
Jack M. Dougherty (Bar No. 6784)
Ryan J. Morley*
500 Delaware Avenue, Suite 1410
John W. Hofstetter*
Wilmington, Delaware 19801
LITTLER MENDELSON, P.C.
(302) 652-3131 (Phone)
Key Tower
(302) 652-3117 (Fax)
127 Public Square, Suite 1600
acole@coleschotz.com
Cleveland, OH 44114
jdougherty@coleschotz.com
(216) 696-7600 (Phone)
[Words: 3,376]
(216) 696-2038 (Fax)
rmorley@littler.com
jhofstetter@littler.com

*Counsel for Plaintiffs,*
*Gordian Medical, Inc.,*
*d/b/a American Medical Technologies*
*and AMT Ultimate Holdings, L.P.*

*\* Motion for Admission Pro Hac Vice*
*Forthcoming*

Dated: March 4, 2022

EFiled:  Mar 04 2022 06:16PM EST
Transaction ID 67368809
Case No. 2022-0210-

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GORDIAN MEDICAL, INC.    :
*d/b/a* AMERICAN MEDICAL    :
TECHNOLOGIES and AMT    :
ULTIMATE HOLDINGS, L.P.,    :
                                  :
      Plaintiffs,    :
                                    :     C.A. No. 2022-_____-\_\_\_\_\_
     v.    :
                                    :
MISTY VAUGHN and    :
CURITEC, LLC,    :
                                    :
      Defendants.    :

## [PROPOSED] PRELIMINARY INJUNCTION ORDER

AND NOW, this _____ day of _____, 2022, the Court having considered Plaintiffs' Motion for Preliminary Injunction Order, the parties' arguments related thereto, and good cause appearing, IT IS HERBY ORDERED AND DECREED that:

1.    Gordian Medical, Inc., d/b/a American Medical Technologies ("AMT") and AMT Ultimate Holdings, L.P.'s ("Holdings") Motion for Preliminary Injunction Order is GRANTED;

2.    Defendant Misty Vaughn ("Vaughn") is enjoined from directly or indirectly owning, managing, operating, controlling, being employed by (whether as an employee, consultant, independent contractor or otherwise, and whether or not for compensation) or rendering services to any person, firm, corporation or other entity, in whatever form, engaged in the business of providing wound care supplies

or related wound care evaluation, treatment and management services, ostomy, urological or tracheostomy services and training and education in any setting, whether in a facility, a clinic, in home-based care or otherwise (the "Restricted Business"), within (A) the United States or (B) any other country in which AMT and/or Holdings conducts the Restricted Business during Vaugn's employment or service with AMT and/or Holdings.

3. Defendant Vaughn shall comply with the terms of her Employment Agreement and Equity Agreement, and the restrictive covenants contained therein;

4. Defendant Vaughn shall to return all AMT and Holdings information, documents, data, files, and materials, including electronically stored information, in her possession, custody, and/or control;

5. This Order is conditioned on, and shall take effect after, the posting of a bond for the sum of $_____ conditioned on payment of damages to any person who may be wrongfully restrained or enjoined.


_____
[Vice] Chancellor

**EFiled:  Mar 04 2022 06:16PM EST**
**Transaction ID 67368809**
**Case No. 2022-0210-**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GORDIAN MEDICAL, INC.      :
*d/b/a* AMERICAN MEDICAL    :
TECHNOLOGIES and AMT     :
ULTIMATE HOLDINGS, L.P.,    :
                                 :
        Plaintiffs,       :
                                 :     C.A. No. 2022-_____-_____
    v.                   :
                                 :
MISTY VAUGHN and         :
CURITEC, LLC,           :
                                 :
        Defendants.     :

## [*PROPOSED*] ORDER GRANTING
## PLAINTIFFS' MOTION FOR EXPEDITED PROCEEDINGS

AND NOW, this _____ day of _____, 2022, the Court having

considered Plaintiffs' Motion for Expedited Proceedings, the parties' arguments

related thereto, and good cause appearing, IT IS HEREBY ORDERED AND

DECREED that:

1.    Plaintiffs' Motion for Expedited Proceedings is GRANTED;

2.    Counsel shall prepare and submit to the Court no later than

_____, 2022, a proposed scheduling order that provides the

requisite deadlines for expedited discovery and briefing on Plaintiffs' Motion for

Preliminary Injunction, which shall be heard at _____ ___.m. on

_____, 2022.


_____
[Vice] Chancellor