13:12:40

```
                IN THE UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF DELAWARE


GORDIAN MEDICAL, INC. d/b/a        )
AMERICAN MEDICAL TECHNOLOGIES      )
and AMT ULTIMATE HOLDINGS, L.P.,   )
                                   )
              Plaintiffs,          )
                                   ) C.A. No.  22-319(MN)
v.                                 )
                                   )
MISTY VAUGHN,                      )
                                   )
              Defendant.           )


                      Tuesday, June 20, 2023
                      2:00 p.m.
                      Pretrial Conference


                      844 King Street
                      Wilmington, Delaware


BEFORE:   THE HONORABLE MARYELLEN NOREIKA
            United States District Court Judge



APPEARANCES:


              COLE SCHOTZ P.C.
              BY:  ANDREW LYNCH COLE, ESQ.

              -and-

              LITTLER MENDELSON
              BY:  RYAN MORLEY, ESQ.
              BY:  JOHN W. HOFSTETTER, ESQ.


                      Counsel for the Plaintiffs
```

1    APPEARANCES CONTINUED:

2

3            LAW OFFICE OF DANIEL C. HERR, LLC
         BY:  DANIEL CHARLES HERR, ESQ.

4            -and-

5            ROTHSTEIN LAW FIRM
         BY:  DAVID E. ROTHSTEIN, ESQ.

6                    Counsel for the Defendant

7

8

9              _ _ _ _ _ _ _ _ _ _ _ _ _

10

13:50:01  11

13:50:01  12            THE COURT:  Good afternoon, everyone.  Please be

14:07:19  13    seated.  Start with some introductions.

14:07:25  14            MR. COLE:  Good afternoon, Your Honor.  Andrew

14:07:30  15    Cole of Cole Schotz here for the plaintiffs in the case.

14:07:33  16    With me today at counsel table are Ryan Morley and John

14:07:36  17    Hofstetter of Littler Mendelson.  They are my co-counsel in

14:07:41  18    this case.  And our client representative, Kelly Skeat, who

14:07:44  19    is the general counsel.

14:07:47  20            MR. HERR:  Good afternoon, Your Honor.  Daniel

14:07:49  21    Herr on behalf of the defendant, Misty Vaughn.  With me at

14:07:52  22    counsel table is Misty Vaughn.  Also, David Rothstein from

14:07:52  23    the Rothstein Law Firm out of Greenville, South Carolina.

14:07:52  24    With the Court's permission, Mr. Rothstein will handle

14:07:52  25    today's hearing.

14:07:59  1          THE COURT:  Has he been admitted pro hac?

14:08:01  2          MR. HERR:  Yes, Your Honor.

14:08:02  3          THE COURT:  All right.  Okay.

14:08:04  4          MR. COLE:  Your Honor, with the Court's

14:08:06  5  permission, Mr. Morley will handle the argument as well.

14:08:09  6          THE COURT:  Okay.  All right.  Plaintiff's

14:08:13  7  Motion in Limine No. 1 seeks to have pretty much the entire

14:08:18  8  case deemed admitted as fact and for defendant to pay

14:08:23  9  attorney's fees and costs for failing to comply with the

14:08:26 10  discovery order.  Seems like a big ask, so I'm going to give

14:08:29 11  you an opportunity to be heard on that.  You tried to

14:08:33 12  incorporate all your prior submissions in your statement.

14:08:36 13  That's not the way it works.  You have a limited amount of

14:08:39 14  space for pretrial for motions in limine.  You don't get to

14:08:45 15  get around that with incorporation by reference, so

14:08:51 16  incorporation by reference is stricken.  Everything else

14:08:55 17  that you have, okay, and I'll hear from you.

14:09:00 18          MR. MORLEY:  Thank you, Your Honor.  I will try

14:09:05 19  to keep this as succinct as possible.  Essentially

14:09:10 20  Magistrate Judge Fallon ordered that certain documents be

14:09:12 21  produced in discovery.  Those documents --

14:09:12 22          THE COURT:  You got to be specific because you

14:09:17 23  want basically everything that you ever asked for deemed

14:09:20 24  admitted.  So tell me specifically what documents were

14:09:25 25  ordered and what you did to get them and what was produced

14:09:29 1    or not produced.

14:09:30 2                    MR. MORLEY:  Yes, Your Honor.

14:09:31 3                    So we had the Court make an order that

14:09:35 4    Ms. Vaughn was to produce any presentations she gave at any

14:09:39 5    Curitec Corporate sales retreat or sales related meeting,

14:09:44 6    any trainings or education she provided to Curitec employees

14:09:48 7    related to wound care evaluation, wound treatment, or wound

14:09:53 8    management, any flights including but not limited to flight

14:09:56 9    schedules and flight itineraries, Ms. Vaughn related to her

14:09:59 10   employment with Curitec, any travel itineraries, travel

14:10:03 11   schedules or travel agendas related to her employment with

14:10:06 12   Curitec, any of the invoices she submits directly to Curitec

14:10:11 13   for the reimbursement of her legal fees and expenses

14:10:15 14   connected with this lawsuit.  In addition, we have asked for

14:10:18 15   Ms. Vaughn to provide e-mails reflecting conversations with

14:10:21 16   vendors or customers --

14:10:24 17                   THE COURT:  Hold on.  Is this still what you

14:10:26 18   said -- you just went from Judge Fallon's order to we have

14:10:30 19   requested, so is this still what Judge Fallon ordered?

14:10:35 20                   MR. MORLEY:  Bear with me, Your Honor.  Yes, it

14:10:42 21   is, Your Honor.

14:10:50 22                   THE COURT:  Okay.

14:11:02 23                   MR. MORLEY:  So we do not have the documents,

14:11:02 24   Your Honor.

14:11:06 25                   THE COURT:  None?

14:11:07  1             MR. MORLEY:  Correct.

14:11:08  2             THE COURT:  All right.  Well, let's hear from

14:11:10  3  the defendant and see what's going on here.  Presentations,

14:11:14  4  has she given any?

14:11:16  5             MR. ROTHSTEIN:  Your Honor, I don't agree with

14:11:21  6  Mr. Morley's --

14:11:23  7             THE COURT:  Presentations, let's go through the

14:11:25  8  things, the categories.

14:11:28  9             MR. ROTHSTEIN:  What he's talking about is Judge

14:11:30 10  Fallon did an order as to supplementing the plaintiffs'

14:11:35 11  first set of discovery.  There was the holding company also

14:11:39 12  served a set of discovery that included the things

14:11:42 13  Mr. Morley just went through and it was inadvertence on my

14:11:46 14  part, I thought they had withdrawn the holding company's

14:11:49 15  discovery entirely.  I did not realize that they had done a

14:11:52 16  separate set of requests for admissions from the holding

14:11:55 17  company.

14:11:55 18             When they filed their motion to compel, their

14:11:57 19  letter motion, I said oops, that was a mistake on our part,

14:12:02 20  we'll comply within seven to ten days to provide that

14:12:05 21  information.  In the judge's order, she ordered us to

14:12:08 22  produce supplemental responses to the first set of discovery

14:12:12 23  and said that we committed to respond to the second set by

14:12:16 24  such and such a date.  I did respond by that date, but I

14:12:15 25  raised some objections.  She never ruled that our objections

14:12:23 1    were waived.

14:12:24 2          As to the presentations, there was a

14:12:25 3    presentation that Ms. Vaughn made at a sales retreat that

14:12:28 4    had nothing to do with this case.  She was training as she

14:12:30 5    testified at her deposition, she was training the sales

14:12:33 6    staff on different types of wound dressings that was not,

14:12:38 7    proprietary to AMT in any way shape or form.

14:12:41 8          THE COURT:  You don't get to make that

14:12:43 9    determination.  They asked for it.  She doesn't get to go

14:12:45 10   and say this presentation, maybe it's okay, maybe it's not,

14:12:48 11   why didn't she just produce it?

14:12:49 12         MR. HERR:  She doesn't have access to that.

14:12:52 13   Curitec is a third-party --

14:12:52 14         THE COURT:  She doesn't have access?  She can't

14:12:54 15   go and ask her employer because she's getting sued because

14:12:57 16   she works for them, she can't go and say hey, I gave a

14:13:00 17   presentation, can I have a copy?  She doesn't have any copy

14:13:03 18   of it anywhere?

14:13:04 19         MR. ROTHSTEIN:  She doesn't.

14:13:05 20         THE COURT:  And is that typical that she never

14:13:08 21   keeps presentations or is it a situation where she didn't

14:13:10 22   want to have it so she doesn't have a copy?

14:13:12 23         MR. ROTHSTEIN:  No --

14:13:14 24         THE COURT:  Does she not have any documents

14:13:16 25   relating to her employment?

14:13:18  1          MR. ROTHSTEIN:  She does.  We have turned those

14:13:19  2   over.  We complied fully with --

14:13:22  3          THE COURT:  How many documents did you produce?

14:13:24  4          MR. ROTHSTEIN:  I don't know the number off the

14:13:25  5   top of my head.

14:13:26  6          THE COURT:  Anyone?

