# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

GORDIAN MEDICAL, INC. d/b/a : 
AMERICAN MEDICAL TECHNOLOGIES : 
and AMT ULTIMATE HOLDINGS, L.P., : 
                                        : 
           Plaintiffs, : 
                                         :   Case No. 1:22-cv-00319-MN-SRF
       v. : 
                                          : 
MISTY VAUGHN, : 
                                          : 
          Defendant. : 
                                          : 

## <u>POST-TRIAL BRIEF</u>

**COLE SCHOTZ P.C.**
Andrew L. Cole (No 5712)
Stacy L. Newman (No. 5044)
Jack M. Dougherty (No. 6784)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
(302) 652-3131 (Phone)
(302) 652-3117 (Fax)
acole@coleschotz.com
snewman@coleschotz.com
jdougherty@coleschotz.com

<u>Of Counsel</u>:

Ryan J. Morley (*pro hac vice*)
John W. Hofstetter (*pro hac vice*)
LITTLER MENDELSON, P.C.
Key Tower
127 Public Square, Suite 1600
Cleveland, OH 44114
(216) 696-7600 (Phone)
(216) 696-2038 (Fax)
rmorley@littler.com
jhofstetter@littler.com

*Attorneys for Plaintiffs,*
*Gordian Medical, Inc.,*
*d/b/a American Medical Technologies and*
*AMT Ultimate Holdings, L.P.*

Dated: <u>July 24, 2023</u>

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     SUMMARY OF FACTS PRESENTED AT TRIAL.............................................1

        A.      The Parties. ..............................................................................................1

        B.      Vaughn's Twenty-Year Employment with AMT. .....................................2

        C.      AMT Is Acquired by Private Equity in 2020............................................3

        D.      The AMT/RestorixHealth Merger, the Success Fee Agreement, and the 2021 Employment Agreement. ..................................................................3

                i.      Vaughn Freely Enters Into the 2021 Employment Agreement...................3

                ii.     The 2021 Employment Agreement's Restrictive Covenants......................4

        E.      The 2021 Incentive Unit Grant Agreement. .............................................7

        F.      Vaughn Resigns from AMT to Work for One of its Direct Competitors. ..............8

        G.      Vaughn Breaches Her Restrictive Covenants. ..........................................9

                i.      Vaughn's Employment with Curitec Breaches Her Non-Compete Covenants............................................................................................9

                ii.     Vaughn Breaches the Confidentiality Covenants During Her Employment with Curitec. ....................................................................10

                iii.    Vaughn Breaches the No-Aid-Or Inducement Covenants.......................12

III.    LAW AND ARGUMENT ....................................................................................13

        A.      Plaintiffs' *Prima Facie* Breach of Contract Claims...............................13

        B.      The Agreements Meet General Contract Law Requirements. ................13

                i.      The 2021 Employment Agreement Is a Valid Contract...........................14

                ii.     The 2021 IUGA Is a Valid Contract. ....................................................15

        C.      The Restrictive Covenants Are Reasonable............................................15

                i.      The Restrictive Covenants Are Reasonable in Duration. .......................16

ii.  The Restrictive Covenants Are Reasonable in Geographic Scope. ...........16

iii.  To the Extent the Court Finds any Restrictive Covenant Overbroad, Delaware Law Permits the Court to Reform the Restrictive Covenant to Render It Reasonable............................................................18

D.  The Restrictive Covenants Advance Plaintiffs' Legitimate Economic Interests. ...............................................................................................18

E.  The Balance of the Equities Strongly Favors Plaintiffs. ........................19

F.  Vaughn Breached the Restrictive Covenants. ........................................20

G.  Plaintiffs Are Entitled to Several Remedies for Vaughn's Breaches of the Agreements. ............................................................................................20

i.  Plaintiffs Are Entitled to Their Reasonable Attorneys' Fees Caused by Vaughn's Breaches of the IUGA. ........................................20

ii.  Plaintiffs Are Also Entitled to Nominal Damages Because of Vaughn's Breaches of the Agreements.....................................22

iii.  Plaintiffs Are Also Entitled to Certain Injunctions Based on Vaughn's Breaches of Her Agreements.....................................22

H.  In the Court's Assessing of the Evidence, Plaintiffs Are Entitled to Strong Adverse Inferences Concerning the Contents of Certain Obstructed and Withheld Documents. ...........................................................................25

IV.  CONCLUSION AND REQUESTED RELIEF ...............................................28

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*All Pro Maids, Inc. v. Layton*,
No. CIV.A. 058-N, 2004 WL 1878784 (Del. Ch. Aug. 9, 2004), *aff'd*, 880
A.2d 1047 (Del. 2005) ................................................................................................20

*Am. Homepatient, Inc. v. Collier*,
No. CIV.A. 274-N, 2006 WL 1134170 (Del. Ch. Apr. 19, 2006) .........................................14

*Am. Inst. for Chartered Prop. Cas. Underwriters v. Potter*,
No. CV 19-1600-RGA, 2022 WL 4245624 (D. Del. Sept. 15, 2022) ...................................22

*Beau Prod., Inc. v. Permagrain Prod., Inc.*,
97 F.R.D. 50 (M.D. Pa. 1983).................................................................................................28

*Chung v. Lee*,
No. CIV.A. N18C-12-236 SKR, 2022 WL 990272 (Del. Super. Ct. Mar. 31,
2022) ..........................................................................................................................................13

*COPI of Delaware, Inc. v. Kelly*,
No. CIV.A. 14529, 1996 WL 633302 (Del. Ch. Oct. 25, 1996)..............................................16

*Delaware Exp. Shuttle, Inc. v. Older*,
No. CIV.A. 19596, 2002 WL 31458243 (Del. Ch. Oct. 23, 2002)...................................20, 21

*EDIX Media Grp., Inc. v. Mahani*,
No. CIV.A. 2186-N, 2006 WL 3742595 (Del. Ch. Dec. 12, 2006).........................................22

*Faw, Casson & Co., L.L.P. v. Halpen*,
No. CIV.A. 00C-01-015, 2001 WL 985104 (Del. Super. Ct. Aug. 7, 2001)..........................21

*First Fin. Sec., Inc. v. Freedom Equity Grp., LLC*,
No. 15-CV-1893-HRL, 2016 WL 5870218 (N.D. Cal. Oct. 7, 2016) ....................................28

*First Mortg. Co. v. Fed. Leasing Corp.*,
456 A.2d 794 (Del. 1982) .......................................................................................................13

*Garfield on behalf of ODP Corp. v. Allen*,
277 A.3d 296 (Del. Ch. 2022)................................................................................................22

*Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*,
No. 20-CV-181 (KMK), 2020 WL 915824 (S.D.N.Y. Feb. 26, 2020).............................23, 24

*Hough Assocs., Inc. v. Hill*,
No. CIV.A. 2385-N, 2007 WL 148751 (Del. Ch. Jan. 17, 2007) ...........................................13

*Kan-Di-Ki, LLC v. Suer*,
  No. CIV.A. 7937-VCP, 2015 WL 4503210 (Del. Ch. July 22, 2015)
  .........................................................................................................13, 18, 22, 23

*Kodiak Bldg. Partners, LLC v. Adams*,
  2022 WL 5240507 (Del. Ch. Oct. 6, 2022) ...........................................................18

*Kold, LLC v. Croman*,
  No. CIV.A. N13C-05-249 MMJ, 2014 WL 7008431 (Del. Super. Ct. Nov. 25,
  2014) ...................................................................................................................14

*Maria Del Socorro Quintero Perez, CY v. United States*,
  No. 13CV1417-WQH-BGS, 2016 WL 705904 (S.D. Cal. Feb. 23, 2016)............................27

*Mystique, Inc. v. 138 Int'l, Inc.*,
  07-22937-CIV, 2011 WL 13173601, at *10 (S.D. Fla. Aug. 31, 2011),
  *report and recommendation adopted*, No. 10-21421-CIV, 2011 WL 13173603
  (S.D. Fla. Dec. 19, 2011) ...................................................................................28

*O'Leary v. Telecom Res. Serv., LLC*,
  No. CIV.A. 10C-03-108-JOH, 2011 WL 379300 (Del. Super. Ct. Jan. 14,
  2011) ...................................................................................................................17

*Research & Trading Corp. v. Pfuhl*,
  1992 WL 345465 (Del. Ch. Nov. 18, 1992) ...........................................18, 19, 20, 21

*Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*,
  2015 WL 6611601 (Del. Ch. Oct. 30, 2015) ........................................................15

*Sarissa Cap. Domestic Fund LP v. Innoviva, Inc.*,
  No. CIV.A. 2017-0309-JRS, 2017 WL 6209597 (Del. Ch. Dec. 8, 2017) ............................13

*Sensus USA, Inc. v. Franklin*,
  No. 15-CV-742, 2016 WL 1466488 (D. Del. Apr. 14, 2016)...........................................23, 24

*Simplexity, LLC v. Zeinfeld*,
  No. CIV.A. 8171-VCG, 2013 WL 1457726 (Del. Ch. Apr. 5, 2013)...........................17, 23

*Tigani v. Fisher Dev. Co.*,
  No. CIV.A. N21A-05-001 CEB, 2022 WL 1039969 (Del. Super. Ct. Apr. 6,
  2022) ...................................................................................................................13

*TP Group–CI, Inc. v. Vetecnik*,
  No. 1:16-CV-00623-RGA, 2016 WL 5864030 (D. Del. Oct. 6, 2016) ...........................16, 19

*Tristate Courier & Carriage, Inc. v. Berryman*,
  2004 WL 835886 (Del. Ch. Apr. 15, 2004) ..........................................................19

*USH Ventures v. Glob. Telesystems Grp., Inc.*,
    796 A.2d 7 (Del. Super. Ct. 2000) ........................................................................22

*WebMD Health Corp. v. Dale*,
    2012 WL 3263582 (E.D. Pa. Aug. 10, 2012) ........................................................18

*Weichert Co. of Pennsylvania v. Young*,
    No. CIV.A. 2223-VCL, 2007 WL 4372823 (Del. Ch. Dec. 7, 2007)....................16

**Rules and Statutes**

Federal Rule of Civil Procedure 37(b)...................................................................25, 28

64157/0001-45802388

## I.      INTRODUCTION

As shown at trial, Plaintiffs Gordian Medical Technologies (d/b/a American Medical Technologies) ("AMT") and AMT Ultimate Holdings, L.P. ("Holdings" or "AMT Holdings") (collectively, "Plaintiffs") should be awarded the benefits of their bargains with Defendant Misty Vaughn ("Vaughn"), caused by her multiple breaches of her 2021 Employment Agreement with AMT (the "2021 Employment Agreement") and her 2021 Incentive Unit Grant Agreement with AMT and Holdings (the "2021 IUGA" or the "IUGA") (collectively, "the Agreements"). Plaintiffs showed Vaughn unfairly breached the Agreements' respective confidentiality, non-competition, and non-aid-or-inducement provisions through her employment as a senior executive at Curitec, LLC ("Curitec"), one of AMT's largest and most direct competitors in the wound care industry. This was although Vaughn utterly failed to produce reams of critically relevant documents concerning that employment within her possession, custody, and control. As a result, Plaintiffs respectfully request that this Court find and order that Plaintiffs are entitled to several remedies, including their reasonable attorneys' fees and an award of specific performance—i.e., an order enjoining Vaughn for a period of twenty-four (24) months (or any lesser period the Court considers reasonable) from rendering services to Curitec.

## II.     SUMMARY OF FACTS PRESENTED AT TRIAL

### A.      The Parties.

Founded in 1994, AMT is a senior care company focused on delivering outcome-driven programs to health care providers in the long-term care and post-acute environments. (Admitted Fact 1). AMT is the leading independent provider of wound care solutions for long-term nursing care facilities in the United States. (Admitted Fact 2). AMT was incorporated in the State of Nevada and has its corporate headquarters in Irvine, California. (Admitted Fact 6). AMT Holdings

is AMT's indirect parent and a limited partnership organized in the State of Delaware.  (Admitted Facts 4–5).

Vaughn is an adult individual who resides at 133 Circle Slope Drive, Simpsonville, South Carolina 29681, and is a citizen of South Carolina.  (Admitted Fact 7).

**B.    Vaughn's Twenty-Year Employment with AMT.**

Vaughn was AMT's first employee, beginning her employment on or about December 15, 2001.  (Admitted Facts 11–12).  During her over twenty-year career with AMT, Vaughn worked her way up to AMT's senior management, ultimately becoming AMT's Senior Vice President, Post-Acute Operations and Clinical Services.  (PTX 1; PTX 4; Pls.' Compl., D.I. 1-1, ¶ 6; Def.'s Ans., D.I. 56, ¶ 7; 6/27/23 Tr. 50:19-21).

AMT is a sales-driven business.  (6/27/23 Tr. 49:3-7).  It has a national sales footprint, servicing long-term care nursing facilities across the country.  (6/27/23 Tr. 49:8-14).  AMT does not sell directly to nursing facilities, rather it sells to patients of nursing facilities who are covered by Medicare or private insurance.  (6/27/23 Tr. 50:3-5).  To generate sales to patients, AMT aligns with nursing facilities—typically large regional or national chains—to establish and grow relationships with facilities over time.  (6/27/23 Tr. 50:6-12).

Vaughn was a key executive of AMT with nationwide responsibilities.  (6/27/23 Tr. 51:4-24).  In her most recent role, her primary responsibility was overseeing all of AMT's clinicians who travelled to nursing homes across the United States to make sales.  (*Id.*).  In this role she developed AMT's protocols for how the company determined which supplies to provide to different patients based on their specific wound types.  (*Id.*).  Vaughn was responsible for negotiating pricing for all of AMT's vendor relationships.  (*Id.*).  As a senior executive, she was involved in all aspects of AMT's business.  In these various roles, Vaughn was a source of tremendous goodwill for AMT.  (6/27/23 Tr. 60:15-61:3).

2

Vaughn was entrusted with a variety of AMT's confidential business information, including its clinical formularies and protocols, reporting and business metrics, customer business reviews, and clinical education programs.  (6/27/23 Tr. 54:12-56:7, 56:8-57:3, 57:4-21, 57:22-59:19, 61:15-23, 72:12-73:3).

### C.  AMT Is Acquired by Private Equity in 2020.

In July of 2020, a private equity firm acquired AMT.  (6/27/23 Tr. 219:4-13).  Following this transaction, on July 31, 2021, Vaughn and AMT signed an employment agreement (the "2020 Employment Agreement").  (PTX 2; 6/27/23 Tr. 219:7-13).  Among other things, the 2020 Employment Agreement included a success fee provision which provided that Vaughn would be paid an initial success fee of approximately $1 million, with a remaining success fee of approximately $1.2 million to be paid pursuant to a schedule over the ensuing five years.  (PTX 2, § 5).  To receive the entirety of this second payment, Vaughn needed to remain employed for the five years.  (PTX 2, § 5).  In connection with the 2020 Employment Agreement, Vaughn received the initial success fee of approximately $1 million.  (6/27/23 Tr. 13:7-16, 140:9-24, 259:7-9).

### D.  The AMT/RestorixHealth Merger, the Success Fee Agreement, and the 2021 Employment Agreement.

#### i.  Vaughn Freely Enters Into the 2021 Employment Agreement.

In April of 2021, AMT merged with a company called RestorixHealth.  (6/27/23 Tr. 18:20-19:5, 229:7-16).  Following the merger, on June 7, 2021, Steve McLaughlin, AMT's then-Chief Executive Officer, presented Vaughn with the Success Fee Agreement and the 2021 Employment Agreement (which the Success Fee Agreement incorporated by reference).  (PTX 1, PTX 12, Tr. 6/27/23 132:21-133:13).  Under the Success Fee Agreement, AMT accelerated the roughly $1.2 million success fee (to be paid over two months) in exchange for Vaughn's signing of the 2021 Employment Agreement and a General Release of AMT and its affiliates (including

3

Holdings).  (PTX 1, Success Fee Agreement, § 2).  This bargain was beneficial to Vaughn because she would no longer have to be employed for the full ensuing five years to receive this payment. (PTX 1; PTX 2, § 5(a)).

Vaughn forwarded the agreements to her attorney, Andrew Prescott of Nixon Peabody, who reviewed them on her behalf prior to signing.  (PTX 12; Tr. 6/27/23 132:21-133:19).  Vaughn admitted she understood the terms of the 2021 Employment Agreement prior to signing it.  (Tr. 6/27/23 134:10-15).