14:13:27  7          MR. ROTHSTEIN:  It was probably about two dozen

14:13:29  8   text messages.  I think it was over, including her cell

14:13:33  9   phone records it was probably over 700 Bates labeled pages

14:13:36 10   of documents.

14:13:37 11          MR. MORLEY:  We have eleven e-mail exchanges,

14:13:40 12   Your Honor, from her time working there, and that's it.

14:13:43 13          THE COURT:  That sounds kind of low.

14:13:46 14          MR. ROTHSTEIN:  Your Honor, what happened was

14:13:47 15   Curitec cut off her access immediately upon Judge Fallon's

14:13:52 16   order.  Anything she needed a password to get, she could no

14:13:56 17   longer get.  She asked the owner of the company if she could

14:13:59 18   produce that information and they said no, that's

14:14:02 19   proprietary to our company.  It has nothing to do with the

14:14:05 20   lawsuit.  It was not something that was, you know, taken

14:14:07 21   from AMT when they left.  This was literally within about

14:14:11 22   two weeks of her leaving AMT, no litigation, no document

14:14:16 23   preservation letter was sent, no nothing, this was a --

14:14:20 24          THE COURT:  So how did she prepare the

14:14:22 25   presentation she gave?

14:14:25 1          MR. ROTHSTEIN:  Again, this was wound care.

14:14:27 2  These were all --

14:14:28 3          THE COURT:  How did she prepare it?  You saying

14:14:31 4  it's wound care, it's irrelevant, it's not helpful.

14:14:34 5          MR. ROTHSTEIN:  She prepared it by looking --

14:14:36 6          THE COURT:  How did she prepare it?

14:14:38 7          MR. ROTHSTEIN:  She prepared it by looking at

14:14:39 8  information on the internet.

14:14:41 9          THE COURT:  Did she have access to a document on

14:14:43 10 the computer that she edited to give the presentation?

14:14:46 11         MR. ROTHSTEIN:  It was a PowerPoint

14:14:47 12 presentation.

14:14:48 13         THE COURT:  So she had access to make a

14:14:50 14 PowerPoint presentation?

14:14:52 15         MR. ROTHSTEIN:  Correct.

14:14:52 16         THE COURT:  She made the PowerPoint

14:14:54 17 presentation?

14:14:54 18         MR. ROTHSTEIN:  Correct.

14:14:55 19         THE COURT:  And at some point after she made the

14:14:57 20 presentation, she just lost all ability to get that

14:14:59 21 presentation?

14:15:02 22         MR. ROTHSTEIN:  That presentation is stored on

14:15:02 23 the company server.

14:15:02 24         THE COURT:  But she had access to it in order to

14:15:06 25 make it.

14:15:06 1                    MR. ROTHSTEIN:  Correct.

14:15:07 2                    THE COURT:  And then after she made it and she

14:15:10 3     gave it, when after that did she lose her ability to access

14:15:16 4     it?

14:15:17 5                    MR. ROTHSTEIN:  Probably fifteen months after.

14:15:19 6     She made the presentation --

14:15:21 7                    THE COURT:  And when was the request made?

14:15:23 8                    MR. ROTHSTEIN:  Probably --

14:15:27 9                    MR. HOFSTETTER:  I can answer that, Your Honor.

14:15:28 10                    THE COURT:  It was made in advance of that.  So

14:15:30 11     she had the ability to get it, she didn't give it over, and

14:15:34 12     then she lost the ability to take it.

14:15:37 13                    MR. ROTHSTEIN:  Your Honor, the presentation

14:15:38 14     request was made later in the game when it was the --

14:15:42 15                    THE COURT:  Give me dates.

14:15:43 16                    MR. HOFSTETTER:  Your Honor, off the top of my

14:15:45 17     head I believe it was January the RFP that underlies the

14:15:48 18     order was served, so January --

14:15:50 19                    THE COURT:  No, he's saying that the

14:15:52 20     discovery -- he's not agreeing that it underlies the order

14:15:55 21     other than -- I don't know.

14:15:55 22                    MR. HOFSTETTER:  My understanding is the

14:16:00 23     presentation that we are seeking --

14:16:01 24                    THE COURT:  Stand up.

14:16:02 25                    MR. HOFSTETTER:  I'm sorry, Your Honor.

14:16:03 1      My understanding is that the presentation that

14:16:05 2  we're seeking was presented at the end of January of this

14:16:08 3  year.

14:16:08 4      THE COURT:  When did she lose ability to get

14:16:10 5  information?

14:16:11 6      MR. ROTHSTEIN:  Your Honor, the presentation was

14:16:13 7  January of last year, 2022, when she gave the presentation.

14:16:16 8      THE COURT:  When did she lose the ability to

14:16:19 9  access it?

14:16:20 10     MR. ROTHSTEIN:  It was the date of Judge

14:16:22 11 Fallon's order, April of this year, I believe.

14:16:24 12     THE COURT:  So when did you request it?

14:16:27 13     MR. HOFSTETTER:  Your Honor, we requested it in

14:16:30 14 February via the supplemental RFP.

14:16:33 15     THE COURT:  Of what year?

14:16:34 16     MR. HOFSTETTER:  Of 2023.

14:16:35 17     Your Honor, the presentation came on our radar

14:16:39 18 because Curitec, the employer, posted on its LinkedIn

14:16:42 19 profile a published image of the defendant presenting with a

14:16:47 20 PowerPoint at a sales meeting, that is what tipped us off to

14:16:51 21 the existence of this document which had not yet been

14:16:55 22 produced.  We then issued a supplemental request for

14:16:57 23 production of documents I believe in February of this year

14:17:00 24 as soon as we identified that within the public realm.  My

14:17:05 25 understanding based upon that Curitec presentation was that

14:17:06 1    it occurred at the end of January of 2023.

14:17:09 2                MR. ROTHSTEIN:  Your Honor, this was the first

14:17:11 3    sales meeting, it was not --

14:17:13 4                THE COURT:  All right.  Hold on.

14:17:15 5                Ms. Vaughn, did you have a sales presentation at

14:17:18 6    the end of January 2023?

14:17:20 7                MS. VAUGHN:  Yes, ma'am, we did.

14:17:21 8                THE COURT:  All right.  And did you have access

14:17:24 9    to that presentation after you gave it?

14:17:28 10               MS. VAUGHN:  It stayed on the company -- all

14:17:31 11   documents stayed on the company server.

14:17:33 12               THE COURT:  And when did you lose access to

14:17:35 13   that?

14:17:36 14               MS. VAUGHN:  Sometime after the defendant's

14:17:39 15   request for production, the company cut off my access.

14:17:44 16               THE COURT:  When?

14:17:45 17               MS. VAUGHN:  I don't remember the date.  I want

14:17:48 18   to say it was earlier this year, but I don't remember -- I

14:17:51 19   do not remember --

14:17:52 20               THE COURT:  But you had a request, you had

14:17:54 21   access, and then you didn't give it over before you lost

14:17:58 22   access?

14:17:59 23               MS. VAUGHN:  This particular document was not

14:18:02 24   requested until later.

14:18:05 25               THE COURT:  This document was requested in

14:18:04 1    February of 2023.

14:18:07 2                MS. VAUGHN:  And it was --

14:18:08 3                THE COURT:  And you lost access the date,

14:18:10 4    according to your lawyer, the date of Judge Fallon's order

14:18:13 5    which was?

14:18:15 6                MR. MORLEY:  April 4th, I believe, Your Honor.

14:18:17 7                THE COURT:  April 4th.

14:18:18 8                MS. VAUGHN:  That's around the time frame.

14:18:20 9                THE COURT:  All right.  Why didn't you give it

14:18:22 10   over when you had access?

14:18:23 11               MS. VAUGHN:  It hadn't been requested.

14:18:24 12               THE COURT:  It was requested in February of

14:18:26 13   2023.  Why didn't you give it over?

14:18:29 14               MS. VAUGHN:  I don't recall.  I don't recall

14:18:32 15   being -- the specifics of the date, but I was not allowed by

14:18:36 16   my employer to hand over material that he deemed --

14:18:42 17               THE COURT:  All right.  So there was a

14:18:43 18   presentation that was given that they want to have some

14:18:46 19   facts deemed admitted.  I'll consider that.

14:18:50 20               Trainings, anything other than that presentation

14:18:52 21   on trainings?  Have you given any other training sessions

14:18:55 22   since you have been at the company?

14:18:58 23               MS. VAUGHN:  Yes, ma'am, we routinely do

14:19:00 24   education for the staff.

14:19:01 25               THE COURT:  Did you produce any of that training

14:19:03 1    stuff?

14:19:03 2                MS. VAUGHN:  Those documents were not requested

14:19:06 3    until after my access was cut off.

14:19:08 4                THE COURT:  Assume that those documents were

14:19:09 5    asked for in February of 2023, okay, were they?  I got

14:19:16 6    people looking at each other.  I need dates.

14:19:19 7                MR. HOFSTETTER:  Yes, Your Honor, those were

14:19:20 8    issued in February of 2023 as well.

14:19:22 9                THE COURT:  February of 2023, you lost access in

14:19:25 10   April of 2023, so you had access before you lost access but

14:19:28 11   you didn't give them over when you had it.  Right?