On June 11, 2021, Vaughn and AMT signed the Success Fee Agreement, the Release, and the 2021 Employment Agreement.  (Admitted Fact 15; PTX 1; 6/27/23 Tr. 134:19-20).  Thereafter, AMT paid Vaughn approximately $1.2 million in accordance with the accelerated success fee provision in the Success Fee Agreement.  (6/27/23 Tr. 140:1-4).

The 2021 Employment Agreement contained materially different terms from Vaughn's prior employment agreements.  These included a new job title and new non-monetary benefits for Vaughn.  (*Compare* PTX 2 (2020 Employment Agreement) *with* PTX 1 (2021 Employment Agreement), § 9(d) (adding new rights and benefits to non-disparagement clause); *id.* at § 1(b) (adding that certain activity approval will not be unreasonably withheld from Vaughn); *id.* at § 3 (adding that Vaughn's base salary cannot be reduced below $240,000); *id.* at § 10 (adding that cooperation will be at AMT's sole cost and expense); see also PTX 6).

### ii.    The 2021 Employment Agreement's Restrictive Covenants.

At issue are several of the restrictive covenants contained in Section 9 of the 2021 Employment Agreement.  First, in Section 9(a), Vaughn acknowledged that as part of her employment with AMT she would have access to Confidential Information, defined as follows:

> For purposes of this Agreement, "Confidential Information" means [AMT's] confidential and/or proprietary information and/or trade secrets that have been developed or used and/or will be developed or used during

[Vaughn's] employment and/or service with [AMT] and that cannot be obtained readily by third parties from outside sources, including, by way of example and without limitation, all data, information, ideas, concepts, discoveries, trade secrets, inventions (whether or not patentable or reduced to practice), innovations, improvements, know-how, developments, techniques, methods, processes, treatments, drawings, sketches, specifications, designs, patterns, models, plans and strategies, and all other confidential or proprietary information or trade secrets in any form or medium (whether merely remembered or embodied in a tangible or intangible form or medium) whether now or hereafter existing, relating to or arising from the past, current or potential business, activities and/or operations of [AMT], including, without limitation, any such information relating to or concerning finances, sales, marketing, advertising, transition, promotions, pricing, personnel, customers, suppliers, vendors, raw partners and/or competitors.

(PTX 1, § 9(a)).

Vaughn agreed that she:

shall not, directly or indirectly, use, make available, sell, disclose or otherwise communicate to any person, other than in the course of [Vaughn's] assigned duties and for the benefit of the [AMT], either during the period of [Vaughn's] employment or service or at any time thereafter, any Confidential Information or other confidential or proprietary information received from third parties subject to a duty on [AMT]'s part to maintain the confidentiality of such information, and to use such information only for certain limited purposes, in each case, which shall have been obtained by [Vaughn] during [Vaughn's] employment by or service to [AMT] (or any predecessor).

(*Id.*).

Second, in Section 9(b), Vaughn acknowledged that:

(i) [Vaughn] performs services of a unique nature for the [AMT], and that [Vaughn's] performance of such services to a competing business may result in irreparable harm to [AMT], (ii) [Vaughn] has had and will continue to have access to Confidential Information which, if disclosed, may unfairly and inappropriately assist in competition against [AMT], (iii) in the course of [Vaughn's] employment by a competitor, [Vaughn] may inevitably use or disclose such Confidential Information, (iv) [AMT] has substantial relationships with its customers and [Vaughn] has had and may continue to have access to these customers, (v) [Vaughn] has received and will receive specialized training from [AMT], and (vi) the Executive has generated and will continue to generate goodwill for [AMT] in the course of [AMT's] employment and service.

(*Id.* at § 9(b)).

Based on these acknowledgements, Vaughn agreed that, for twenty-four (24) months following the end of her employment she would not:

> directly or indirectly, own, manage, operate, control, be employed by (whether as an employee, consultant, independent contractor or otherwise, and whether or not for compensation) or render services to any person, firm, corporation or other entity, in whatever form, engaged in the business of providing wound care supplies or related wound care evaluation, treatment and management services, ostomy, urological or tracheostomy services and training and education in any setting, whether in a facility, a clinic, in home-based care or otherwise (the "Restricted Business"), within (A) the United States or (B) any other country in which [AMT] conducts the Restricted Business during [Vaughn's] employment or service with [AMT] during the Restricted Period.

(*Id.*).

Third, in Section 9(c), Vaughn also agreed, in pertinent part, that:

> During the Restricted Period, . . . **[Vaughn] shall not**, except in the furtherance of [Vaughn's] duties hereunder, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, (i) solicit, **aid or induce any [individual or entity of any kind] who is**, as of [Vaughn's] termination date, **or was**, during the eighteen (18)-month period immediately preceding [Vaughn's] termination date, **a customer of [AMT] to purchase goods or services related to the Restricted Business from another person**, firm, corporation or other entity **or assist any other person** or entity **in identifying or soliciting any such customer**.

(*Id.* at § 9(c)(i) (emphasis added)).

Each of these covenants is buttressed by several important acknowledgements by Vaughn.

First, in Section 9(g), Vaughn acknowledged the reasonableness of the covenants:

> In signing this Agreement, [Vaughn] gives [AMT] assurance that [Vaughn] has carefully read and considered all of the terms and conditions of this Agreement, including the restraints imposed under this Section 9. [Vaughn] agrees that these restraints are necessary for the reasonable and proper protection of [AMT] and its Confidential Information and that each and every one of the restraints is reasonable in respect of subject matter, length of time and geographic area, and that these restraints, individually or in the aggregate, will not prevent [Vaughn] from obtaining other suitable

> employment during the period in which [Vaughn] is bound by the restraints. [Vaughn] acknowledges that each of these covenants has a unique, very substantial and immeasurable value to [AMT] and that [Vaughn] has sufficient assets and skills to provide a livelihood while such covenants remain in force. [Vaughn] further covenants that [Vaughn] will not challenge the reasonableness or enforceability of any of the covenants set forth in this Section 9.

(*Id.* at § 9(g)).

Second, in Section 11, Vaughn acknowledged the remedies available to AMT in the event of her breach of the covenants:

> [Vaughn] acknowledges and agrees that [AMT's] remedies at law for a breach or threatened breach of any of the provisions of Sections 9 or l0 hereof would be inadequate and, in recognition of this fact, [Vaughn] agrees that, in the event of such a breach or threatened breach, in addition to any remedies at law, [AMT] shall be entitled to seek equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available, without the necessity of showing actual monetary damages or the posting of a bond or other security.

(*Id.* at § 11).

### E.    The 2021 Incentive Unit Grant Agreement.

The 2021 Employment Agreement also stated that AMT Holdings would provide Vaughn an equity grant representing Class B Units in AMT Holdings and, to that end, the parties would enter into a separate award agreement granting such units. (PTX 1, § 5(e)). On July 31, 2022, Vaughn, AMT, and AMT Holdings signed the 2021 Incentive Unit Grant Agreement (the "IUGA"). (PTX 3; Admitted Facts 17-18; 6/27/23 Tr. 121:25-122:9, 234:7-13).

In Annex A to the IUGA, Vaughn agreed to confidentiality, non-competition, and non-aid-or-inducement restrictive covenants functionally identical to the corresponding provisions in the 2021 Employment Agreement. (PTX 3, Annex A, §§ 1-3). As with the 2021 Employment Agreement, these restrictive covenants were buttressed by Vaughn's acknowledgements that they were reasonable and that any breach would entitle Plaintiffs to seek injunctive relief. (PTX 3 §

7

6(c), 13(g)).  The IUGA also included a clause stating that each of the parties "will be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including attorney's fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor." (PTX 3, § 13(g)).

The parties performed the 2021 IUGA.  (6/27/23 Tr. 94:4-24, 103:7-9, 123:9-124:5). Specifically, pursuant to Section 1(a) of the IUGA, AMT Holdings issued to Vaughn, and Vaughn accepted, 634.46 Class B Units in AMT Holdings.  (PTX 3, § 1; 6/27/23 Tr. 94:4-24, 103:7-9, 123:9-124:5).  Thereafter, on August 23, 2021, pursuant to Section 1(c) of the IUGA, Vaughn made an effective election with the Internal Revenue Service under Section 83(b) of the Internal Revenue Code.  (DTX 1; 6/27/23 Tr. 94:4-24, 103:7-9, 105:15-106:15, 233:1-15).  Had Vaughn not made her Section 83(b) election, Vaughn would have had to pay taxes on the Class B Incentive Units.  (6/27/23 Tr. 119:9-120:2, 144:19-145:14).