14:19:31 12               MS. VAUGHN:  Yes, ma'am.

14:19:31 13               THE COURT:  All right.  So we had presentations

14:19:34 14   that could have been given and weren't, training that could

14:19:36 15   have been given and weren't.  What about flights, you travel

14:19:42 16   for your job?

14:19:43 17               MS. VAUGHN:  I did twice last year.

14:19:44 18               THE COURT:  Did you produce the information on

14:19:46 19   your flights?

14:19:48 20               MS. VAUGHN:  I shared the information with

14:19:49 21   Mr. Rothstein.

14:19:50 22               THE COURT:  Has that been produced?

14:19:52 23               MR. ROTHSTEIN:  It has not, Your Honor.  I

14:19:54 24   objected to that.  As described there were two flights that

14:19:57 25   she took.  They were not related to any client or former

14:20:00  1    client --

14:20:01  2              THE COURT:  Produce them.  Produce them.  You

14:20:03  3    don't get to make an ultimate relevance call based on what

14:20:07  4    she was doing.  They asked for it, you're like drawing small

14:20:11  5    lines.  So can you produce that?  Apparently she gave it to

14:20:15  6    a while back.

14:20:16  7              MR. ROTHSTEIN:  I will produce it when I get

14:20:18  8    back to South Carolina, Your Honor.

14:20:20  9              THE COURT:  I think you should call someone and

14:20:22 10    have it produced even before then.

14:20:23 11              What about travel, other travel things?

14:20:26 12              MR. ROTHSTEIN:  Is the same, the same requests.

14:20:29 13              THE COURT:  Invoices for legal fees.

14:20:30 14              MR. ROTHSTEIN:  It wasn't legal fees, they asked

14:20:32 15    for expense reimbursements related to travel.

14:20:35 16              THE COURT:  Which is fair.  They want to know

14:20:37 17    who she was traveling to see and if it was their clients.

14:20:40 18    Were there any of those?

14:20:41 19              MS. VAUGHN:  I think all that I had --

14:20:42 20              MR. ROTHSTEIN:  It was the same information as

14:20:45 21    the flights, Your Honor.

14:20:47 22              THE COURT:  E-mails regarding communications

14:20:48 23    with customers, I'm told there were eleven e-mails given.

14:20:51 24    Do you not e-mail with your customers?

14:20:52 25              MS. VAUGHN:  They ask for documentation specific

14:20:55 1    to the list of clients and there are none.

14:20:59 2            THE COURT:  So tell me what that request

14:21:03 3    actually said.  Read the request to me.  I mean, none of you

14:21:09 4    guys gave me any -- I got nothing on turned over requests or

14:21:14 5    whatever, so if you want to win, tell me what the request

14:21:17 6    was.

14:21:18 7            MR. HOFSTETTER:  Your Honor, as part of the

14:21:21 8    requests that were served in December and then subsequently

14:21:24 9    ordered to be produced in April, one of the request was all

14:21:29 10   written communications between Ms. Vaughn and any person

14:21:33 11   that was a client, vendor, or customer of AMT within two

14:21:39 12   years prior to the date of January 12th, 2022, who had also

14:21:43 13   been a Curitec, meaning the current employer's customer,

14:21:47 14   referral source, strategic partner or vendor since she began

14:21:52 15   employment.  That was one of the categories that was served

14:21:54 16   in December and expressly ordered to be produced by

14:21:58 17   Magistrate Judge Fallon.

14:21:59 18           THE COURT:  Okay.  Well, she just said that

14:22:00 19   there weren't any.

14:22:02 20           MR. HOFSTETTER:  Your Honor, respectfully we

14:22:02 21   have awareness as to the vendor category that there are

14:22:07 22   wayward e-mails that were transmitted by vendors of ours to

14:22:14 23   her old e-mail account which demonstrates that there are

14:22:18 24   unproduced vendor e-mail communication.

14:22:21 25           THE COURT:  Her old e-mail account, what's that

14:22:23 1    mean?

14:22:24 2                MR. HOFSTETTER:  Her e-mail account with us,

14:22:26 3    Your Honor.  In other words, we produced in discovery our

14:22:30 4    communications that we were receiving from third-party

14:22:32 5    vendors that she was clearly communicating with.  These

14:22:36 6    vendors misidentified her e-mail account as her new Curitec

14:22:40 7    e-mail account, thus there is a universe of vendor e-mails

14:22:44 8    that we know exist, based solely on the fact that we

14:22:51 9    received wayward e-mails from these vendors --

14:22:51 10               THE COURT:  You got an e-mail after she had left

14:22:54 11   AMT while she was working for Curitec that said hey, it was

14:22:58 12   nice talking to you yesterday.  We want to talk to you about

14:23:02 13   going forward with this.

14:23:03 14               MR. HOFSTETTER:  Precisely, Your Honor.  None of

14:23:05 15   those have been produced.

14:23:07 16               MR. ROTHSTEIN:  Your Honor --

14:23:07 17               THE COURT:  Do these things not exist?

14:23:09 18               MR. ROTHSTEIN:  Your Honor, may I explain

14:23:12 19   something?  In this industry there are about maybe five or

14:23:15 20   ten vendors common to everything.  There is no exclusivity

14:23:15 21   between AMT and any of the vendors.  There is a

14:23:22 22   non-interference provision in the employment agreement.

14:23:27 23   Ms. Vaughn hasn't interfered in any way, shape or form.

14:23:30 24               THE COURT:  The way you decide that, the way I

14:23:32 25   decide that is I look at the discovery, I look at what was

14:23:36 1   produced and I say gosh, that is a completely innocent

14:23:39 2   communication and it doesn't interfere with anything.  Okay?

14:23:43 3   It's not you get to decide well, heck, I'm not going to

14:23:48 4   produce it because it's innocent.  That's not the way it

14:23:51 5   works.

14:23:51 6          So what are we doing about these e-mails that

14:23:54 7   apparently may exist but you've decided well, I just don't

14:23:58 8   think they're relevant for the judge to see?

14:24:01 9          MR. ROTHSTEIN:  Your Honor, the objection we

14:24:02 10  raised was that Curitec at the time would not allow her

14:24:06 11  because it would disclose confidential like, you know, where

14:24:09 12  they are going in the market or what products are they

14:24:13 13  asking for, things like that that's a competitive advantage

14:24:16 14  to AMT potentially that Curitec didn't want to give over.

14:24:20 15  And they're not relevant or potentially relevant in this

14:24:23 16  case because there was no harm to the relationship between

14:24:25 17  AMT and any of these vendors.  And what Judge Fallon ordered

14:24:29 18  her to produce was any communications and so we could mark

14:24:33 19  them attorneys' eyes only and that's when Curitec pulled her

14:24:36 20  access.

14:24:36 21         THE COURT:  Yes, I don't think that was actually

14:24:41 22  what Judge Fallon meant was that suddenly things that she

14:24:45 23  had access to when the request was made would be held back.

14:24:50 24         MR. ROTHSTEIN:  My client is not holding

14:24:51 25  anything back, Your Honor.  She has no access, custody or

14:24:55 1    control of those documents.

14:24:55 2            THE COURT:  Your client had access and the

14:24:57 3    ability to produce it before that order came out and before

14:24:59 4    her access was cut off.

14:25:02 5            MR. ROTHSTEIN:  I agree with that.  But she had

14:25:05 6    nothing to do with the --

14:25:07 7            THE COURT:  So why shouldn't I hold her

14:25:09 8    responsible for not producing it during a period when she

14:25:12 9    was under an obligation to do so and did not?

14:25:15 10            MR. ROTHSTEIN:  Your Honor, before the order was

14:25:19 11    complied with, she had no custody -- possession, custody or

14:25:23 12    control of those documents.  There is no way she could have

14:25:26 13    produce those documents.

14:25:27 14            THE COURT:  She didn't have custody and control

14:25:30 15    of e-mails people sent to her or discussions that she had

14:25:32 16    with people?

14:25:33 17            MR. ROTHSTEIN:  We produced that.  We produced

14:25:35 18    text messages that were on her phone, her personal phone

14:25:38 19    that she still had access to.  We produced documents that

14:25:42 20    she had given to me, hard copy of documents that Curitec

14:25:47 21    said you're not allowed to produce these documents.  I

14:25:49 22    turned those over to AMT after the judge's order.  So we

14:25:52 23    turned over everything that we had possession, custody and

14:25:56 24    control of at the time the judge ordered it.  You know, this

14:26:00 25    is like --

14:26:00 1          THE COURT:  You're not making me feel sorry for

14:26:02 2 you because it basically sounds like there was a court order

14:26:07 3 and your client or her employer decided, well, screw the

14:26:09 4 court order, we're going to say she doesn't have control

14:26:13 5 over it.

14:26:14 6          MR. ROTHSTEIN:  My client had nothing to do with

14:26:15 7 it.

14:26:15 8          THE COURT:  I understand, and that's the way it

14:26:18 9 is going to be, your client didn't produce them at the time

14:26:20 10 that she could have produced them, then maybe I just have to

14:26:23 11 make some assumptions as to what was in those documents.