### F.    Vaughn Resigns from AMT to Work for One of its Direct Competitors.

On January 12, 2022, Vaughn voluntarily resigned from her employment with AMT to, in her own words, pursue her interest in travel, her passion for bird watching, and her real estate investments.  (Admitted Fact 19; Tr. 6/27/23 52:3-7, 53:24-54:8).  Based on these representations, Vaughn's manager at AMT, Therese Hernandez, understood Vaughn to be retiring.  (Tr. 6/27 54:9-11; 88:6-8).  Despite these representations, on February 7, 2022, Vaughn confirmed to AMT that she had taken a position with Curitec.  (Admitted Fact 20).

Curitec is one of AMT's strongest competitors in the wound care industry, which is relatively small and highly competitive.  (Tr. 6/27/23 63:1-17).  Like AMT, Curitec has a nationwide sales footprint, and AMT and Curitec compete for the same customers around the country.  (Tr. 6/27/23 63:18-22).  Nick Percival, one of Vaughn's "best friends," is Curitec's Chief Executive Officer.  (Tr. 6/27/23 147:13-16).

### G.    Vaughn Breaches Her Restrictive Covenants.

#### i.    Vaughn's Employment with Curitec Breaches Her Non-Compete Covenants.

Since January 2022, Vaughn has worked for Curitec as its Executive Vice President of Clinical Services.  (Admitted Facts 20, 25; Tr. 6/27/23 127:25-128:2).  In that role, she is one of the top four executives at Curitec, earning a salary of $275,000 per year, which is $35,000 more than the base salary she last earned at AMT.  (PTX 1; Tr. 6/27/23 127:6-16, 127:25-128:2).  At Curitec, Vaughn travels around the country and is responsible for the clinical education of Curitec's sales staff, including its "back-end" sales staff.  (Tr. 6/27/23 149:18-150:9, 189:22-190:7).  As Vaughn admitted, she assists in driving revenue for Curitec:

> Q.    The clinician side [of Curitec's operations], that is its own form of sales, though, correct?
>
> A.    The clinicians are responsible for finding and selecting the correct products that go on to the patients and making sure that those are clinically appropriate, making sure that those are the clinically appropriate products, and we're getting the right dressings for the patient and making sure we get good clinical outcomes for the patient.  I don't know if I would characterize that as sales, at AMT they categorize that as sales, the clinicians are responsible for working with the facilities staff and making sure the patients are getting what they need as far as the best clinical practices for that particular individual.  A large part of my job, is to make sure that that is happening, that those clinicians are in fact providing them the right products[.]
>
> * * *
>
> Q.    And the selection of those wound related products is what drives sales revenue for the company, correct?
>
> A.    It's what drives the revenue, you're defining that as sales.
>
> Q.    Well, you said it better than I did, so it drives the revenue for the company, the products that the clinicians are able to get to the patients, that's how Curitec makes money?
>
> A.    Correct.

9

> Q.    And when you educate the clinicians, you're assisting the clinicians in maximizing the profitability to Curitec based on the products that are sold to the patients; correct?
>
> A.    It could be maximizing[.]

(6/27/23 Tr. 150:10-151:23).

Under the plain text of her non-compete restrictive covenants with Plaintiffs, Vaughn's employment as a senior executive with Curitec is an ongoing breach.  (PTX 1, § 9(b); PTX 3, Annex A, § 2).

### ii.    Vaughn Breaches the Confidentiality Covenants During Her Employment with Curitec.

Almost immediately after starting her employment with Curitec, Vaughn began divulging AMT's Confidential Information to Curitec and its senior employees.  (*See* PTX 26-28).

Specifically, on February 9, 2022, Vaughn, responding on an email thread with Mark Hopkins (Curitec's Vice President of Sales and Marketing), Nancy McNally (Curitec's Vice President of Wound Care Education and Clinical Services), and the "Curitec Management" email subgroup regarding a mutual competitor in eastern Texas, Impact Medical, Vaughn divulged sensitive competitive information that she obtained while employed by AMT:

> Being on the end that just had the services cancelled, I can give a little additional information:
>
> They [an AMT customer] stated that AMT was over-providing products (boxes of supplies unopened) and that was what prompted [the customer] to entertain the conversation with Impact.  We also learned that there was some type of connection between the leaders of the companies (may have been a Jewish connection?).  But the decision was made above the "day to day" level of operations with which AMT had connections (either at the C suite or owner level).
>
> Add "one stop shop" with Wounds+ OUTs + Enterals and Creative Solutions wanted to be able to have 1 group to do all of it.

> Last was the 'person in the office' - that just meant they had someone in house connected to the EMR to find all the wounds (which could be done by having anyone, anywhere, have access to the EMR).
>
> I did not remember hearing that they had people available to do rounds in the buildings or provide ongoing education. But that was apparently not on the top of the list for the decision maker.
>
> I don't know that Impact is asking the facilities to fill out a supply form, or if they are doing it for them after digging through the files (and sending for signatures). What I would imagine is that their clinical efficacy would drop drastically, and the wound care would suffer, given the turnover in the industry and lack of education/training that the average agency staff member would have on wounds. I imagine Impact is billing for a lot of gauze, ABDs, and tape.

(PTX 26).

That same day, in a separate email chain, Vaughn divulged to Nick Percival AMT's most recent wound healing benchmarks to compare against Curitec's healing benchmarks. (PTX 27). AMT considers such metrics its confidential business information. (6/27/23 Tr. 56:8-57:3).

Later, on March 2, 2022, in another email chain, Vaughn divulged to Ms. McNally that AMT possessed several customers utilizing a certain type of program, but that there "are still plenty of [such potential customers] around the country that AMT is not in," and that Curitec "could focus on those [potential customers] if anyone was up for it." (PTX 28).

These emails are among the only eleven (11) email chains Vaughn produced from her Curitec email account during discovery. As the Court is aware, Curitec obstructed Vaughn's access to her own email account during this litigation. (6/27/23 Tr. 160:1-6, 162:3-6, 166:8-11, 177:7-12; 193:24-194:8; Pretrial Tr. 7:11-17). Thus, as discussed in greater detail in Section II.H., *infra*, these three emails reflect merely the "tip of the iceberg" of Vaughn's likely breaches of her confidentiality covenants.

### iii.    Vaughn Breaches the No-Aid-Or Inducement Covenants.

At trial, Vaughn admitted that she also breached the Agreements' no-aid-or-inducement covenants.  (6/27/23 Tr. 156:1-157:16).  Vaughn admitted to servicing and selling products to AMT customers lost to Curitec since her departure from AMT, including the Prestige Group of nursing care facilities.  (*Id.*).  Specifically, Vaughn testified that she assists the Prestige Group with its product formulary, which is the products that Prestige Group selects and desires to use on its patients.  (*Id.*).

At trial, Vaughn attempted to draw a distinction between "hunting" or "winning" AMT's customers from AMT, which she purports to have no hand in, versus servicing or selling products to a former AMT customer once it has been "won" by others at Curitec, which she believes she may do "all day every day":

> Q.    So, just so I'm clear and the record is clear, you're saying if, let's just use Prestige Group because that's someone you identified in your deposition, if Prestige Group is an AMT client yesterday, but then Curitec gets the Prestige Group of facilities tomorrow, you believe that you can immediately go and assist Curitec with stuff for Prestige Group?
>
> A.    I'm not going in and doing –
>
> Q.    I'm not saying you're going in, I'm saying it's your understanding that you can work with Prestige Group?
>
> A.    It would be my understanding that I can work with a Curitec client.

(6/27/23 Tr. 157:8-16, 158:3-14, 173:5-175:8; PTX 42).

Under the plain language of the no-aid-or-inducement covenant, this is a distinction without a difference, as that covenant expressly prohibits Vaughn from "aiding or inducing" AMT's former customers from purchasing goods from Curitec.  (PTX 1, § 9(c); PTX 3, Annex A, § 3).

## III.    LAW AND ARGUMENT

### A.    Plaintiffs' *Prima Facie* Breach of Contract Claims.

Plaintiffs assert breach of contract claims against Vaughn.  To prove a breach of contract, a plaintiff must show: "(1) the existence of a contract; (2) breach of an obligation imposed by that contract; and (3) resulting damages.  After a full trial on the merits, a plaintiff bears the burden of proving the elements of its contract claim by a preponderance of the evidence."  *Kan-Di-Ki, LLC v. Suer*, No. CIV.A. 7937-VCP, 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015).