14:26:27 12          MR. ROTHSTEIN:  Your Honor, the other thing is

14:26:28 13 that the very first effort to try to get any discovery was

14:26:31 14 they served a subpoena on Curitec.  Curitec objected to the

14:26:35 15 subpoena in Texas.  They never filed any type of motion to

14:26:38 16 compel to enforce their subpoena in Texas.  They never took

14:26:42 17 a Rule 30(b)(6) deposition of Curitec to find out what

14:26:45 18 information was on the server, what was being withheld.

14:26:48 19 They're trying to blame this all on Ms. Vaughn.  And again,

14:26:52 20 if her employer says your access has been cut off, you have

14:26:55 21 no more password, no ability to --

14:26:55 22          THE COURT:  My problem -- maybe I have a problem

14:27:01 23 with Curitec on what they did at the time of that order, but

14:27:04 24 my problem is before that order, she had an obligation as a

14:27:06 25 party in this case to produce discovery.  She did not.

14:27:12  1          MR. ROTHSTEIN:  Right.

14:27:13  2          THE COURT:  And therefore, I am a little

14:27:16  3    concerned that you're using as she lost access, she couldn't

14:27:20  4    have done it, judge, but she could have done it.  She could

14:27:24  5    have done it when she had an obligation to do it and she

14:27:27  6    didn't.

14:27:30  7          MR. MORLEY:  Your Honor --

14:27:31  8          THE COURT:  No, you're not double teaming him.

14:27:34  9          MR. ROTHSTEIN:  The other thing, Your Honor, is

14:27:36 10    we said look, you never identified any customer that you

14:27:38 11    lost.  I mean, we can't just give over everything that

14:27:41 12    Curitec has.  We don't know what customers you're talking

14:27:44 13    about.  What customers have you lost that you think were

14:27:46 14    taken by Curitec.

14:27:48 15          THE COURT:  I know that's a problem.

14:27:50 16          MR. ROTHSTEIN:  Right.  He sent an e-mail

14:27:52 17    February 3rd to identify --

14:27:53 18          THE COURT:  I know and then another one in June

14:27:54 19    that had more people on it.  I know.  That seems like a

14:27:57 20    different issue, though.  He sent an e-mail in February.

14:28:01 21    They sent document requests in February.  She had access in

14:28:05 22    February.  And guess what, it wasn't produced.

14:28:09 23          MR. ROTHSTEIN:  Well, she ran the search before

14:28:11 24    her access was cut off and she did not have any

14:28:14 25    communications with any of the people that were on that

14:28:16 1   list.  She is not a sales and marketing person.  What she --

14:28:21 2   I'll give you an example.  Curitec uses a program called

14:28:26 3   Sales Force which is a sales, it's like a database where you

14:28:31 4   can log in, I spoke to this customer on this day, this is

14:28:35 5   the contact number, you know, it has -- company wide it has

14:28:40 6   everybody that puts something in to Sales Force.  Ms. Vaughn

14:28:43 7   has put in two entries in her entire time at Curitec into

14:28:49 8   Sales Force.  If we ran search terms on the 124 names that

14:28:54 9   are now on there, they're going to pull up things

14:28:56 10  undoubtedly from Sales Force that Ms. Vaughn had nothing to

14:28:59 11  do with.  And that would be responsive to the order.  I

14:29:03 12  don't know how Ms. Vaughn would have an obligation to turn

14:29:06 13  over a document that's proprietary to Sales Force, or

14:29:10 14  proprietary to Curitec that she had nothing to do with but

14:29:13 15  it would cause a hit on the search terms.

14:29:16 16           THE COURT:  The question was her written

14:29:17 17  communication.  I don't understand how you take --

14:29:19 18           MR. ROTHSTEIN:  She has none.

14:29:21 19           THE COURT:  -- a bunch of stuff that has nothing

14:29:22 20  to do with her.  She's not talking about a bunch of stuff

14:29:25 21  that has nothing to do with her.  They're asking for her

14:29:28 22  communication.

14:29:30 23           MR. ROTHSTEIN:  And she truthfully responded she

14:29:32 24  has no documents with regard to customers.  With regard to

14:29:34 25  vendors, we wanted them to identify which vendors are you

14:29:38 1    concerned about.  Before any of the court got involved, we

14:29:41 2    turned over text messages from her private phone with regard

14:29:44 3    to some vendors, it was about four or five of them.  And

14:29:48 4    then there were some e-mails we turned over after the

14:29:51 5    Court's order that she had printed out that were responsive

14:29:54 6    and we turned those over because again, she had possession,

14:29:58 7    custody and control over at that time.

14:30:00 8             THE COURT:  I think that what I am going to do,

14:30:03 9    I'm denying this motion at this point.  I think it's just

14:30:06 10   shooting for the moon and I haven't been convinced that

14:30:09 11   that's appropriate.  But you guys can question her all you

14:30:12 12   want and try to lay the foundation, but I need dates, I need

14:30:15 13   specifics where she had an obligation, she did not give over

14:30:19 14   things.  You know, just saying generally vendors, I don't

14:30:22 15   know what you're talking about, so I can't make that

14:30:24 16   determination, but you can ask for it later if it's

14:30:29 17   appropriate after her testimony.

14:30:34 18            All right.  Defendant's Motion in Limine No. 1.

14:30:38 19   And I can tell you, if there are any documents that you are

14:30:40 20   withholding saying I have them but I just don't think they

14:30:44 21   are relevant, you should produce them.

14:30:46 22            MR. ROTHSTEIN:  It's about two or three travel

14:30:48 23   related documents, Your Honor.

14:30:52 24            THE COURT:  All right.  Plaintiffs, defendant's

14:30:55 25   Motion in Limine No. 1, plaintiffs should be precluded from

14:31:00 1    claiming damages with respect to any of the 75 or 76

14:31:03 2    customers identified in plaintiffs' counsel's e-mail of

14:31:07 3    February 3rd.  So it starts off by talking about those 76

14:31:11 4    and then it somehow gets into an additional 124, so I don't

14:31:16 5    know what you want.

14:31:17 6              MR. ROTHSTEIN:  Your Honor, the 75 or 76 was the

14:31:20 7    e-mail that Mr. Hofstetter sent me on February 3rd, said

14:31:25 8    these are accounts that we think -- we suspect had been

14:31:28 9    moved from AMT to Curitec.  The day before, or actually the

14:31:32 10   morning of the 30(b)(6) deposition, he handed me another

14:31:36 11   document -- he didn't hand it to me, he e-mailed it to me

14:31:40 12   two minutes before the deposition started and that list had

14:31:43 13   now grown to 120 something potential customers that AMT, the

14:31:50 14   plaintiffs, lost to Curitec.

14:31:52 15             THE COURT:  A 30(b)(6) deposition?

14:31:54 16             MR. ROTHSTEIN:  A 30(b)(6) deposition.

14:31:56 17             THE COURT:  Of what?

14:31:58 18             MR. ROTHSTEIN:  I took a 30(b)(6) deposition of

14:32:00 19   the plaintiffs.

14:32:01 20             THE COURT:  Go ahead.

14:32:02 21             MR. ROTHSTEIN:  And they produced the CEO of the

14:32:05 22   company.  And during that deposition, he said that they -- I

14:32:05 23   asked him if there was any attempt made to calculate the

14:32:12 24   damages that plaintiffs have suffered in this case and he

14:32:12 25   said not at this point, or he said there is no way to

14:32:18 1    identify that.  We don't know what we don't know.

14:32:20 2                THE COURT:  That was in June of this year?

14:32:23 3                MR. ROTHSTEIN:  That was June 2nd.

14:32:24 4                THE COURT:  Earlier this month?

14:32:26 5                MR. ROTHSTEIN:  Yes, ma'am, a couple weeks ago.

14:32:28 6                THE COURT:  All right.

14:32:29 7                MR. ROTHSTEIN:  And there are a lot of things he

14:32:31 8    didn't know or couldn't testify to.  And part of my motion

14:32:34 9    is to prevent someone coming in now who wasn't produced

14:32:39 10   during the 30(b)(6) and saying on behalf of the corporation

14:32:42 11   this is the damages we've suffered because the 30(b)(6)

14:32:46 12   deponent that they produced I don't believe was an

14:32:49 13   appropriate designee.  He had only been with the company

14:32:51 14   since February of this year --

14:32:54 15               THE COURT:  What was the topic on which you

14:32:55 16   think that the damages calculated should have been --

14:33:00 17               MR. ROTHSTEIN:  I could read it to you if you

14:33:02 18   give me a second to pull it up.

14:33:04 19               THE COURT:  Why don't you read it to me.  Having

14:33:07 20   generalizations is not helpful at all.

14:33:09 21               MR. ROTHSTEIN:  I may have quoted it actually,

14:33:11 22   Your Honor, in the submissions.  It's Item Number 8, Your

14:33:58 23   Honor, whether plaintiff AMT has suffered any actual damages

14:34:02 24   caused by Ms. Vaughn's alleged breach of her employment

14:34:05 25   agreement.  Any attempt to calculate or quantify such

14:34:08 1    damages and any evidence that supports plaintiff AMT's claim

14:34:13 2    for damages.