In Delaware, restrictive covenants are enforceable if they: (1) meet general contract law requirements; (2) are reasonable in scope and duration, both geographically and temporally; (3) advance a legitimate economic interest of the party enforcing the covenant; and (4) survive a balance of the equities.  *Id.*

### B.    The Agreements Meet General Contract Law Requirements.

Under Delaware law, "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."  *Sarissa Cap. Domestic Fund LP v. Innoviva, Inc.*, No. CIV.A. 2017-0309-JRS, 2017 WL 6209597, at *21 (Del. Ch. Dec. 8, 2017), *judgment entered*, (Del. Ch. 2017).  Mutual assent may be shown by the parties either signing the contract (*see, e.g., Hough Assocs., Inc. v. Hill*, No. CIV.A. 2385-N, 2007 WL 148751, at *14 (Del. Ch. Jan. 17, 2007), *judgment entered*, (Del. Ch. 2007)) or by performing the contract.  *See, e.g., Chung v. Lee*, No. CIV.A. N18C-12-236 SKR, 2022 WL 990272, at *5 (Del. Super. Ct. Mar. 31, 2022).  Consideration, in turn, "can consist of either a benefit to the promiser [sic] or a detriment to the promisee."  *First Mortg. Co. v. Fed. Leasing Corp.*, 456 A.2d 794, 795-96 (Del. 1982).  "Delaware courts do not appraise the value of consideration.  Nor do they assess 'whether it is fair or adequate.'  Instead, Delaware courts ask if consideration 'exists.'  By consequence, 'bad' consideration is still consideration."  *Tigani v. Fisher Dev. Co.*, No. CIV.A. N21A-05-001

CEB, 2022 WL 1039969, at *6 (Del. Super. Ct. Apr. 6, 2022) (internal citations and quotations omitted).

### i.    The 2021 Employment Agreement Is a Valid Contract.

AMT and Vaughn freely bargained for, executed, and performed the 2021 Employment Agreement.  As to mutual assent, as the 2021 Employment Agreement itself acknowledges, Vaughn negotiated the contract with the help of her counsel, Andrew B. Prescott of Nixon Peabody LLP, and then signed the 2021 Employment Agreement on June 11, 2021.  (Admitted Fact 15; PTX 1; PTX 12; Tr. 6/27/23 123:16-19, 133:8-13, 134:19-20).

The 2021 Employment Agreement is also supported by consideration.  In exchange for signing, Vaughn received over $1.2 million as an accelerated bonus payment through the Success Fee Agreement.  (6/27/23 Tr. 140:1-4).  If Vaughn had not signed the Success Fee Agreement, under her 2020 Employment Agreement, she would have been required to wait, and continuously work for AMT, through 2025 to receive this bonus payment.  (PTX 2, § 5).

Vaughn also received new non-monetary benefits under the 2021 Employment Agreement. *See Kold, LLC v. Croman*, No. CIV.A. N13C-05-249 MMJ, 2014 WL 7008431, at *3 (Del. Super. Ct. Nov. 25, 2014) ("In an employment contract context, sufficient consideration can exist if the employee receives a benefit or experiences a beneficial change.").  Moreover, Vaughn's continued employment with AMT, coupled with her new position, also constituted consideration for the 2021 Employment Agreement.  *See Am. Homepatient, Inc. v. Collier*, No. CIV.A. 274-N, 2006 WL 1134170, at *2 (Del. Ch. Apr. 19, 2006) ("The Agreements satisfy the general requirements of a valid contract.  Those requirements are mutual assent and consideration.  [The employer] offered [the employee a] new position and continued employment in consideration of the Non–Compete Agreement, which [the employee] executed.").

Last, the parties performed the 2021 Employment Agreement.  AMT employed Vaughn pursuant to the terms of the agreement and compensated her.  (*See* Admitted Facts 11, 19).  As Vaughn herself admitted in her Counterclaim for Declaratory Relief, the 2021 Employment Agreement "expressly superseded all other agreements between Defendant and Plaintiff AMT." (Def.'s Counterclaim, ¶ 119, D.I. 56).

### ii.    The 2021 IUGA Is a Valid Contract.

Plaintiffs and Vaughn also freely bargained for, executed, and performed the IUGA.  As to mutual assent, AMT, AMT Holdings, and Vaughn signed the IUGA.  (PTX 3; Admitted Facts 17-18; 6/27/23 Tr. 121:25-122:9, 234:7-13).

As to consideration and performance, pursuant to Section 1(a) of the IUGA, on July 28, 2021, AMT Holdings issued to Vaughn, and Vaughn accepted, 634.46 Class B Units in AMT Holdings.  (PTX 3; 6/27/23 Tr. 94:4-24, 103:7-10, 123:9-124:5).  Thereafter, on August 23, 2021, pursuant to Section 1(c) of the IUGA, Vaughn made an effective election with the Internal Revenue Service under Section 83(b) of the Internal Revenue Code.  (DTX 1; 6/27/23 Tr. 94:4-24, 103:7-9, 105:15-106:15, 233:1-15).  Although the value of the Class B Units was contingent in nature, such value was by no means illusory.  Indeed, underscoring their inherent value, had Vaughn not made her Section 83(b) election, she would have had to pay taxes on the Class B Incentive Units. (6/27/23 Tr. 119:9-120:2, 144:19-145:14).

### C.    The Restrictive Covenants Are Reasonable.

Delaware law provides parties discretion to determine the temporal duration and geographic scope of restrictive covenants.  Indeed, "where restrictive covenants are carefully negotiated, our law requires that the unambiguous terms be given effect."  *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *10 (Del. Ch. Oct. 30, 2015).  Vaughn also agreed that the Restrictive Covenants were "necessary for the reasonable and proper protection of

15

[Plaintiffs] . . . and that each and every one of the restraints" was "reasonable in respect of subject matter, length of time and geographic area[.]" (PTX 1, § 9(g); *see also* PTX 3, § 6(c)).

### i.    The Restrictive Covenants Are Reasonable in Duration.

The 2021 Employment Agreement's non-competition and non-aid-or-inducement restrictions have 24-month durations, while the IUGA non-competition and non-aid-or-inducement restrictions have 2-year durations. "Delaware courts have routinely found restrictive covenants with a duration of two years to be reasonable in duration." *TP Group–CI, Inc. v. Vetecnik*, No. 1:16-CV-00623-RGA, 2016 WL 5864030, at *2 (D. Del. Oct. 6, 2016); *see also COPI of Delaware, Inc. v. Kelly*, No. CIV.A. 14529, 1996 WL 633302, at *5 (Del. Ch. Oct. 25, 1996) (two-year restriction reasonable for company officers). "Those few cases holding that two years is an unreasonable duration involve unskilled workers who received no specialized training—clearly not the type of employee in this case." *Weichert Co. of Pennsylvania v. Young*, No. CIV.A. 2223-VCL, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007). Here, Vaughn's specialized and extensive knowledge of AMT business operations—developed over nearly two decades as a high-level executive—render the temporal scope of Vaughn's Restrictive Covenants reasonable. *Id.*

### ii.    The Restrictive Covenants Are Reasonable in Geographic Scope.

Like the two-year temporal scope, the geographic scope of the Restrictive Covenants here is what "is necessary to protect [Plaintiffs'] legitimate interests." *Weichert*, 2007 WL 4372823, at *3. As Vaughn expressly acknowledged, she "perform[ed] services of a unique nature for [Plaintiffs]," and her "performance of such services to a competing business may result in irreparable harm to [Plaintiffs]." (PTX 1, § 9(b); PTX 3, Annex A, § 2). In light of this, Vaughn agreed that, for two years after leaving AMT, she could not:

> [Engage] in the business of providing wound care supplies or related wound care evaluation, treatment and management services, ostomy, urological or tracheostomy services and training and education in any setting, whether in a facility, a clinic, in home-based care or otherwise (the "Restricted Business"), within (A) the United States or (B) any other country in which [Plaintiffs] conduct[] the Restricted Business during [Vaughn's] employment or service with [AMT].

(PTX 1, § 9(b); PTX 3, Annex A, § 2).