14:34:14 3             THE COURT:  Okay.  And he said they hadn't

14:34:18 4    calculated any damages at the time?

14:34:20 5             MR. ROTHSTEIN:  That's right.

14:34:21 6             THE COURT:  Okay.

14:34:22 7             MR. ROTHSTEIN:  I asked him, well when do you --

14:34:23 8    so the trial is three weeks away, when do you anticipate

14:34:27 9    calculating our damages?  And he said well, it depends on

14:34:30 10   what we can get from Curitec and Ms. Vaughn, and we don't

14:34:33 11   know what we don't know.

14:34:36 12            THE COURT:  All right.  So you want to keep out

14:34:38 13   not just the 75 to 76, you want all 124 out?

14:34:44 14            MR. ROTHSTEIN:  Correct.  We did ask in Item

14:34:48 15   Number 1, again, at the time I asked for information about

14:34:52 16   their list of 76 customers suspected to have been lost by

14:34:55 17   AMT to Curitec since January 1st, 2022, as reflected in the

14:35:00 18   e-mail from attorney Hofstetter.  And I attached a copy of

14:35:04 19   the e-mail to the notice.  And then I asked also for the

14:35:12 20   identity of any other customer -- this is number 4, the

14:35:12 21   identity of any other customer, client vendor or strategic

14:35:12 22   partner of plaintiff AMT who was allegedly solicited by

14:35:2 23   defendant Vaughn after her resignation from AMT beyond those

14:35:2 24   identified in Mr. Hofstetter's February 3rd e-mail.  I

14:35:3 25   didn't know about the 124, the additional 50 names until the

14:35:39 1    morning of the deposition.

14:35:44 2              THE COURT:  All right.

14:35:45 3              MR. ROTHSTEIN:  And he testified, the 30(b)(6)

14:35:48 4    witness testified that every month they have a meeting where

14:35:51 5    they review a document that shows how many customers they

14:35:55 6    lost in that month.  And they is supposed to be a notice

14:36:00 7    letter, I think there is a thirty- or sixty-day notice

14:36:03 8    requirement under the contract with the customer.  There has

14:36:05 9    to be some follow-up by the sales team to find out why the

14:36:10 10   customer left and what we could do to get the customer back,

14:36:13 11   whether there were any communications with the customer,

14:36:16 12   hey, did Misty Vaughn have anything to do with you leaving.

14:36:19 13   They don't even know for sure whether the customers went to

14:36:22 14   Curitec or not.

14:36:23 15             So if you look at the e-mail, it says suspected,

14:36:27 16   and that was part of the basis for my motion in limine is

14:36:31 17   it's all speculation.

14:36:33 18             THE COURT:  All right.  Let me hear from the

14:36:35 19   plaintiffs.  Okay.  This deposition occurred before

14:36:37 20   Ms. Vaughn, but it can't possibly be that Ms. Vaughn gave

14:36:41 21   you enough to show what the damages were for 124 customers,

14:36:44 22   so what's going on?  What do you think you're going to put

14:36:47 23   in front of me?

14:36:49 24             MR. MORLEY:  Yeah.  So, Your Honor, she

14:36:51 25   identified in her -- my apologies, Your Honor.

14:36:58 1     We provided the list as search terms for

14:37:03 2 Ms. Vaughn to run on her e-mails to provide us with --

14:37:07 3     THE COURT:  You provided a search term list on

14:37:09 4 June 2nd of this year?

14:37:11 5     MR. MORLEY:  No, we provided it in February this

14:37:13 6 year, Your Honor.

14:37:15 7     THE COURT:  The 76?

14:37:17 8     MR. MORLEY:  Correct.  Then they asked for

14:37:18 9 anymore that we had lost and we provided then the additional

14:37:21 10 fifty that we had lost since that time.

14:37:23 11     THE COURT:  In June?

14:37:24 12     MR. MORLEY:  Correct.

14:37:25 13     THE COURT:  You lost fifty customers between

14:37:27 14 February and June?

14:37:28 15     MR. MORLEY:  I believe so, Your Honor, yes.

14:37:29 16     THE COURT:  All right.

14:37:30 17     MR. MORLEY:  So we provided that information and

14:37:32 18 --

14:37:32 19     THE COURT:  And your guy said I don't know what

14:37:34 20 the damages are.

14:37:35 21     MR. MORLEY:  No, we provided a list to them --

14:37:37 22     THE COURT:  What are you going to show me as

14:37:40 23 evidence of the damages you're going to ask me for?  What

14:37:42 24 damages are you going to ask me for and what is the evidence

14:37:45 25 that you are going to show?

14:37:47  1          MR. MORLEY:  Right now based on Ms. Vaughn's

14:37:49  2   admission at her deposition last week, she identified two of

14:37:53  3   the customers she's doing the business with, we're going to

14:37:56  4   show the lost revenues from that.

14:37:59  5          THE COURT:  What is that lost revenue?

14:38:01  6          MR. MORLEY:  It's in excess of $250,000.

14:38:04  7          THE COURT:  Have you produced that information

14:38:05  8   to the defendant?

14:38:07  9          MR. MORLEY:  We just calculated it.

14:38:09 10          THE COURT:  Okay.  See, that's not the way

14:38:11 11   litigation work.

14:38:12 12          MR. MORLEY:  I understand, Your Honor.

14:38:13 13          THE COURT:  You don't just say oh, my gosh,

14:38:15 14   judge, we have five days until trial and they don't have a

14:38:19 15   clue of what our damages were.  See, I give it back, too,

14:38:23 16   it's not just you.  All right.  So I don't understand.

14:38:27 17   You're saying oh, it's in excess of $250,000.  Well, that

14:38:31 18   might have been relevant to them to know.  Maybe they want

14:38:34 19   to take some discovery and figure out how you did that.  Why

14:38:37 20   should you now -- I mean, what part of the scheduling order

14:38:40 21   that says fact discovery is over allows you to give that

14:38:44 22   over now?

14:38:45 23          MR. MORLEY:  Your Honor, we took her deposition

14:38:48 24   on the close of discovery.

14:38:49 25          THE COURT:  Yes, and when was that?

14:38:51  1                MR. MORLEY:  It was on the 6th.

14:38:53  2                THE COURT:  That's thirteen days ago.

14:38:55  3                MR. MORLEY:  And then we got the transcript a

14:38:57  4   week after that.

14:38:57  5                THE COURT:  Right.  You couldn't just get a

14:38:59  6   quick transcript?

14:39:00  7                MR. MORLEY:  We ordered expedited.  That's the

14:39:03  8   quickest they were able to do it, Your Honor.

14:39:04  9                THE COURT:  And you couldn't write down the

14:39:07 10   names of the two parties that she said that she -- you

14:39:09 11   couldn't write down the names of the two parties that she

14:39:13 12   said she had had communications with?

14:39:14 13                MR. MORLEY:  Yes, Your Honor, we could have done

14:39:15 14   that, obviously.

14:39:17 15                THE COURT:  I mean, truly, what do you think is

14:39:21 16   going to happen at this trial?  You're going to get up there

14:39:23 17   and say hey, she took away these two companies and that's

14:39:27 18   $250,000.  And she's going to be like, or her lawyer is

14:39:31 19   going to get up and say I have no idea how he calculated

14:39:34 20   that money, Judge, and I never had a chance to figure it

14:39:37 21   out.

14:39:40 22                MR. MORLEY:  Well, it's no different than we not

14:39:43 23   having any information that we requested and was not

14:39:46 24   produced.

14:39:47 25                THE COURT:  Except you are going to make a

14:39:48  1    contention at trial.  You are going to say they owe me this

14:39:52  2    much money for these two companies.  And that was never -- I

14:39:56  3    just want to make sure I understand it.  That information

14:39:58  4    that you just told me, this much money for these two

14:40:01  5    companies, was never produced in discovery?  It has not been

14:40:05  6    produced to this day?

14:40:07  7            MR. MORLEY:  I don't know if that's necessarily

14:40:09  8    true in terms of not being produced because those companies

14:40:12  9    were identified on a list that we did produce the numbers

14:40:15 10    for.  So I mean, it was produced, but we just didn't know

14:40:18 11    until her deposition the exact --

14:40:22 12            THE COURT:  So you produced documents from which

14:40:24 13    they can look at the number of how much you lost, or how

14:40:27 14    much it was worth and now you're going to tell them it was

14:40:30 15    company A and company B.

14:40:32 16            MR. MORLEY:  They know who the companies were

14:40:33 17    because she testified to it, yes, Your Honor, that's the

14:40:36 18    plan.

14:40:36 19            THE COURT:  So that takes care of two of the

14:40:39 20    124.  What are you planning to do with the others?

14:40:42 21            MR. MORLEY:  I mean, we're going do what we can.

14:40:46 22    We're going to have someone testify that --

14:40:48 23            THE COURT:  What are you going to testify in

14:40:50 24    terms of damages, when your guy says I haven't figured out

14:40:54 25    the damages and then you expect in a week to come in and say

14:40:57 1    oh, so the damages total is $5 million because there is 124

14:41:03 2    customers and it was this and this and this, when you never

14:41:07 3    gave them that contention.