As the Superior Court held in *O'Leary v. Telecom Res. Serv., LLC*, No. CIV.A. 10C-03-108-JOH, 2011 WL 379300, at *5 (Del. Super. Ct. Jan. 14, 2011):

> In Delaware, the reasonableness of a covenant's scope is not determined by reference to physical distances, but by reference to the area in which a covenantee has an interest the covenants are designed to protect. . . . The overarching intent of a non-compete covenant is to protect the geographical area where the business owner conducts business, and to protect its economic interests against those who may have gained an unfair competitive advantage against them as a former employee. . . . A national scope can be particularly necessary in today's world where so many businesses operate on a national or even global scale. . . . Delaware courts and other jurisdictions have permitted a nationwide non-compete covenant in certain circumstances and are not adverse to broad geographical scopes when they are necessary to protect the legitimate business interests of the party trying to enforce the covenant. . . .

*Id.* at *5. *See also Simplexity, LLC v. Zeinfeld*, No. CIV.A. 8171-VCG, 2013 WL 1457726, at *10 (Del. Ch. Apr. 5, 2013) ("While the restriction is geographically broad--it applies to the entire United States as well as any country in which the [Company] conducts business--that comports with the business interest of the Company....")

Here, AMT, as a leading independent provider of wound care solutions for long-term care facilities in the United States, conducts its business and serves customers throughout the United States. (Admitted Facts 1-2; 6/27/23 Tr. 49:8-14). In her most recent positions for AMT, Vaughn was charged with developing relationships with key AMT customers, vendors, and strategic partners who conduct business throughout the United States. (*See* PTX 4; PTX 51; Tr. 6/27/23 51:4-24). Because AMT's customers and business operations span across the United States and

17

because Vaughn oversaw various parts of AMT's business operations—where she had responsibilities nationwide—a noncompete provision that is nationwide in scope is necessary to protect AMT's legitimate business interests. (PTX 1, § 9(g); 6/27/23 Tr. 79:22-24). A provision any narrower would put AMT's ability to maintain its domestic customers and business operations at risk. Accordingly, the geographic restriction was not only reasonable, but necessary, considering the circumstances.

### iii. To the Extent the Court Finds any Restrictive Covenant Overbroad, Delaware Law Permits the Court to Reform the Restrictive Covenant to Render It Reasonable.

Plaintiffs do not believe that any of the Restrictive Covenants need to be reformed, particularly given their focus on preventing Vaughn from working for directly competing businesses, such as Curitec. To the extent that this Court finds that either the duration or scope of any Restrictive Covenant is unreasonable, however, it may reform such covenants. First, the Agreements themselves expressly provide for such modification, if necessary. (*See* PTX 1, § 9(h); PTX 3, § 6(d)). Second, Delaware law allows for reformation of restrictive covenants if the equities in play so dictate. *See, e.g., WebMD Health Corp. v. Dale*, 2012 WL 3263582, at *9 (E.D. Pa. Aug. 10, 2012) (applying Delaware law); *but see Kodiak Bldg. Partners, LLC v. Adams*, 2022 WL 5240507 (Del. Ch. Oct. 6, 2022) (citing *Norton Petroleum Corp. v. Cameron*, 1998 WL 118198, at * 3 (Del. Ch. Mar. 5, 1998)).

### D. The Restrictive Covenants Advance Plaintiffs' Legitimate Economic Interests.

Delaware courts recognize that companies have a legitimate economic interest in protecting company goodwill and protecting confidential information from misuse. *See Kan-Di-Ki,* 2015 WL 4503210, at *20; *see also Research & Trading Corp. v. Pfuhl*, 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992). Such protections are particularly vital in industries where "personal contacts are critical to the success or failure of the venture" and the breaching former employee had

18

"complete knowledge of [the company's] proprietary information." *Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004); *see also TP Group-CI, Inc.*, 2016 WL 5864030, at *2 ("Protecting a company's goodwill and confidential information are recognized as legitimate economic interests advanced by the restrictive covenants.").

AMT is in such an industry. And Vaughn, as AMT's first employee and, most recently, Senior Vice President, Post-Acute, was such an employee having complete knowledge of AMT's proprietary information. She was a key employee overseeing AMT's: supply chain relationship with its vendors; strategic initiatives, product formulary and recommended protocols; internal reporting and metrics; and the development of AMT's client reporting process. (6/27/23 Tr. 55:8-61:23). These functions are critical to AMT's business, and the Restrictive Covenants are reasonably necessary to protect Plaintiffs' legitimate economic interests. *See Research & Trading Corp.*, 1992 WL 345465, at *12 (noting "an employer has an interest in the goodwill created by its sales representatives and other employees, which is vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs.").

E.    **The Balance of the Equities Strongly Favors Plaintiffs.**

With respect to enforcing these covenants, the balancing of the equities tips strongly in favor of Plaintiffs. On the one hand, Vaughn understood the Agreements and had her own personal counsel review them prior to signing. (PTX 1, § 9(g); PTX 3, § 6(c); Tr. 6/27/23 133:4-134:15). In the 2021 Employment Agreement, Vaughn acknowledged that the restrictive covenants "will not prevent Vaughn from obtaining other suitable employment during the period in which [she] is bound by the restraints." (PTX 1, § 9(g)). And, even if Vaughn had difficulty in finding other employment (which is doubtful given Vaughn's decades of expertise in wound care), Vaughn has sufficient means to sit out her restrictive periods (as she led her colleagues to believe she was doing when she departed AMT). (Tr. 6/27/23 53:24-54:11; 88:8-9; 129:12-20). Indeed, within the past

19

four years, Vaughn received payments totaling approximately $2.4 million dollars from AMT. (Tr. 6/27/23 144:9-14; 259:7-9). Vaughn's long-term partner is a regional vice president of a company. (Tr. 6/27/23 259:24-260:1). And Vaughn also owns at least two rental properties, which are also a source of income for her. (Tr. 6/27/23 259:10-12).

On the other hand, failing to enforce the Agreements would deprive Plaintiffs of the benefits of their bargains which served to protect their legitimate business interests. *See, e.g.*, *All Pro Maids, Inc. v. Layton*, No. CIV.A. 058-N, 2004 WL 1878784, at *5 (Del. Ch. Aug. 9, 2004), *aff'd*, 880 A.2d 1047 (Del. 2005) (following trial, balancing of the equities favored enforcement, where employee read and understood covenant not to compete, which was designed to protect former employer's valuable business relationships with its customers).

### F.    Vaughn Breached the Restrictive Covenants.

As discussed in Section II.G., *supra*, Vaughn breached the agreements' respective confidentiality, non-competition, and non-aid-or-inducement restrictions. Accordingly, the Court must assess the remedies for Vaughn's breaches of the agreements.

### G.    Plaintiffs Are Entitled to Several Remedies for Vaughn's Breaches of the Agreements.

#### i.    Plaintiffs Are Entitled to Their Reasonable Attorneys' Fees Caused by Vaughn's Breaches of the IUGA.

"With respect to contracts it is settled that a provision by which one party undertakes to pay counsel fees of the other in the event of [her] own breach is not void as against public policy." *Rsch. & Trading Corp. v. Pfuhl*, No. CIV. A. 12527, 1992 WL 345465, at *15 (Del. Ch. Nov. 18, 1992)). Such provisions are routinely enforced in cases like this where a sophisticated former executive freely bargains for the provision. *See, e.g., Delaware Exp. Shuttle, Inc. v. Older*, No. CIV.A. 19596, 2002 WL 31458243, at *23 (Del. Ch. Oct. 23, 2002) ("[I]n accordance with the agreement that [the employee] made with [his former employer, the former employer] is entitled

to recover from [the employee] its attorneys' fees reasonably incurred in pursuing the relief obtained because of [the employee's] breach of the Non–Competition Agreement."); *Faw, Casson & Co., L.L.P. v. Halpen*, No. CIV.A. 00C-01-015, 2001 WL 985104, at *3 (Del. Super. Ct. Aug. 7, 2001) (awarding the plaintiff reasonable attorneys' fees pursuant to a provision in an employment contract that contained a non-competition covenant); *Pfuhl*, 1992 WL 345465, at *15 ("[T]he sentiments of the court do not present a basis to deny to plaintiff its contracted for right [to its attorneys' fees] where, as it appears here, plaintiff itself has acted reasonably and not oppressively in bringing the suit and the clause sought to be enforced creates a legal and not an equitable remedy.").