14:41:11 4              MR. MORLEY:  Well, then, we'll use the two

14:41:15 5    facilities she identified.

14:41:17 6              THE COURT:  Okay.  So I guess what I am going to

14:41:20 7    do is I am going to reserve on this motion for right now and

14:41:24 8    you can go back and make sure that you guys need to talk

14:41:27 9    about this and agree what you're using in the documents that

14:41:32 10   were already produced in order to come up with whatever

14:41:34 11   you're going to present to me.  Do you understand?

14:41:39 12             MR. MORLEY:  I do, Your Honor.

14:41:40 13             THE COURT:  All right.  And you guys can tell me

14:41:47 14   at trial where you came out on that one.  But if they

14:41:50 15   produced the information that you can figure it out from,

14:41:54 16   then saying that they didn't give it to you isn't going to

14:41:57 17   be terribly persuasive to me for the defendants.

14:42:02 18             All right.  Defendant's Motion in Limine No. 3.

14:42:04 19   Defendants should be precluded from offering any testimony

14:42:07 20   that Ms. Vaughn bears any responsibility for Curitec's

14:42:10 21   hiring of former AMT employees.  Okay.  Were these four

14:42:12 22   employees deposed?

14:42:17 23             MR. ROTHSTEIN:  None of them were deposed, Your

14:42:21 24   Honor.

14:42:21 25             THE COURT:  Okay.  Well, I'm going to deny that

14:42:23 1    motion because it seems like there were plenty of ways that

14:42:27 2    plaintiffs could have figured out -- I'm sorry, I'm going to

14:42:29 3    grant that motion.

14:42:30 4            MR. ROTHSTEIN:  Thank you.

14:42:32 5            I think you skipped over number two.

14:42:35 6            THE COURT:  Wait a second.  Wait a second.  Wait

14:42:37 7    a second.  No.  This is your motion.  You say they're not

14:42:41 8    allowed to say she bears any responsibility.  Okay.  So

14:42:47 9    let's just make sure the record is clear.  I withdraw my

14:42:51 10   previous granting and my previous denying.  Now I want to

14:42:55 11   make sure I understand this.

14:43:00 12           They want to argue that Ms. Vaughn is somehow

14:43:03 13   responsible for these folks leaving AMT and going to

14:43:07 14   Curitec.

14:43:09 15           MR. ROTHSTEIN:  Correct.

14:43:13 16           THE COURT:  Why can't they ask her about that?

14:43:18 17           MR. ROTHSTEIN:  They did ask her about that.

14:43:21 18           THE COURT:  Well, why can't at trial that you

14:43:23 19   want to preclude them from offering any testimony about

14:43:26 20   that, so --

14:43:27 21           MR. ROTHSTEIN:  Your Honor, I took their

14:43:29 22   30(b)(6) deposition witness and again, that was one of the

14:43:33 23   topics that we asked for.  Mr. Hofstetter had identified

14:43:35 24   four people that were supposedly relevant to potential

14:43:35 25   solicitation of employees.  Those four employees are

14:43:42 1    identified.  One of those employees actually left AMT and

14:43:47 2    started at Curitec before Ms. Vaughn --

14:43:50 3              THE COURT:  You're going to have a good time

14:43:52 4    with that one.

14:43:53 5              MR. ROTHSTEIN:  So the other ones I asked, this

14:43:55 6    is Item Number 3, information about the four employees on

14:43:59 7    the preliminary list of topics relevant to solicitation as

14:44:02 8    reflected in the e-mail, including the following

14:44:05 9    information:  Dates of employment and positions of each

14:44:08 10   employee.  Notice of resignation by each employee.  Any exit

14:44:11 11   interview conducted by AMT upon the departure.  Whether the

14:44:17 12   employee had any restrictive covenants with AMT or any other

14:44:20 13   employment agreements with AMT.  Whether AMT has taken any

14:44:25 14   legal action against those employees or written any type of

14:44:28 15   cease and desist letter.  The reporting relationship between

14:44:31 16   those employees and Ms. Vaughn.  Any investigation into

14:44:35 17   possible communications between the employee and Curitec or

14:44:39 18   anyone acting on behalf of Curitec.  And any evidence that

14:44:42 19   Ms. Vaughn had anything to do with an employee's decision to

14:44:46 20   leave AMT or seek or accept employment with Curitec.

14:44:49 21             Mr. Newton, the 30(b)(6) deponent, testified

14:44:52 22   that there would be a resignation letter in the file, which

14:44:57 23   they didn't produce.  There would be an exit interview,

14:45:00 24   which they didn't produce.  He said as the three of them,

14:45:05 25   they wrote cease and desist letters to the employees which

14:45:08  1    they didn't produce.  So he didn't provide any information

14:45:11  2    to me about any of these four people.

14:45:13  3            Ms. Vaughn, the only communication she had with

14:45:15  4    any of these four employees was one woman named Amy Watson

14:45:20  5    whose husband went into hospice in February of 2022, the

14:45:28  6    year -- right after Ms. Vaughn left and then her husband

14:45:32  7    passed away in September.  And Ms. Vaughn I think left a

14:45:35  8    voicemail or talked to her briefly about her husband's

14:45:39  9    condition.  That was the extent of the conversation.

14:45:42 10    Ms. Vaughn testified about that in her deposition.  Again,

14:45:44 11    we have not had anything in discovery to indicate that there

14:45:48 12    is any evidence --

14:45:49 13            THE COURT:  Did you ever look through her

14:45:52 14    e-mails to just to make sure she didn't have communication?

14:45:56 15            MR. ROTHSTEIN:  We did, e-mail and text

14:45:58 16    messages.  There were none.  There were two phone numbers I

14:46:00 17    think that had to do with Amy Watson, and that's it.

14:46:03 18            THE COURT:  You don't have a problem with them

14:46:05 19    asking Ms. Vaughn about it at trial?

14:46:07 20            MR. ROTHSTEIN:  No.

14:46:07 21            THE COURT:  So when you say they should be

14:46:09 22    precluded from offering testimony, you don't mean

14:46:12 23    cross-examining, you mean you don't want someone to come in

14:46:14 24    for them -- so what are you planning to do for this?

14:46:18 25            MR. MORLEY:  Your Honor, we would just be

14:46:20 1   seeking testimony on cross.  We're not seeking any other

14:46:23 2   evidence as relates to that.

14:46:24 3           THE COURT:  So with that understanding, I'll

14:46:27 4   deny the motion.  But if it turns out that they start

14:46:32 5   putting on some testimony, you can object.

14:46:35 6           All right.  What is the scope of the trial?

14:46:50 7   Plaintiffs list eight fact witnesses as may call live, two

14:46:54 8   may call via deposition transcript.  Defendant list one

14:46:57 9   additional fact witness may call live, so we're a week from

14:47:02 10  trial, let's go from may to will.  What's the plan?  Start

14:47:11 11  with the plaintiffs.

14:47:13 12          MR. MORLEY:  Sorry, Your Honor, I'm pulling up

14:47:15 13  our list.

14:47:35 14          We would be calling -- we will be calling the

14:47:50 15  defendant, Misty Vaughn.  Mr. Newton, who was our 30(b)(6)

14:48:00 16  witness.

14:48:01 17          THE COURT:  Just so we understand, Mr. Newton,

14:48:05 18  we don't usually have 30(b)(6) testimony at trial, we have

14:48:08 19  people testifying based on actual knowledge.  Does he have

14:48:12 20  actual knowledge?

14:48:12 21          MR. MORLEY:  He does have some knowledge.

14:48:14 22          THE COURT:  Not just I went and looked at

14:48:17 23  something that happened, it has to be actual knowledge

14:48:21 24  within the scope of his employment.

14:48:22 25          MR. MORLEY:  I think it will be, Your Honor.

14:48:25 1          THE COURT:  All right.

14:48:26 2          MR. MORLEY:  Sara Holden-Mount is a witness who

14:48:30 3  will be called.  And the others are still maybe at this

14:48:41 4  point, Your Honor.

14:48:43 5          THE COURT:  Well, I need you to decide because I

14:48:46 6  need to figure out how much time you get for the trial.  So

14:48:49 7  when are you going to decide that?

14:48:52 8          MR. MORLEY:  If they were to testify, Your

14:48:53 9  Honor, their testimony would be very short in duration, if

14:48:56 10  that helps you.

14:48:57 11          THE COURT:  Yes, that does help me.  Thank you.

14:49:00 12          MR. MORLEY:  Yes.

14:49:01 13          THE COURT:  All right.  For the defendant?

14:49:04 14          MR. ROTHSTEIN:  Your Honor, before we get to my

14:49:06 15  list, one of the witnesses, number five, Sarah Leuzzi, we

14:49:11 16  objected.  They never identified her as a witness until the

14:49:15 17  pretrial brief.

14:49:16 18          THE COURT:  He didn't say he was going to call

14:49:18 19  her.  So why don't you deal with that if they actually do.

14:49:21 20          MR. ROTHSTEIN:  That's fine.

14:49:23 21          THE COURT:  Who are you calling?

14:49:25 22          MR. ROTHSTEIN:  Just Ms. Vaughn.