Section 13(g) of the IUGA states that each of the parties "will be entitled to enforce [their] rights under this Agreement specifically, to recover damages and costs (including attorney's fees) caused by any breach of any provision of this Agreement[.]"  (PTX 3, § 13(g)).  As discussed, Defendant then breached the IUGA's confidentiality, non-competition, and "no aid or inducement" provisions, causing Plaintiffs to bring this action to enforce their contractual rights.  (Tr. 6/27/23 99:25-100:5).  Accordingly, Plaintiffs are entitled to recover their reasonable attorneys' fees incurred in pursuing relief against Vaughn because of her breaches of the IUGA.  *See Older*, 2002 WL 31458243, at *23 (scope of appropriate relief is amount of attorney's fees reasonably incurred in obtaining relief because of breach of non-competition agreement).  To that end, Plaintiffs respectfully request leave to submit their reasonable attorneys' fees via a post-trial application to the Court.  *See id*. at *24 ("Plaintiff may apply for its attorneys' fees reasonably incurred in prosecution of its claim of breach of the Non–Competition Agreement.").

### ii.    Plaintiffs Are Also Entitled to Nominal Damages Because of Vaughn's Breaches of the Agreements.

"[W]here the Plaintiff establishes the fact of loss in contract, but not its amount, [it] may recover nominal damages." *USH Ventures v. Glob. Telesystems Grp., Inc.*, 796 A.2d 7, 23 (Del. Super. Ct. 2000) (citing Charles T. McCormick, Handbook on the Law of Damages, 91 (1935) and Arthur L. Corbin, Corbin on Contracts § 1001 (1964)). "Such damages are not given as an equivalent for the wrong, but rather merely in recognition of a technical injury and by way of declaring the rights of the plaintiff." *Id.* (quoting Finger & Finger, Delaware Trial Handbook § 22:1 (1994)); *see also Garfield on behalf of ODP Corp. v. Allen*, 277 A.3d 296, 328 (Del. Ch. 2022) (quoting Restatement (Second) of Contracts § 346(2) (Am. L. Inst. 1981), Westlaw (database updated May 2023)) ("If the breach caused no loss or if the amount of the loss is not proved under the rules stated in this Chapter, a small sum fixed without regard to the amount of loss will be awarded as nominal damages.").

Here, Vaughn's breaches of her restrictive covenants entitle Plaintiffs to an award of nominal damages in recognition of Vaughn's breaches. *See, e.g., Am. Inst. for Chartered Prop. Cas. Underwriters v. Potter*, No. CV 19-1600-RGA, 2022 WL 4245624, at *9 (D. Del. Sept. 15, 2022) (defendants' breach of the non-compete provision entitled plaintiffs nominal damages); *EDIX Media Grp., Inc. v. Mahani*, No. CIV.A. 2186-N, 2006 WL 3742595, at *10 (Del. Ch. Dec. 12, 2006) (holding same).

### iii.    Plaintiffs Are Also Entitled to Certain Injunctions Based on Vaughn's Breaches of Her Agreements.

To merit a permanent injunction, Plaintiffs must demonstrate: (1) actual success on the merits; (2) irreparable harm; and (3) that the balance of the equities weighs in favor of issuing the injunction. *Kan-Di-Ki, LLC v. Suer*, No. CIV.A. 7937-VCP, 2015 WL 4503210, at *25 (Del. Ch.

July 22, 2015). "Further, to gain specific performance of a covenant not to compete, these elements must be established by clear and convincing evidence." *Id.*

Again, Vaughn breached the agreements' respective confidentiality, non-competition, and non-aid-or-inducement restrictions. The first of those breaches occurred in January 2022, when Vaughn began working for Curitec. Such breaches have continued throughout her tenure working for Curitec.

Regarding irreparable harm, in each of the agreements, Vaughn expressly acknowledged that she "perform[ed] services of a unique nature for [Plaintiffs], and that [her] performance of such services to a competing business may result in irreparable harm to [Plaintiffs]." (PTX 1, § 9(b); PTX 3, Annex A, § 2). Vaughn also acknowledged that Plaintiffs' "remedies at law for a breach or threatened breach . . . would be inadequate and," in recognition of this fact, she agreed that "in the event of such a breach or threatened breach, in addition to any remedies at law, [Plaintiffs] shall be entitled to seek equitable relief in the form of specific performance . . . [or a] permanent injunction[.]" (PTX 1, § 11. *See also* PTX 3, § 13(g), Annex A, § 2). As the Delaware Court of Chancery has observed, Delaware law "has consistently found a threat of irreparable injury in circumstances when a covenant not to compete is breached." *Simplexity, LLC v. Zeinfeld*, No. CIV.A. 8171-VCG, 2013 WL 1457726, at *14 (Del. Ch. Apr. 5, 2013).

In addition, numerous courts in Delaware "have found irreparable harm where a senior executive with proprietary knowledge of a company's inner workings violates a non-compete agreement." *Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*, No. 20-CV-181 (KMK), 2020 WL 915824, at *9 (S.D.N.Y. Feb. 26, 2020) (analyzing and applying Delaware law). For example, in *Sensus USA, Inc. v. Franklin*, No. 15-CV-742, 2016 WL 1466488 (D. Del. Apr. 14, 2016), the court reasoned:

> [The defendant's] employment history with [the plaintiff] supports a finding of irreparable harm. The record indicates that [the defendant] has in-depth knowledge regarding several key elements of [the plaintiff's] business operations. As a former executive . . ., [the defendant] is intimately familiar with [the plaintiff's proprietary system]. The Parties recognize that [the defendant] worked on some of [the plaintiff's] biggest projects, . . . [and] both acknowledge [the defendant's] familiarity with [the plaintiff's] internal policies regarding pricing and contract negotiation.
>
> . . . Due to [the defendant's history] with [the plaintiff], as well as his former and prospective relationships with [his new employer], it is likely that [the plaintiff] will suffer irreparable harm if [the defendant] is not enjoined.

2016 WL 1466488, at *8. In other words, the threat of Vaughn's inevitable, continued disclosure of AMT's confidential business information establishes irreparable harm. *See Gen. Mills*, 2020 WL 915824, at *10 ("[W]hen addressing violations of non-compete agreements, courts— including in Delaware—commonly consider the harm arising from the likely, even if inadvertent, misuse of confidential information or customer relationships.").

The mere eleven (11) email chains Vaughn produced demonstrate that she immediately began improperly utilizing AMT's confidential business information to Curitec's advantage as soon as she started working for Curitec. (*See, e.g.*, PTX 26-28). These communications are just the "tip of the iceberg" as to Vaughn's improper utilization of AMT's confidential business information. Based on the arm's-length agreement between Plaintiffs and Vaughn that any breaches of the agreements would result in irreparable harm, the evidence shows that this element has been satisfied by clear and convincing evidence.

Finally, to reiterate, under the circumstances, any balancing of the equities strongly favors Plaintiffs over Vaughn.

**H.     In the Court's Assessing of the Evidence, Plaintiffs Are Entitled to Strong Adverse Inferences Concerning the Contents of Certain Obstructed and Withheld Documents.**

This case is the poster child for utilizing adverse inferences under Federal Rule of Civil Procedure 37(b).  As the Court invited at the final pretrial conference (*see* Pretrial Conf. Tr. 22:8-14), at trial, Plaintiffs laid the evidentiary foundation to conclude that, in direct violation of Magistrate Judge Fallon's April 4, 2023, Oral Discovery Order, Vaughn utterly failed to produce reams of critically relevant documents within her possession, custody, or control, and necessary for Plaintiffs to fairly prosecute their case.

First, despite being properly served with AMT Holdings' RFP No. 1 on February 10, 2023 (*see* D.I. 74), and being subject to Magistrate Judge Fallon's April 4, 2023 Oral Discovery Order (*see* D.I. 83), Vaughn failed to produce any "documents reflecting or concerning any presentations [Vaughn has] made or given to any Curitec employee or agent at any Curitec corporate sales retreat or sales-related meeting."  (PTX 54, Tr. 6/27/23 186:17-187:4).  This failure occurred despite Vaughn admitting to personally creating and giving at least one such presentation to Curitec's sales staff, which was within her possession throughout February and March 2023.  (*See* PTX 44; PTX 45; 187:5-20).  As ordered by the Court, the Court has likely seen this presentation *in camera*, but Plaintiffs still do not know its contents and were foreclosed from assessing its impact on Plaintiffs or presenting evidence concerning such impact at trial.