14:49:26 23          THE COURT:  So we have three witnesses and maybe

14:49:27 24  a couple of short ones.  So how much time do you really

14:49:31 25  think we need for this trial?

14:49:33 1          MR. ROTHSTEIN:  I think two days --

14:49:35 2          THE COURT:  Two days is twelve hours.  That

14:49:37 3  seems ridiculous for three witnesses.  So how much time do

14:49:40 4  we really need?

14:49:42 5          MR. MORLEY:  I'm fine with a day, Your Honor.

14:49:44 6  We can get it all in in a day, Your Honor.

14:49:47 7          MR. ROTHSTEIN:  I think we can get it all in in

14:49:49 8  a day, six hours.

14:49:52 9          THE COURT:  All right.  How about we do this.  I

14:49:54 10  give you each four hours.  And then if we need to do

14:49:59 11  closings on the next day, we can do them.

14:50:03 12          MR. ROTHSTEIN:  Sounds good.  Thank you.

14:50:05 13          THE COURT:  So you each get four hours for

14:50:08 14  trial.  If it turns out that any of your mays are going to

14:50:14 15  be called, when you know that they're going to be called,

14:50:17 16  you must tell the defendant.

14:50:21 17          All right.  Plaintiffs indicate they still need

14:50:24 18  to obtain some deposition transcripts.  Has that been

14:50:27 19  addressed?  Have you gotten those?

14:50:31 20          MR. MORLEY:  Your Honor, we have pending motions

14:50:35 21  in Texas.  There is a motion to quash the testimony of

14:50:38 22  persons who are the Curitec principles, so at this point in

14:50:42 23  time, we haven't had an opportunity to review them.

14:50:42 24          THE COURT:  So plaintiffs, you object to

14:50:51 25  Mr. Newton, why?

14:50:56  1      MR. ROTHSTEIN:  Your Honor, defendant --

14:50:57  2      THE COURT:  I'm sorry, defendant.

14:50:59  3      MR. ROTHSTEIN:  We objected to -- we just said

14:51:04  4  we intended to use the deposition transcript of Mr. Newton.

14:51:07  5  The objection was that he needs to be limited to what he

14:51:11  6  testified was his knowledge at the time of the 30(b)(6)

14:51:14  7  deposition, and it can't be something that he's suddenly

14:51:18  8  learned that we've had no opportunity to ask him questions

14:51:22  9  about.

14:51:22 10      THE COURT:  I guess you guys need to talk.  Is

14:51:25 11  there something that he's going to testify about that he has

14:51:27 12  learned since February.  Why don't you guys figure that out

14:51:32 13  and then talk to each other about whether that is the case

14:51:32 14  and there is something, then you let them depose him for a

14:51:36 15  short period of time.

14:51:36 16      MR. ROTHSTEIN:  This would be since June 2nd of

14:51:38 17  this year, not February, Your Honor, so it's something that

14:51:42 18  was after his deposition.

14:51:43 19      THE COURT:  Let's hope he hasn't learned too

14:51:46 20  much since June 2nd.

14:51:46 21      Okay.  With respect to the exhibit list,

14:51:51 22  exhibits not included on the exhibit list will not be

14:51:53 23  introduced absent a showing of good cause.  The pretrial

14:51:57 24  order contains the maximum universe of exhibits that may be

14:52:00 25  used at trial.  The same goes for witnesses, you can't add

14:52:03 1    witnesses or exhibits at this point except in exceptional

14:52:08 2    circumstances.

14:52:08 3            All right.  The other thing I will say on the

14:52:11 4    exhibits is I can't figure out how many exhibits you have

14:52:17 5    because there is just stuff that says Misty Vaughn's cell

14:52:21 6    phone records, Vaughn 165 to 464.  That's listed as number

14:52:27 7    50.  So I don't know what you all are doing, but I need you

14:52:31 8    to mark each exhibit with if it's a plaintiffs' exhibit, PTX

14:52:36 9    1 through whatever, if it's a defendant's exhibit,

14:52:40 10   Defendant's Exhibit 1 through whatever, and if it's a joint

14:52:43 11   exhibit, Joint Exhibit 1 through whatever.  Because what you

14:52:46 12   have here is not an exhibit list that I can figure out.  So

14:52:50 13   why don't you guys go back and figure that out and what

14:52:54 14   exhibits, what objections you have and you can submit that

14:52:57 15   as an amendment to the pretrial order and do that by

14:53:01 16   Thursday.

14:53:02 17           All right.  I didn't see anything about

14:53:06 18   procedures regarding unresolved objections, so I'm going to

14:53:12 19   read you my procedures.

14:53:12 20           Any unresolved objections whether regarding

14:53:16 21   witnesses, exhibits, demonstratives, opening or closing --

14:53:20 22   opening statements or closing arguments need to be raised

14:53:22 23   with my judicial administrator, Diana Welham, via e-mail by

14:53:27 24   7:00 a.m. the day the evidence will be used with relevant

14:53:31 25   documents attached to the e-mail and hard copies brought to

14:53:34 1    the Court as well.  We will either deal with the objections

14:53:37 2    in the morning or over lunch depending on what I decide and

14:53:40 3    when that witness will, or those documents will be used.

14:53:46 4    Failure to follow those proposals will be a waiver of the

14:53:49 5    objection.  And I should also add that the e-mail should go

14:53:53 6    to Ms. Welham, but you should also cc Mr. Buckson.

14:53:58 7              Regarding witnesses to be called by deposition

14:54:02 8    testimony, counsel shall confer prior to the trial to

14:54:06 9    determine what testimony will be offered by deposition.  If

14:54:09 10   there are objections that remain to be resolved, the party

14:54:13 11   calling the witness by definition shall no later than

14:54:18 12   48 hours before the witness is to be called to trial submit

14:54:21 13   on behalf all parties, one copy of the entire deposition

14:54:25 14   testimony of the witness at issue, clearly highlighting the

14:54:28 15   designations, counter-designations and pending objections;

14:54:31 16   and two, a cover letter clearly identifying the pending

14:54:35 17   objections as well as a brief indication, *i.e.*, no more than

14:54:39 18   one sentence per objection of the bases for the objection

14:54:43 19   and the offering parties' response to it.  Failure to comply

14:54:46 20   with these procedures absent any agreement by the parties

14:54:50 21   and approval by the court will result in waiver of the use

14:54:52 22   of the deposition testimony or a waiver of the objection to

14:54:55 23   the use of the deposition testimony.

14:54:58 24              If there are depositions played, you will need

14:55:02 25   to give us the actual time taken to read or play the

14:55:05 1 depositions and how to break it up, so if the defendant has

14:55:08 2 one minute and the plaintiff has four, you need to give that

14:55:11 3 information to Mr. Buckson before the deposition is played

14:55:15 4 or read.

14:55:17 5          When a witness is called by deposition, please

14:55:19 6 provide us with digital copies of the transcript of the

14:55:22 7 designations and counter-designations, not hard copies.

14:55:28 8          I didn't see anything in my procedures for

14:55:30 9 providing us with versions of the exhibits, so I'll read

14:55:35 10 that now.

14:55:36 11          On or before noon on Monday, June 26th, the

14:55:40 12 parties need to provide electronic versions of all trial

14:55:43 13 exhibits on the exhibit list to us in a single folder.  How

14:55:47 14 you get that to us is up to you, whether it's a shared link

14:55:51 15 or a flash drive, it doesn't matter to us, but work with

14:55:56 16 your IT department and coordinate with Mr. Buckson so that

14:56:01 17 we can have all trial exhibits electronically on the first

14:56:04 18 day of trial.  We don't need any hard copies.  As I just

14:56:05 19 mentioned earlier, the exhibits need to be named with their

14:56:07 20 exhibit numbers, PTX, DTX, JTX, and shall appear in a folder

14:56:12 21 in ascending chronological order, exhibits to be grouped

14:56:12 22 together.

14:56:17 23          So when I get a folder, the folder with all the

14:56:20 24 exhibits should be PTX 1, PTX 2, PTX 3, PTX 4, all the way

14:56:25 25 down, then DTX, I guess DTX is first because it comes

14:56:30 1    earlier in the alphabet, DTX 1, DTX 2, DTX 3, and JTX 1, JTX
14:56:39 2    2, JTX 3.  That's the only name that should be in the
14:56:42 3    electronic version you give us.

14:56:44 4            In addition, every morning the parties need to
14:56:46 5    provide Mr. Buckson with a flash drive that contains witness
14:56:50 6    folders for any direct examinations that will happen on
14:56:54 7    trial day and the witness folder will contain the exhibits
14:56:57 8    that would have otherwise gone into a witness binder.
14:57:00 9    Again, organize those by exhibit number in ascending
14:57:04 10   chronological order grouped by exhibit type.  Also you need
14:57:04 11   to include for us any demonstratives that will be used on
14:57:07 12   examination.  To the extent that a party uses a cross
14:57:11 13   binder, I ask that you also provide us the cross binder via
14:57:16 14   flash drive.

14:57:17 15           Now, you don't have to give the other side your
14:57:19 16   cross binder when you give it to us, but just send us the
14:57:23 17   cross binder and then at the time the witness goes on the
14:57:26 18   stand you can give the cross binder.