Second, despite also being properly served with AMT Holdings' RFP No. 3 on February 10, 2023 (*see* D.I. 74) and being subject to Magistrate Judge Fallon's April 4, 2023 Oral Discovery Order (*see* D.I. 83), Vaughn failed to produce any "documents reflecting or concerning any training or education [Vaughn has] provided to any Curitec employee or agent regarding or relating to: wound care evaluation; wound treatment; or wound management."  (PTX 54, Tr. 6/27/23 187:23-188:17).  This failure occurred despite Vaughn admitting that she personally creates such

25

documents and conducts such education for Curitec's staff "on a daily basis." (Tr. 6/27/23 188:10-17). This failure goes to the very heart of this case and begs the question of why, if Vaughn's job duties for Curitec don't violate her agreements with Plaintiffs, didn't she (and Curitec) simply produce the documents evidencing as much? (Tr. 6/27/23 191:21-23).

Third, despite being properly served with AMT's Amended RFP No. 16 on December 12, 2022 (months before Curitec obstructed Vaughn's access to her Curitec email account) (*see* D.I. 62), and also being subject to Magistrate Judge Fallon's April 4, 2023 Oral Discovery Order (*see* D.I. 83), rather than producing the "e-mails . . . between [Vaughn] and any person or entity that was a client, vendor or customer of AMT within the two years leading up to January 12, 2022, who has also been a Curitec, LLC customer (including, without limitation, healthcare facilities where Curitec, LLC supplies products or provides services), referral source, strategic partner, or vendor (former, current, or prospective)," Vaughn instead produced a mere eleven email exchanges from her Curitec email account in discovery. (PTX 53; Tr. 6/27/23 162:3-6, 184:7-20).

This production was facially deficient, particularly in a case where the most relevant evidence of Vaughn's improper use of Plaintiffs' confidential information is within her possession, custody, or control. As Vaughn admitted, notwithstanding Curitec's efforts to obstruct her access to documents, she always maintained the practical ability to access her Curitec email account (and other responsive Curitec documents) to do her job. (Tr. 6/27/23 192:5-12).

Despite this, Vaughn failed to produce the emails she had with vendors or any of the former AMT customers she now services on behalf of Curitec, including the Prestige Group. (Tr. 6/27/23 184:7-185:18). The eleven email exchanges Vaughn did produce are only a small sample of Vaughn's breaches of her agreements.

As the Court noted at trial, Curitec's efforts to obstruct Vaughn's access to basic discovery documents are offensive.  (Tr. 6/27/23 194:7-8; 199:3-7).  They also suggest that Curitec has something to hide.

Vaughn's own failure to produce critical documents within her possession, custody, or control is equally egregious.  Under the Federal Rules of Civil Procedure, upon service of the underlying requests for production of documents, Vaughn and her counsel had an affirmative duty to at least search for, identify, and collect responsive documents.  (*See* Pretrial Conf. Tr. 18:7-9; 19:22-25).  *See also Maria Del Socorro Quintero Perez, CY v. United States*, No. 13CV1417-WQH-BGS, 2016 WL 705904, at *3 (S.D. Cal. Feb. 23, 2016) ("Defendants would have this Court measure possession, custody or control under Federal Rule 34 from the date on which a party responds to discovery. . . . Such a reading of Federal Rule 34 would allow a party to evade his obligations in discovery[.] . . .  This Court does not endorse an interpretation of possession, custody or control that creates opportunities for a party to manipulate the discovery process.  Accordingly, the Court finds that possession, custody and control under Federal Rule 34 is measured at the time the party receives a discovery request, not at the time the party decides to respond.").  Vaughn blaming her inability to produce responsive documents within her possession, custody, or control on Curitec is nothing more than a red herring, designed to distract from her own discovery failures.[1]

Absent adverse inferences, Vaughn and Curitec's discovery behavior will provide future litigants with a veritable road map for how to stonewall the production of evidence in a case like this without sanction.

---

[1] Vaughn's counsel's concession—that he made a "mistake" by failing to advise Vaughn of the existence of the underlying discovery requests—does not mitigate this failure.  (Tr. 6/28/23 354:10-11).

Plaintiffs respectfully request the Court's permission to renew their Rule 37(b) motion and that, in the Court's assessing of the evidence, Plaintiffs be entitled to strong adverse inferences concerning the contents of the obstructed and withheld documents. Specifically, Plaintiffs request that the Court either infer, or utilize a rebuttable presumption, that the contents of such documents would have reflected Vaughn's breaches of the agreements' respective confidentiality, non-competition, and non-aid-or-inducement provisions. *See Mystique, Inc. v. 138 Int'l, Inc.*, 07-22937-CIV, 2011 WL 13173601, at *10 (S.D. Fla. Aug. 31, 2011), *report and recommendation adopted*, No. 10-21421-CIV, 2011 WL 13173603 (S.D. Fla. Dec. 19, 2011) (rebuttable presumption as to legal issue was warranted at trial given party's violation of Civ. R. 37(b)(2)); *First Fin. Sec., Inc. v. Freedom Equity Grp., LLC*, No. 15-CV-1893-HRL, 2016 WL 5870218, at *6 (N.D. Cal. Oct. 7, 2016) (party's failure to turn over certain data despite court order justified adverse inference jury instruction under Civ. R. 37(b)(2)). *See also Beau Prod., Inc. v. Permagrain Prod., Inc.*, 97 F.R.D. 50, 53 (M.D. Pa. 1983) ("Discovery sanctions under Rule 37(b)(2) are appropriate for any non-compliance with this Court's order and no willfulness, contumacy, or design need be shown.")

## IV.    CONCLUSION AND REQUESTED RELIEF

For the foregoing reasons, Plaintiffs respectfully request that this Honorable Court find and order that:

1.    Plaintiffs be awarded their reasonable attorneys' fees caused by Vaughn's breaches of the IUGA, and that Plaintiffs be allowed to submit their reasonable attorneys' fees to the Court for its post-trial review and approval.

2.    Plaintiffs be awarded nominal damages for Vaughn's breaches of the 2021 Employment Agreement and the IUGA.

3.      Vaughn be enjoined for a period of twenty-four (24) months (or any lesser period the Court considers reasonable) from the date of this Court's order from directly or indirectly owning, managing, operating, controlling, being employed by (whether as an employee, consultant, independent contractor or otherwise, and whether or not for compensation) or rendering services to Curitec.

4.      Vaughn be enjoined for a period of twenty-four (24) months (or any lesser period the Court considers reasonable) from the date of this Court's order from aiding or inducing any person who is, as of January 7, 2022, or was, during the eighteen (18)-month period immediately preceding January 7, 2022, a customer of the AMT's to purchase goods or services related to wound care supplies or related wound care evaluation, treatment and management services, ostomy, urological or tracheostomy services and training and education from another person, firm, corporation or other entity.

5.      Vaughn be permanently enjoined from violating the confidentiality provisions of the of the 2021 Employment Agreement (Section 9(a)) and the IUGA (Annex A, Section 1).

6.      Award Plaintiffs pre- and post-judgment interest on their monetary damages.

7.      Grant any such other and further relief as the Court may deem just, equitable, and proper.

64157/0001-45802388

**COLE SCHOTZ P.C.**

Of Counsel:

/s/ Andrew L. Cole
Andrew L. Cole (No 5712)
Stacy L. Newman (No. 5044)
Ryan J. Morley (*pro hac vice*)
Jack M. Dougherty (No. 6784)
John W. Hofstetter (*pro hac vice*)
500 Delaware Avenue, Suite 1410
LITTLER MENDELSON, P.C.
Wilmington, Delaware 19801
Key Tower
(302) 652-3131 (Phone)
127 Public Square, Suite 1600
(302) 652-3117 (Fax)
Cleveland, OH 44114
acole@coleschotz.com
(216) 696-7600 (Phone)
snewman@coleschotz.com
(216) 696-2038 (Fax)
jdougherty@coleschotz.com
rmorley@littler.com
jhofstetter@littler.com

*Attorneys for Plaintiffs,*
*Gordian Medical, Inc.,*
*d/b/a American Medical Technologies and*
*AMT Ultimate Holdings, L.P.*

Dated:  July 24, 2023

30