14:57:27 19           A couple of other questions I had when looking
14:57:30 20   through this.  There is a bunch of stuff on page 7 where we
14:57:37 21   have the defendant's issues of fact that remain to be
14:57:41 22   determined.  And there are things in here including whether
14:57:46 23   the plaintiff breached the employment agreement.  I didn't
14:57:47 24   see any counterclaims for breach of employment agreement by
14:57:52 25   the plaintiffs, so where was that pleaded?

14:57:59  1          MR. ROTHSTEIN:  Your Honor, if you're referring

14:58:02  2  to the counterclaim, that's just for declaratory judgment.

14:58:05  3          THE COURT:  Yes, I said in the issues that you

14:58:08  4  say remain to be determined, one of them is whether

14:58:13  5  plaintiffs breached their employment agreement by not

14:58:15  6  providing her with the equity units in the new company as

14:58:20  7  required.  I didn't see that claim anywhere.

14:58:22  8          The other one says whether plaintiff, AMT,

14:58:26  9  breached their employment agreement including the implied

14:58:29 10  covenant of good faith and fair dealing by refusing to

14:58:33 11  investigate allegations by Vaughn that the company had

14:58:36 12  engaged in Medicare fraud or overbilling of government

14:58:40 13  programs.  I did not see anything like that in the

14:58:43 14  pleadings.  So I'm trying to figure out, do you have

14:58:46 15  someplace pleaded counterclaims for a breach of contract by

14:58:50 16  the plaintiff?

14:58:52 17          MR. ROTHSTEIN:  I'm sorry, I misunderstood your

14:58:54 18  question.  Your Honor, those are part of our affirmative

14:58:56 19  defenses for prior breach of contract and unclean hands

14:59:00 20  doctrine.  They're not specific breach of contract causes of

14:59:05 21  action.  They are raised as defenses to the breach of

14:59:10 22  contract claim.  That's a prior breach argument.

14:59:12 23          THE COURT:  And you have that pleaded, prior

14:59:12 24  breach?

14:59:15 25          MR. ROTHSTEIN:  Yes, ma'am.

14:59:16  1          THE COURT:  Okay.

14:59:17  2          MR. ROTHSTEIN:  And the issue with the

14:59:18  3  employment agreement breach also deals with the question of

14:59:23  4  consideration.  There was a 2002 employment contract that

14:59:26  5  had the exact same covenant not to compete in there and it

14:59:31  6  said within -- Ms. Vaughn would receive within sixty days of

14:59:36  7  closing a grant of equity units.  That never occurred.  They

14:59:40  8  required us to sign another contract a year later --

14:59:42  9          THE COURT:  I don't care.  I just want to know

14:59:45 10  whether it was properly pleaded and presented in this case.

14:59:48 11  You can present whatever evidence you want at trial.

14:59:52 12          MR. ROTHSTEIN:  It is in there, Your Honor.

14:59:54 13          THE COURT:  All right.  Trial logistics, we

14:59:57 14  already talked about that.  You have four hours for trial.

15:00:03 15  That includes both case-in-chief and response, opening

15:00:07 16  statements, closing arguments, witness examinations and

15:00:08 17  arguments over objections.  Generally if we are in the

15:00:10 18  courtroom, someone is being charged for time.

15:00:13 19          It is generally helpful for me to hear closing

15:00:16 20  arguments so that I can ask any questions that I have, so

15:00:18 21  the parties are required to set aside one hour of the four

15:00:21 22  hours of trial time for closing arguments.  Closing

15:00:24 23  arguments will occur at the close of the evidentiary

15:00:27 24  presentation.  Now, if it turns out that you need an extra

15:00:31 25  fifteen minutes for your evidentiary procedures, I will

15:00:37 1   probably let you take that out of the hour I asked you to

15:00:43 2   reserve, but just ask me first.  My problem is that I have

15:00:47 3   had times when people get down and they had like nine

15:00:50 4   minutes left for a closing argument and that's not fair to

15:00:54 5   me or if there is a jury, to a jury.

15:00:56 6          Okay.  Trial will be held starting on Tuesday,

15:01:01 7   June 27th, at 9:00 a.m.  Plan to present evidence until

15:01:06 8   5:30.  To the extent that we need additional time, we will

15:01:09 9   go back on Wednesday morning.  We will do our normal

15:01:16 10  fifteen-minute break in the morning, fifteen-minute break in

15:01:18 11  the afternoon, and have a launch break of thirty to

15:01:22 12  forty-five minutes.

15:01:23 13         Consistent with the Court's procedures, the

15:01:26 14  parties shall provide a completed AO Form 187 exhibit list

15:01:30 15  to the courtroom deputy on the first day of trial.

15:01:33 16         We tend to limit movement around the courtroom.

15:01:36 17  Attorneys should stay at counsel table or come to the podium

15:01:39 18  when asking questions or doing arguments.  I think most

15:01:42 19  people find it's easier to go to the podium, but if you want

15:01:46 20  to ask questions by standing at your table, that's fine.

15:01:49 21         Whether on direct or cross, the witness needs to

15:01:51 22  have a binder with all the exhibits they will be asked to

15:01:54 23  look at so we don't have to keep going back and forth giving

15:01:58 24  over exhibits.  No copies of the witness binders come to me,

15:02:01 25  to my court reporter or my clerk, just one copy to the

15:02:04 1    witness, and that also includes the cross binder.  So when a

15:02:08 2    witness goes up to the stand on direct, the witness should

15:02:12 3    be handed a direct binder and a cross binder.

15:02:15 4            As to closing the courtroom, I am generally

15:02:19 5    disinclined to close the courtroom.  If any party

15:02:21 6    anticipates asking to seal the courtroom at any point, the

15:02:25 7    party must keep it to an absolute bare minimum and provide

15:02:28 8    sufficient notice to the other side and the Court, and I

15:02:33 9    cannot guarantee that we will seal the courtroom.

15:02:36 10           After closing arguments, we will discuss

15:02:40 11   post-trial briefing, the limits and the schedule.  After

15:02:42 12   trial I need you all to review the trial transcript and

15:02:45 13   submit any necessary corrections to the court reporter no

15:02:48 14   later than two weeks after trial.  I don't want a bunch of

15:02:51 15   corrected post-trial briefs to account for trial errata.  If

15:02:55 16   you need to access the courtroom to set up for your trial,

15:02:59 17   you may do so this Friday, June 23rd.  Coordinate with my

15:03:05 18   staff as to when you can come in and set up.

15:03:07 19           All right.  Settlement.  You said in the

15:03:12 20   pretrial order that there was a request made, but no further

15:03:22 21   discussions.  I don't know if it was before or after I

15:03:26 22   ordered you guys to mediate.  So where are we?  You don't

15:03:30 23   have to tell me the substance of what happened, just tell me

15:03:32 24   where we are.

15:03:34 25           MR. ROTHSTEIN:  We mediated yesterday with Chip

15:03:36 1    Connolly and reached an impasse after about six or

15:03:40 2    seven hours of good faith negotiations.

15:03:43 3          THE COURT:  Any agreement, disagreement?

15:03:45 4          MR. MORLEY:  We were left with the mediator's

15:03:50 5    proposal, Your Honor, that's where we're at.

15:03:52 6          THE COURT:  All right.  Well, I suggest that you

15:03:54 7    guys continue talking because it seems like both of you have

15:03:57 8    some risks here, and so if there is a possibility of

15:04:06 9    settling it, that would be good.

15:04:08 10          All right.  Anything else that you all -- that's

15:04:12 11    all I wanted to talk about.  What do you guys want to talk

15:04:15 12    about?

15:04:16 13          MR. ROTHSTEIN:  Judge Noreika, can I get a

15:04:17 14    clarification on one of your rulings.  I think they

15:04:19 15    indicated that as to two of the customers they provided

15:04:23 16    information about damages, I don't know that that's

15:04:25 17    accurate.

15:04:26 18          THE COURT:  So that one I reserved my ruling and

15:04:28 19    I said they need to go back and tell you where and what you

15:04:32 20    entered have they are pulling the information that they are

15:04:35 21    going to submit for damages, they need to talk to you, you

15:04:39 22    need to talk to them and figure it out.  I have no idea

15:04:42 23    because no one gave me my documents or deposition --

15:04:47 24          MR. ROTHSTEIN:  The only thing we have is the

15:04:48 25    list of 100 --

15:04:49 1                    THE COURT:  I don't care.  Talk to them.

15:04:51 2                    MR. ROTHSTEIN:  Okay.  Thank you.

15:04:52 3                    THE COURT:  Okay.  Anything else?

15:04:55 4                    MR. COLE:  Nothing for the plaintiff, Your

15:04:57 5       Honor.

15:04:57 6                    THE COURT:  All right.  See you guys next week.

15:05:01 7                    COURT CLERK:  All rise.

8                    (Court adjourned at 3:05 p.m.)

9

10                    I hereby certify the foregoing is a true and
         accurate transcript from my stenographic notes in the proceeding.

11

12                                    /s/ Dale C. Hawkins
                                      Official Court Reporter
13                                    U.S. District Court

14

15

16

17

18

19

20

21

22

23

24

25