IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GORDIAN MEDICAL, INC. d/b/a AMERICAN MEDICAL TECHNOLOGIES and AMT ULTIMATE HOLDINGS, L.P., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 22-319 (MN) |
| MISTY VAUGHN, | ) ) | |
| Defendant. | ) ) ) | |

## **MEMORANDUM OPINION**

Andrew L. Cole, Stacy L. Newman, Jack M. Dougherty, COLE SCHOTZ P.C., Wilmington, DE; Ryan J. Morley, John W. Hofstetter, LITTLER MENDELSON, P.C., Cleveland, OH – Attorneys for Plaintiffs

Daniel C. Herr, LAW OFFICE OF DANIEL C. HERR, LLC, Wilmington, DE; David E. Rothstein, ROTHSTEIN LAW FIRM, PA, Greenville, SC – Attorneys for Defendant

March 30, 2024
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

Plaintiffs Gordian Medical, Inc. d/b/a American Medical Technologies ("AMT") and AMT Ultimate Holdings, L.P. ("AMT Ultimate Holdings") (collectively, "Plaintiffs") brought this breach of contract and tortious interference with contract action in the Delaware Court of Chancery against Defendants Misty Vaughn ("Vaughn") and Curitec, LLC, ("Curitec") alleging that Vaughn breached two agreements with Plaintiffs and that Curitec tortiously interfered with those agreements. (D.I. 1 at 17-19). Vaughn removed the action to this Court based on diversity jurisdiction. (D.I. 1 at 2). After Curitec was dismissed,[1] Vaughn counterclaimed seeking declaratory judgment that her Employment Agreement (PTX-1) is not a binding and enforceable contract and that the non-competition and non-solicitation provisions of her Employment Agreement (PTX-1) and her Incentive Unit Grant Agreement ("Equity Agreement") (PTX-3) are not enforceable, as well as injunctive relief against enforcing those covenants. (D.I. 56 at 28-29).

In June 2023, the Court conducted a two-day bench trial. (*See* D.I. 137, 138). The parties submitted post-trial briefing (D.I. 130, 132, 134) and proposed findings of fact (D.I. 131, 133). In January 2024, Vaughn submitted a notice of supplemental authority to which Plaintiffs filed a response. (D.I. 135, 136).

After considering the entire record and the applicable law, the Court concludes that: (1) both the Employment Agreement (PTX-1) and the Equity Agreement (PTX-3) are binding and enforceable contracts; (2) Section 9(a) of the Employment Agreement and Annex A, Section 1 of the Equity Agreement ("the Confidentiality Covenants") are enforceable but have not been

---

[1]     On April 13, 2022, this action was referred to Magistrate Judge Fallon to hear and resolve all pre-trial matters. (D.I. 14). On May 6, 2022, Judge Fallon issued a Report & Recommendation (D.I. 22) recommending the Court grant Curitec, LLC's motion to dismiss for lack of personal jurisdiction (D.I. 9). On May 23, 2022, this Court adopted Judge Fallon's recommendation and Curitec was dismissed from the case. (D.I. 24). With Curitec's dismissal, only breach of contract against Vaughn remained.

breached by Vaughn; (3) Section 9(b) of the Employment Agreement and Annex A, Section 2 of the Equity Agreement ("the Non-Competition Covenants") are unenforceable; and (4) that Section 9(c) of the Employment Agreement and Annex A, Section 3 of the Equity Agreement ("the Non-Solicitation Covenants") are enforceable but have not been breached by Vaughn.  This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.   **FINDINGS OF FACT**

This section contains the Court's findings of fact on disputes raised by the parties during trial, as well as uncontested facts to which the parties have stipulated.  Additional findings of fact are presented in connection with the Court's discussion and conclusions of law.  (*See infra* § III).

### A.   **The Parties**

1. AMT is a senior care company founded in 1994, focused on delivering outcome-driven programs to health care providers in the long-term care and post-acute environments. (D.I. 123 at 4, ¶ 1).[2]  AMT is a Nevada corporation with corporate headquarters in Metairie, Louisiana.  (*Id.* at 5, ¶ 6; D.I. 136 at 3).  AMT was sold to a private equity firm in July 2020 and merged with another company called Restorix Health in April 2021.  (D.I. 123 at 5, ¶ 3).

2. AMT Ultimate Holdings is AMT's indirect parent and a limited partnership organized in the State of Delaware.  (*Id.* at 5, ¶ 4-5).

3. Misty Vaughn, a resident of South Carolina (*id*. at 5, ¶ 7), is currently an employee of Curitec, LLC, a limited liability company organized in the State of Florida, with its corporate headquarters in The Woodlands, Texas.  (*Id*. at 5, ¶¶ 8, 9).  Vaughn was previously employed by AMT.  (*Id.* at 5, ¶¶ 11-13).

---

[2]   When citing to page numbers in D.I. 123, the Court cites to the ECF-assigned page numbers at the top of each page.

**B.    Fact Witnesses at Trial**

4.     Sarah Kathryn Holden-Mount ("Holden-Mount") testified at trial.  Holden-Mount is AMT's former Senior Vice President of Acute Sales.  (Trial Transcript ("Tr.") at 18:1-47:9).

5.     Therese Hernandez ("Hernandez") testified at trial.  Hernandez is President of AMT's Acute Division.  (*Id.* at 47:17-91:9).

6.     Kelly Todd Newton ("Newton") testified at trial.  Newton is AMT's Chief Executive Officer.  (*Id.* at 92:2-124:23).

7.     Defendant Vaughn testified at trial.[3]  (*Id.* at 127:2-261:15).

**C.    Vaughn's Employment History at AMT**

8.     Vaughn became an employee of AMT on or about December 15, 2001.  (D.I. 123 at 5, ¶ 11).

9.     Vaughn was AMT's first employee.  (*Id.* at 5, ¶ 12).

10.    During her employment with AMT, Vaughn became Senior Vice President of Post-Acute Operations & Clinical Services in 2021.  (*Id.* at 5, ¶ 13).

11.    On June 30, 2020, Vaughn executed what the parties refer to as an "Original Agreement" naming her as a Senior Vice President of AMT.  (*Id.* at 6, ¶ 14).

12.    On January 12, 2022, Vaughn resigned from her employment with AMT.  (D.I. 123 at 6, ¶ 19).

**D.    The Employment and Equity Agreements**

13.    On June 10, 2021, Vaughn executed the Employment Agreement.  (*Id.* at 6, ¶ 15).

14.    Section 9(a) of the Employment Agreement states:

---

[3]     The Court found Vaughn to be a credible witness.

9. RESTRICTIVE COVENANTS.

(a) CONFIDENTIALITY. During the course of the Executive's employment and service with the Company, the Executive has had and will continue to have access to Confidential Information.  For purposes of this Agreement, "Confidential Information" means the Company Group's confidential and/or proprietary information and/or trade secrets that have been developed or used and/or will be developed or used during the Executive's employment and/or service with the Company Group and that cannot be obtained readily by third parties from outside sources, including, by way of example and without limitation, all data, information, ideas, concepts, discoveries, trade secrets, inventions (whether or not patentable or reduced to practice), innovations, improvements, know-how, developments, techniques, methods, processes, treatments, drawings, sketches, specifications, designs, patterns, models, plans and strategies, and all other confidential or proprietary information or trade secrets in any form or medium (whether merely remembered or embodied in a tangible or intangible form or medium) whether now or hereafter existing, relating to or arising from the past, current or potential business, activities and/ or operations of the Company Group, including, without limitation, any such information relating to or concerning finances, sales, marketing, advertising, transition, promotions, pricing, personnel, customers, suppliers, vendors, raw partners and/or competitors. The Executive agrees that the Executive shall not, directly or indirectly, use, make available, sell, disclose or otherwise communicate to any person, other than in the course of the Executive's assigned duties and for the benefit of the Company Group, either during the period of the Executive's employment or service or at any time thereafter, any Confidential Information or other confidential or proprietary information received from third parties subject to a duty on the Company Group's part to maintain the confidentiality of such information, and to use such information only for certain limited purposes, in each case, which shall have been obtained by the Executive during the Executive's employment by or service to the Company (or any predecessor). The foregoing shall not apply to information that (i) was disclosed (through no fault, action or inaction of the Executive) or known to the public prior to its disclosure to the Executive; (ii) becomes generally known to the public subsequent to disclosure to the Executive through no act of the Executive or any representative of the Executive in violation of this Agreement or any other written agreement between the

4

Executive and a member of the Company Group; or (iii) the Executive is required to disclose by applicable law, regulation or legal process (<u>provided</u>, that, the Executive provides the Company with prior notice of the contemplated disclosure and reasonably cooperates with the Company at the Company's sole cost and expense in seeking a protective order or other appropriate protection of such information). The terms and conditions of this Agreement shall remain strictly confidential, and, except as required by applicable law, regulation or legal process or in connection with any Claim (as defined below) or the Executive's exercise of any rights or remedies hereunder, the Executive hereby agrees not to disclose the terms and conditions hereof to any person or entity, other than immediate family members, legal advisors or personal tax or financial advisors, or prospective future employers, as to the latter, solely for the purpose of disclosing the limitations on the Executive's conduct imposed by the provisions of this <u>Section 9</u> who, in each case, the Executive agrees to instruct to keep such information confidential.

(PTX-1 at AMT 000304-AMT 000305).

15.     Section 9(b) of the Employment Agreement states:

(b) NON-COMPETITION. The Executive acknowledges that (i) the Executive performs services of a unique nature for the Company Group, and that the Executive's performance of such services to a competing business may result in irreparable harm to the Company Group, (ii) the Executive has had and will continue to have access to Confidential Information which, if disclosed, may unfairly and inappropriately assist in competition against the Company Group, (iii) in the course of the Executive's employment by a competitor, the Executive may inevitably use or disclose such Confidential Information, (iv) the Company Group has substantial relationships with its customers and the Executive has had and may continue to have access to these customers, (v) the Executive has received and will receive specialized training from the Company Group, and (vi) the Executive has generated and will continue to generate goodwill for the Company Group in the course of the Executive's employment and service. Accordingly, during the Executive's employment or service with the Company Group and for a period of twenty four (24) months thereafter (the "<u>Restricted Period</u>"), the Executive agrees that the Executive will not, directly or indirectly, own, manage, operate, control, be employed by (whether as an employee, consultant,

independent contractor or otherwise, and whether or not for compensation) or render services to any person, firm, corporation or other entity, in whatever form, engaged in the business of providing wound care supplies or related wound care evaluation, treatment and management services, ostomy, urological or tracheostomy services and training and education in any setting, whether in a facility, a clinic, in home-based care or otherwise (the "Restricted Business"), within (A) the United States or (B) any other country in which the Company Group conducts the Restricted Business during the Executive's employment or service with the Company Group during the Restricted Period. Notwithstanding the foregoing, nothing herein shall prohibit the Executive from holding for investment as a passive owner up to five percent (5%) of the equity securities or other securities of a publicly traded corporation engaged in a business that is in competition with the Company Group, so long as the Executive has no active participation in the business operations of such corporation.

(PTX-1 at AMT 000305-000306).

16.     Section 9(c) of the Employment Agreement states:

(c) NON-SOLICITATION; NON-INTERFERENCE. During the Restricted Period, the Executive agrees that the Executive shall not, except in the furtherance of the Executive's duties hereunder, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, (i) solicit, aid or induce any Person (as defined below) who is, as of the Executive's termination date, or was, during the eighteen (18)-month period immediately preceding the Executive's termination date, a customer of the Company Group to purchase goods or services related to the Restricted Business from another person, firm, corporation or other entity or assist any other person or entity in identifying or soliciting any such customer, (ii) solicit, aid or induce any Person who is, as of the Executive's termination date, or was, within the eighteen (18)-month period prior to such solicitation, aid or inducement, an employee, representative or agent of the Company Group to leave such employment or retention or to accept employment with or render services to or with any other person, firm, corporation or other entity unaffiliated with the Company Group or hire or retain any such Person who is, as of the Executive's termination date, or was, within the eighteen (18)-month period prior to such hiring or retainer, an employee, representative or agent, or take any action to materially assist

or aid any other person, firm, corporation or other entity in identifying, hiring or soliciting any such employee, representative or agent; or (iii) intentionally interfere, or intentionally aid or induce any other person or entity in interfering, with the relationship between the Company Group and any of their respective vendors, joint venturers or licensors which causes harm to the Company Group. An employee, representative or agent shall be deemed covered by this <u>Section 9( c)</u> while so employed or retained and for a period of twelve (12) months thereafter. Notwithstanding the foregoing, the provisions of this <u>Section 9(c)</u> shall not be violated by general advertising or solicitation not specifically targeted at Company Group-related persons or entities. For purposes of this <u>Section 9(c)</u>, "<u>Person</u>" means any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, joint venture, joint stock company, governmental agency or instrumentality or other entity of any kind.

(PTX-1 at AMT 000306).

17.      Section 9(g) of the Employment Agreement states:

(g) REASONABLENESS OF COVENANTS. In signing this Agreement, the Executive gives the Company Group assurance that the Executive has carefully read and considered all of the terms and conditions of this Agreement, including the restraints imposed under this <u>Section 9</u>. The Executive agrees that these restraints are necessary for the reasonable and proper protection of the Company Group and its Confidential Information and that each and every one of the restraints is reasonable in respect of subject matter, length of time and geographic area, and that these restraints, individually or in the aggregate, will not prevent the Executive from obtaining other suitable employment during the period in which the Executive is bound by the restraints. The Executive acknowledges that each of these covenants has a unique, very substantial and immeasurable value to the Company Group and that the Executive has sufficient assets and skills to provide a livelihood while such covenants remain in force. The Executive further covenants that the Executive will not challenge the reasonableness or enforceability of any of the covenants set forth in this <u>Section 9</u>. It is also agreed that each of the Company Group's affiliates will have the right to enforce all of the Executive's obligations to that affiliate under this Agreement, including, without limitation, pursuant to this <u>Section 9</u>.

(PTX-1 at AMT 000307-000308).

18.     On July 31, 2021, Vaughn executed the Equity Agreement.  (D.I. 123 at 6, ¶ 17).

AMT's indirect equity holder, AMT Ultimate Holdings, signed the Equity Agreement promising

to issue Vaughn certain Class B equity units in AMT Ultimate Holdings.  (*Id.* at 6, ¶ 18).[4]

19.     Annex A, Section 1 of the Equity Agreement states:

> 1. During the course of Grantee's employment and service with the Partnership, Grantee has had and will continue to have access to Confidential Information. For purposes of this Annex A, "Confidential Information" means the Affiliated Companies' and/or proprietary information and/or trade secrets that have been developed or used and/or will be developed or used during Grantee's employment and/or service with the Affiliated Companies and that cannot be obtained readily by third parties from outside sources, including, by way of example and without limitation, all data, information, ideas, concepts, discoveries, trade secrets, inventions (whether or not patentable or reduced to practice), innovations, improvements, know-how, developments, techniques, methods, processes, treatments, drawings, sketches, specifications, designs, patterns, models, plans and strategies, and all other confidential or proprietary information or trade secrets in any form or medium (whether merely remembered or embodied in a tangible or intangible form or medium) whether now or hereafter existing, relating to or arising from the past, current or potential business, activities and/or operations of the Affiliated Companies, including, without limitation, any such information relating to or concerning finances, sales, marketing, advertising, transition, promotions, pricing, personnel, customers, suppliers, vendors, raw partners and/or competitors. Grantee agrees that Grantee shall not, directly or indirectly, use, make available, sell, disclose or otherwise communicate to any person, other than in the course of Grantee's assigned duties and for the benefit of the Affiliated Companies, either during the period of Grantee's employment or service or at any time thereafter, any Confidential Information or other confidential or proprietary information received from third parties subject to a duty on the Affiliated Companies' part to

---

[4]     The signature page of the Equity Agreement that AMT Ultimate Holdings signed, which references the "Employer" as "NEW YORK HYPERBARIC & WOUND CARE CENTERS, LLC" is different from the signature page that AMT (referred to as "GORDIAN MEDICAL, INC.") signed as Vaughn's "Employer".  (PTX-3 at AMT224-25).

maintain the confidentiality of such information, and to use such information only for certain limited purposes, in each case, which shall have been obtained by Grantee during Grantee's employment by or service to the Partnership (or any predecessor). The foregoing shall not apply to information that  (i) was disclosed (through no fault, action or inaction of Grantee) or known to the public prior to its disclosure to Grantee; (ii) becomes generally known to the public subsequent to disclosure to Grantee through no act of Grantee or any representative of Grantee in violation of this Annex A or any other written agreement between Grantee and an Affiliated Company; or (iii) Grantee is required to disclose by applicable law, regulation or legal process (provided, that, Grantee provides the Partnership with prior notice of the contemplated disclosure and reasonably cooperates with the Partnership at the Partnership's sole cost and expense in seeking a protective order or other appropriate protection of such information). The terms and conditions of this Annex A shall remain strictly confidential, and, except as required by applicable law, regulation or legal process or in connection with any claims or causes of action (whether at law or in equity, in contract, in equity, in statute, in tort or otherwise) that may be based upon, arise out of or relate to this Agreement or Grantee's employment by any Affiliated Company, or the negotiation, execution or performance thereof, or the transactions contemplated hereby or Grantee's exercise of any rights or remedies hereunder (any such claim or cause of action, a "Claim"), Grantee hereby agrees not to disclose the terms and conditions hereof to any person or entity, other than immediate family members, legal advisors or personal tax or financial advisors, or prospective future employers, as to the latter, solely for the purpose of disclosing the limitations on the Grantee's conduct imposed by the provisions of this Section 1 who, in each case, Grantee agrees to instruct to keep such information confidential.

(PTX-3 at AMT 000228-000229).

20.     Annex A, Section 2 of the Equity Agreement states:

Grantee acknowledges that (i) Grantee performs services of a unique nature for the Affiliated Companies, and that Grantee's performance of such services to a competing business may result in irreparable harm to the Affiliated Companies, (ii) Grantee has had and will continue to have access to Confidential Information which, if disclosed, may unfairly and inappropriately assist in competition against the Affiliated Companies, (iii) in the course of Grantee's employment by a competitor, Grantee may inevitably use or disclose such Confidential Information, (iv) the Affiliated

Companies have substantial relationships with their customers and Grantee has had and may continue to have access to these customers, (v) Grantee has received and will receive specialized training from the Affiliated Companies, and (vi) Grantee has generated and will continue to generate goodwill for the Affiliated Companies in the course of Grantee's employment and service. Accordingly, during Grantee's employment or service with the Affiliated Companies and for a period of two (2) years thereafter (the "Restricted Period"), Grantee agrees that Grantee will not, directly or indirectly, own, manage, operate, control, be employed by (whether as an employee, consultant, independent contractor or otherwise, and whether or not for compensation) or render services to any person, firm, corporation or other entity, in whatever form, engaged in the business of providing wound care supplies or related wound care evaluation, treatment and management services, ostomy, urological or tracheostomy services and training and education in any setting, whether in a facility, a clinic, in home-based care or otherwise (the "Restricted Business"), within (A) the United States or (B) any other country in which the Affiliated Companies conduct the Restricted Business during Grantee's employment or service with the Affiliated Companies during the Restricted Period. Notwithstanding the foregoing, nothing herein shall prohibit Grantee from (I) holding for investment as a passive owner up to five percent (5%) of the equity securities or other securities of a publicly traded corporation engaged in a business that is in competition with the Affiliated Companies, so long as Grantee has no active participation in the business operations of such corporation.

(PTX-3 at AMT 000229).

21.    Annex A, Section 3 of the Equity Agreement states:

During the Restricted Period, Grantee agrees that Grantee shall not, except in the furtherance of Grantee's duties hereunder, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, (i) solicit, aid or induce any Person (as defined below) who is, as of Grantee's termination date, or was, during the eighteen (18)-month period immediately preceding Grantee's termination date, a customer of the Affiliated Companies to purchase goods or services related to the Restricted Business from another person, firm, corporation or other entity or assist any other person or entity in identifying or soliciting any such customer, (ii) solicit, aid or induce any Person who is, as of Grantee's termination date, or was, within the eighteen (18)-month period prior to such solicitation, aid or inducement, an employee,

representative or agent of the Affiliated Companies to leave such employment or retention or to accept employment with or render services to or with any other person, firm, corporation or other entity unaffiliated with the Affiliated Companies or hire or retain any such Person who is, as of Grantee's termination date, or was, within the eighteen (18)-month period prior to such hiring or retainer, an employee, representative or agent, or take any action to materially assist or aid any other person, firm, corporation or other entity in identifying, hiring or soliciting any such employee, representative or agent; or (iii) intentionally interfere, or intentionally aid or induce any other person or entity in interfering, with the relationship between the Affiliated Companies and any of their respective vendors, joint venturers or licensors which causes harm to the Affiliated Companies. An employee, representative or agent shall be deemed covered by this Section 3 while so employed or retained and for a period of twelve (12) months thereafter. Notwithstanding the foregoing, the provisions of this Section 3 shall not be violated by general advertising or solicitation not specifically targeted at Affiliated Company-related persons or entities. For purposes of this Section 3, "Person" means any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, joint venture, joint stock company, governmental agency or instrumentality or other entity of any kind.

(PTX-3 at AMT 000229-000230).

22.     The Equity Agreement also provides that:

The Partnership will promptly amend and update the Unit Ledger to reflect the issuance of the Incentive Units and provide to Grantee [i.e., Vaughn] a copy of such updated Unit Ledger containing the information permitted to be disclosed to Grantee under Section 3.2 of the LP Agreement.

(PTX-3 at 1).

23.     Vaughn did not receive a copy of the updated Unit Ledger showing the issuance of any Class B shares to her.  (Tr. at 232:11-232:25).

**E.     Vaughn's Employment at Curitec**

24.     On February 7, 2022, Vaughn confirmed to AMT that she had taken a position with Curitec.  (D.I 123 at 6, ¶ 20).

11

25.     On February 11, 2022, AMT's counsel sent Vaughn a letter, informing her that her employment with Curitec violated the Employment Agreement, including its noncompete provisions.  (D.I. 123 at 6, ¶ 21).

26.     In the February 11, 2022 letter, AMT demanded that Vaughn cease and desist any further unlawful activity, and asked Vaughn to confirm in writing that she had resigned her employment with Curitec.  (*Id.* at 6, ¶ 22).

27.     Curitec is aware of Vaughn's former employment with AMT and her postemployment obligations to AMT and AMT Ultimate Holdings in the Employment Agreement and the Equity Agreement.  (*Id.* at 6, ¶ 24).

28.     Vaughn continues to work at Curitec.  (D.I. 123 at 6, ¶ 25).

**1.      Vaughn's Actions Related to Allegations She Breached the Confidentiality Covenants**

29.     On February 9, 2022, Vaughn emailed several Curitec employees stating in pertinent part:

> "Being on the end that just had the services cancelled, I can give a little additional information: [the former clients] stated that AMT was over-providing products (boxes of supplies unopened) and that was what prompted them to entertain the conversation with Impact [Medical, an AMT competitor and the subject of the email chain]. We also learned that there was some type of connection between the leaders of the companies . . . But the decision was made above the 'day to day' level of operations with which AMT had connections (either at the C suite or owner level)."

(PTX-26 at 1).

30.     At the time Vaughn sent the email, AMT had already lost the clients referenced in that email.  (Tr. at 203:2-203:5).  The former clients had left AMT while Vaughn was still employed at AMT, but Vaughn was not involved in the discussions with the former clients about their decision to leave AMT.  (Tr. 202:11-21).

31.     Vaughn's email did not disclose Plaintiffs' confidential information.  Vaughn testified that the email did not disclose confidential trade secret or proprietary information of AMT.  (Tr. 202:14-16).  She testified that the fact that the former clients "had accused AMT of over providing products" was "relatively common knowledge within a large group of people" and that she had been reminded of that accusation by someone else at Curitec before sending the email.  (Tr. 201:23-202:10).

32.     Therese Hernandez, President of AMT's Acute Division, stated on direct examination that "anything that we develop internally in my view, is considered confidential, and the organization takes that approach as well."  (Tr. at 55:2-55:4).  Hernandez testified only generally, however, and did not contradict Vaughn's testimony that the information disclosed as to the former client or its reasons for leaving AMT was, in fact, confidential.

33.     Also on February 9, 2022, Vaughn emailed Nick Percival, Curitec's Chief Executive Officer, with certain AMT statistics referred to as "healing benchmarks."  (Tr. at 162:1-163:12; PTX-27 at 1).

34.     Vaughn's statements about "healing benchmarks" do not disclose confidential information.  Vaughn testified that AMT widely publicized these "healing benchmarks" through marketing materials and statements by leadership.  (Tr. at 162:18-21, 204:7-205:22).

35.     Again, other than general assertions of confidentiality, Plaintiffs offered no evidence to contradict Vaughn's testimony.  None of Plaintiffs' witnesses testified that (or was even asked whether) the information about "healing benchmarks" was, in fact, confidential.

36.     On March 9, 2022, one of Vaughn's colleagues at Curitec, Nancy McNally ("McNally"), emailed Vaughn and a third colleague, Brian Harmon ("Harmon"), regarding various types of treatment programs, including "PACE" programs.  (PTX-28 at 3).

37.     Vaughn replied to McNally and Harmon the same day as follows:

> Those PACE programs – those are independent facilities and they often have patients with wounds.  They usually have funds to help pay the Medicare allowables.  We would just have to convince them why we would be able to help heal their wounds and why using our company would be better different than others.  I know that AMT has a number of PACE programs but there are still plenty of them around the country that AMT is not in.  We could just focus on those if anyone was up for it.

(PTX-28 at 1).

38.     In the next message on the email chain, McNally wrote that she had been "the first person at AMT to get a PACE contract."  (PTX-28 at 1).

39.     Vaughn's statement about PACE programs does not disclose confidential information about AMT or its involvement in PACE programs.  The general fact that AMT was involved in PACE programs was "widely held information, that people [were] aware of."  (Tr. at 166:23-167:17).

40.     Once again, Plaintiffs offered no evidence to contradict the only specific evidence at trial offered about confidentiality regarding the PACE programs, Vaughn's testimony.  None of Plaintiffs' witnesses testified that the information about PACE programs was confidential, though again presumably they would have been asked and testified to that if it had been true.

41.     In January 2023, Vaughn gave a presentation ("the January 2023 presentation") to Curitec sales staff at Curitec's annual corporate sales retreat.  (Tr. at 137:11-137:18; PTX-045).

42.     Plaintiffs have not shown that the January 2023 presentation contained any information that Plaintiffs would consider confidential.[5]

---

[5]     The January 2023 presentation was submitted to the Court *in camera* but no party offered it into evidence.  Therefore, the Court will not refer to the contents of the presentation in connection with its ruling.

14

43.     Plaintiffs have not shown that Vaughn disclosed any AMT confidential information while she was at Curitec.

### 2.     Vaughn's Actions Related to Allegations She Breached the Non-Solicitation Covenants[6]

44.     The only one of Plaintiffs' witnesses asked whether Vaughn had solicited any AMT clients or customers testified that she was unaware of any such efforts.  (*See* Tr. 35:22-36:2).

45.     Vaughn similarly testified that there had not been any attempt by her or by Curitec using Vaughn as an inducement to solicit customers of AMT after she moved to Curitec. (Tr. 195:8-10).

46.     There is no evidence that Vaughn's employment at Curitec caused AMT to lose any customers or clients.  (Tr. at 42:22-44:9, 90:3-90:6, 117:5-117:19, 155:1-155:11).

47.     Plaintiffs assert that Vaughn admitted that she breached the Non-Solicitation Covenants by servicing Curitec customers who had previously been AMT customers. (D.I. 130 at 12).  AMT points to one customer, the Prestige Group of nursing care facilities.  (*Id.*).

48.     Vaughn testified that she has had nothing to do with any account moving from AMT to Curitec, but that after an account is "won by other individuals," or becomes a Curitec account she has been "asked to help with a couple of formulary issues with a couple of the clients," including an account called the Prestige Group. (Tr. at 156:1-12).

---

[6]     Plaintiffs originally asserted that Vaughn solicited AMT employees to leave AMT to work for Curitec.  (D.I. 123 at 9, ¶ 2).  They conceded, however, that they put on no evidence of that at trial.  (Tr. 267:17-268:6).  Indeed, the only AMT witness asked about that issue, Holden-Mount, testified that she did not know whether Vaughn did so. (Tr. 35:22-23-36:2).   Thus, the only remaining issue involving the Non-Solicitation Covenants is whether Vaughn's actions with respect to customers violated the Non-Solicitation Covenants.

49.     Vaughn testified that the Prestige Group was handled by a former Curitec employee named Yvette Monteleon, who was also a former long-time AMT employee who left AMT after the merger with Restorix Health, which occurred in mid-2021.[7] (Tr. at 203:6-18). According to Vaughn, Monteleon had been one of the primary contacts for Prestige when she (Monteleon) worked for AMT. (Tr. at 203:25 to 204:3).

50.     Vaughn testified that she had nothing to do with helping Monteleon solicit Prestige as a client to move away from AMT to Curitec. (Tr. at 204:4-6).

51.     Plaintiffs did not offer any evidence as to when or why Prestige discontinued its relationship with AMT.  Indeed, Plaintiffs offered no evidence at trial whether Prestige did so before or after Vaughn's departure from AMT or her decision to work at Curitec.[8]

52.     Plaintiffs also cite to PTX-42, an undated text exchange between Vaughn and Bobby Grandas, Curitec's Executive Director of Sales.  The brief exchange reflects Vaughn telling Grandas that she cannot be involved in a conference call to discuss a potential account called HMG, for which call she had previously received in invitation.  (PTX-42).  She goes on to state, "When we win the account, then I can help all day every day. I just can't be involved in anything where Curitec might be taking accounts from AMT."  (*Id.*).

53.     There is no evidence what HMG is.  Nor is there any evidence when HMG was a customer of AMT, nor whether Vaughn ever did any work for HMG at Curitec.

---

[7]     Monteleon left AMT and began working for Curitec before Vaughn resigned from AMT.

[8]     Plaintiffs' counsel suggested that there was evidence in the record as to when Prestige was a client of AMT, and the Court asked Plaintiffs to point out that evidence. (Tr. 301:14-21).  Plaintiffs have not yet done so, and the Court has been unable to find any such evidence in its review of the record.

54.     Similarly, Plaintiffs have not shown that the January 2023 presentation (the slides for which are not in evidence) contained any instructions for recruiting customers away from AMT, or otherwise interfering with AMT's business.

## II.    LEGAL STANDARDS

### A.    Breach of Contract Containing Restrictive Covenants

"To prove a breach of contract under Delaware law,[9] [a plaintiff] must show: (1) the existence of a contract; (2) breach of an obligation imposed by that contract; and (3) resulting damages.  After a trial on the merits, a plaintiff bears the burden of proving the elements of its contract claim by a preponderance of the evidence."  *Kan-Di-Ki, LLC v. Suer,* C.A., No. 7937-VCP, 2015 WL 4503210 at *19 (Del. Ch. July 22, 2015).

In Delaware, a valid contract exists when the parties intended to be bound by the contract, the contractual terms are sufficiently definite and the parties exchange legal consideration.  *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).  "A contract is sufficiently definite and certain to be enforceable if the court can—based upon the agreement's terms and applying proper rules of construction and principles of equity—ascertain what the parties have agreed to do."  *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1232 (Del. 2018).  Moreover, to be enforceable, a contract must contain all material terms.  *Id.* at 1230; *see also Osborn*, 991 A.2d at 1159.  When a contract contains restrictive covenants, Delaware courts will determine whether that specific covenant "exists" for purposes of this inquiry by determining whether that covenant is enforceable.  *See, e.g., Kan-Di-Ki*, 2015 WL 4503210 at *19-*22; *Tristate Courier and Carriage, Inc. v. Berryman*, No. C.A. 20574-NC, 2004 WL 835886 at *9-*11 (Del. April 15, 2004).

---

[9]     As discussed in § III.A.1, *infra*, Delaware law governs this action.

III.   **DISCUSSION**[10]

   A.   **Threshold Legal Issues**

      1.   **Choice of Law**

In the Pretrial Order and post-trial briefing, there was no dispute between the parties that Delaware law applied.   Indeed, each argued that Delaware law supported the positions it advocated in the Pretrial Order as well as in the post-trial submissions.   Neither side asked this Court to decide a choice of law issue.   Nevertheless, on January 2, 2024, Vaughn's counsel filed a Notice of Supplemental Authority arguing that California's new ban on non-competition agreements in employment contracts applies to AMT.   (D.I. 135 at 1-2) (citing CAL. BUS. & PROF. CODE § 16600.5 (2024)).   Plaintiffs responded on January 9, 2024, pointing out that Delaware substantive law governs this dispute.   (D.I. 136).   Plaintiffs are correct.

As an initial matter, Vaughn has waived the choice of law issue by failing to raise it until more than six months after the trial had concluded and well after the submission of post-trial briefs.   Even had that not been the case, however, the Court would find that Delaware law applies.   Both the current Equity Agreement and the current Employment Agreement specify that that Delaware law will govern their disputes.   (PTX-1 at 16; PTX-3 at 15).[11]   Vaughn has given the Court no reason not to uphold this provision.   (D.I. 135).[12]

---

[10]   The Court addresses only those issues addressed at trial and briefed in the post-trial submissions.   Issues raised in the Pretrial Order but not pursued at trial or after trial are deemed waived.

[11]   A previous Employment Agreement between Vaughn and AMT contained a California choice-of-law provision, (PTX-6 at AMT 000193), but the current agreement supersedes the prior agreement, (PTX-1 at AMT 000313).

[12]   This Court, like Delaware state courts, applies the Restatement (Second) of Conflict of Laws.   *See Focus Financial Partners, LLC v. Holsopple*, 241 A.3d 784, 803 (Del. Ch. 2020).   Section 187 of the Restatement provides that a contract's choice-of-law provision

### 2.     The Enforceability of the Restrictive Covenants

Vaughn challenges the enforceability of both the Employment Agreement and the Equity Agreement in their entireties, as well as the specific provisions relating to the Confidentiality Covenants, the Non-Competition Covenants and the Non-Solicitation Covenants (collectively the "Restrictive Covenants").  (D.I. 56 at 28-29; D.I. 132 at 13-32).  In response, Plaintiffs argue that Vaughn "is contractually barred from challenging or in any way disputing the validity of any aspect of her contracts with Plaintiffs."  (D.I. 123 at 14).  Plaintiffs rely on two contractual provisions that purport to do so.  First, in a Success Fee Agreement signed on June 10, 2021, Vaughn agreed to release AMT and its affiliates from all future counterclaims.  (PTX-1 at AMT 000355, 000361).[13]  Second, Section 9(g) of the Employment Agreement states that Vaughn "will not challenge the reasonableness or enforceability of any of the covenants."  (PTX-1 at AMT 000309).

Despite these provisions, the Court must examine the enforceability of the Restrictive Covenants that Vaughn challenges.  As the Delaware Court of Chancery has held: "[C]ourts can discount contractual waivers of defenses when public policy demands it.  Public policy requires Delaware courts to evaluate noncompetition and nonsolicitation contracts holistically, carefully, and nonmechanically, with an eye towards reasonableness, equity, and the advancement of legitimate business interests . . . mechanical submission to an employee's promise not to challenge a restrictive covenant would fly in the face of the public policy that compels review of that covenant."  *Kodiak Bldg. Partners, LLC v. Adams*, No. 2022-0311-MTZ, 2022 WL 5240507, at *6-*7 (Del. Ch. Oct. 6, 2022).  Indeed, the Chancery Court went further,

---

governs absent specific circumstances.  Neither of those circumstances applies here (indeed, Vaughn does not argue that either does). Thus, Delaware law applies.

[13]     The parties dispute whether this agreement was backed by valid consideration.  (D.I. 132 at 18-19; D.I. 134 at 12-13).

determining that even if a plaintiff does not contest a restrictive covenant's enforceability, the court must still ensure that the covenant "compl[ies] with Delaware law and review the [agreement containing the restrictive covenant] for compliance with public policy before enforcing it with an injunction." *Id.* at *7. Thus, regardless of any waivers Vaughn signed, the Court must determine whether the Restrictive Covenants here are enforceable.

### B.    Enforceability of the Employment Agreement and the Equity Agreement Generally

Vaughn argues that the Equity Agreement and Employment Agreement are unenforceable due to lack of a valid signature, lack of consideration, or breach by one of the Plaintiffs. (D.I. 132 at 13-19). The Court will address each of these arguments in turn.

### 1.    The Discrepancies on the Equity Agreement's Signature Page Do Not Render the Agreement Unenforceable

The Equity Agreement includes three signature pages, one each signed by Vaughn, (PTX-3 at AMT 000227), AMT's then-CEO Steve McLaughlin (PTX-3 at AMT 000226), and AMT Ultimate Holdings' then-President Gregory Belinfanti ("Belinfanti") (PTX-3 at AMT 000227). The page signed by McLaughlin includes another, empty line for Belinfanti to sign as president of AMT Ultimate Holdings. (PTX-3 at AMT 000226). The page signed by Belinfanti includes another, empty signature line labelled: "EMPLOYER: NEW YORK HYPERBARIC & WOUND CARE CENTERS, LLC." (PTX-3 at AMT 000227). On cross-examination, current AMT CEO Kelly Todd Newton acknowledged that New York Hyperbaric & Wound Care Centers had never been Vaughn's employer; he stated it was "quite possible" a signature page from Vaughn's Equity Agreement signed by Belinfanti existed but had gone missing due to a clerical error. (Tr. at 108:19-109:18).

Vaughn argues that "Plaintiffs appear to have inserted a signed signature page from another individual's agreement and are trying to pass it off as part of Ms. Vaughn's Equity

Agreement," in an "apparent attempt by Plaintiffs to alter or manipulate the document." (D.I. 132 at 13). She then asks the Court to find that Plaintiffs never introduced a copy of her Equity Agreement signed by AMT Ultimate Holdings into evidence, (D.I. 133 at 8), and that as a result: (1) Plaintiffs cannot show that they issued the Class B shares to Vaughn, (D.I. 133 at 9); and (2) the Equity Agreement violates the Statute of Frauds. (D.I. 132 at 14).

The Court need not reach Vaughn's requested findings, or evaluate Newton's credibility, on this point. Here, the parties admitted in the pretrial order that "on July 31, 2021, AMT's indirect equity holder, [AMT Ultimate] Holdings, a Delaware limited partnership, signed the Equity Agreement." (D.I. 123 at 6). Vaughn did not attempt to withdraw this admission before trial. *See, e.g., Pritchard v. Dow Agro Sciences*, 255 F.R.D. 164, 168-74 (W.D. Pa. 2009) (applying the procedure for withdrawal of admission pursuant to Fed. Rule Civ. Pro. 36(b)). The admission therefore stands and the Court will treat the Equity Agreement as validly signed. *See McNeil v. AT & T Universal Card*, 192 F.R.D. 492, 494 n.4 (E.D. Pa. 2000) ("Admissions are conclusively binding on parties at trial, and carry more weight than a witness statement, deposition testimony, or interrogatories, because once made, admissions cannot be countered by other evidence"); *Allen v. Scott*, 257 A.3d 984, 990 (Del. 2021) ("As a general matter, agreements entered pursuant to pretrial conferences and pretrial stipulations are binding court orders unless they are formally amended.").[14]

### 2.   AMT Ultimate Holdings' Alleged Failure to Provide the Unit Ledger Is Not a Material Breach of the Equity Agreement

The Equity Agreement states that AMT Ultimate Holdings "will promptly amend and update the Unit Ledger to reflect the issuance of the Incentive Units and provide to Grantee a

---

[14]   The record also includes evidence that Vaughn received consideration for signing the Equity Agreement: the transfer of 694 AMT Ultimate Holdings Class B Units to Vaughn. (DTX-1 at 2). She acknowledged on direct examination that these units' value at the time of transfer – zero dollars – conferred a tax benefit. (Tr. at 145:1 – 145:14).

copy of such updated Unit Ledger containing the information permitted to be disclosed to Grantee" under AMT Holdings policy.  (PTX-3 at AMT 000207).  Vaughn testified on cross-examination that she never received a copy of this unit ledger.  (Tr. at 232:21-232:25).  Newton testified that he did not know whether Vaughn had been given this ledger.  (Tr. at 103:16-103:18).

Vaughn has asked the Court to find that AMT Ultimate Holdings did not issue her the ledger (D.I. 133 at 9), materially breaching the Equity Agreement and excusing Vaughn from her obligations under the Restrictive Covenants (D.I. 132 at 15).  The Court need not decide this factual issue.  Even if AMT Holdings failed to issue Vaughn the unit ledger, this failure would not constitute a material breach of the Equity Agreement.  "As a matter of common law, '[a] breach is material if it goes to the root or essence of the agreement between the parties, or touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract.'"  *AB Stable VII LLC v. Maps Hotels and Resorts One LLC*, C.A. No. 2020-0310-JTL, 2020 WL 7024929 at *98 (Del. Ch. Nov. 30, 2020)(quoting *Mrs. Fields Brand, Inc. v. Interbake Foods LLC*, C.A. No. 12201-CB, 2017 WL 2729860 at *28 (Del. Ch. June 26, 2017)).  The Chancery Court has found that contractual provisions requiring LLC managers to provide members with certain financial information necessary for tax preparation does not touch "the fundamental purpose of the contract" so as to give rise to material breach.  *Avgris Brothers, LLC v. Bouikidis*, C.A. No. 2021-0741-LWW, 2022 WL 4672075 at *14 (Del. Ch. Sept. 30, 2022).  Here, there is no evidence that the Equity Agreement's requirement for an updated unit ledger gives rise to such a breach, and the Court cannot find that AMT Holdings' alleged failure to give Vaughn the ledger would excuse Vaughn from her obligations under the Equity Agreement.  *See DeMarie v. Neff,* No. Civ.A.2077-S, 2005 WL 89403 at *4 (Del. Ch. Jan. 12, 2005)

("Although a material breach excuses performance of a contract, a nonmaterial – or *de minimis* – breach will not allow the non-breaching party to avoid its obligations under the contract.").

### 3.   The 2021 Employment Agreement is Backed by Consideration

Vaughn makes two arguments that her 2021 Employment Agreement (PTX-1) is not backed by consideration.  Both arguments fail.

Vaughn first argues that due to an alleged breach of the 2020 Employment Agreement, "the only new consideration for the 2021 Employment Agreement [at issue in this case] . . . was again the restated promise to provide the Class B equity units to Ms. Vaughn" under the Equity Agreement.  (D.I. 132 at 15-18).  Vaughn argues that this consideration was not valid, rendering the Employment Agreement and its restrictive covenants invalid as well.  (D.I. 132 at 18).

Assuming without deciding that Plaintiffs did breach the 2020 Employment Agreement, Vaughn's claim that the 2021 Employment Agreement lacks valid consideration falls short.  To support this claim, she reiterates her arguments that the 2021 Equity Agreement was not properly signed and was breached by AMT Holdings' alleged failure to give Vaughn the unit ledger. (D.I. 132 at 18).  As discussed in §§ III.B.1-2, *supra*, neither claim, even if true, would undermine the Equity Agreement and its grant of Class B Equity Units to Vaughn.  This argument therefore falls short.

### C.   Enforceability and Breach of Restrictive Covenants

Vaughn's Employment Agreement and Annex A of her Equities Agreement contain nearly-identical restrictive covenants regarding confidentiality, non-competition, and non-solicitation.  (PTX-1 at AMT 000304-000306; PTX-3 at AMT 000226-000230).  At trial, Plaintiffs' counsel confirmed that they considered the two agreements' sets of restrictive covenants to be reciprocal and were making the same arguments for both.  (Tr. at 23:15-24:15). Plaintiffs contend that Vaughn breached each of the Restrictive Covenants.  (D.I. 123 at 7).

To prove that Vaughn breached any of the Restrict Covenants, Plaintiffs must show by a preponderance of the evidence: "(1) the existence of a contract; (2) breach of an obligation imposed by that contract; and (3) resulting damages." *Kan-Di-Ki*, 2015 WL 4503210 at *19.[15] The first inquiry – whether a contract exists – does not end simply because the Employment and Equity Agreements have been signed and backed by consideration. Delaware courts determine whether a restrictive contractual covenant exists by determining whether that covenant is enforceable. *See, e.g., Kan-Di-Ki,* 2015 WL 4503210 at *19-*22*; Tristate Courier*, 2004 WL 835886 at *9-*11. A restrictive covenant "is enforceable if: (1) it meets general contract law requirements, (2) is reasonable in scope and duration, (3) advances a legitimate economic interest of the party enforcing the covenant, and (4) survives a balance of the equities." *Kan-Di-Ki*, 2015 WL 4503210, at *19.

For each pair of Restrictive Covenants, the Court will first decide whether the covenants are enforceable. If so, the Court will then determine whether Plaintiffs have proved a breach of those covenants.

### 1.   **The Confidentiality Covenants**

#### a.   **The Confidentiality Covenants are Enforceable.**

Plaintiffs have satisfied the first requirement from *Kan-Di-Ki;* as discussed in § III.B, *supra*, the Employment and Equity Agreements containing the Confidentiality Covenants are both supported by consideration. *See TP-Group-CI, Inc. v. Vetecnik*, Civil Action No. 1:16-cv-00623-RGA, 2016 WL 5864030 at *2 (D. Del. Oct. 6, 2016) (finding that restrictive covenants at this stage of the inquiry "meet the requirements of contract law because Defendant made

---

[15]   If Plaintiffs prove that Vaughn breached the non-competition covenant, they will also need to prove the other factors required to obtain injunctive relief. *Kan-Di-Ki,* 2015 WL 4503210 at *25.

promises not to compete and not to reveal confidential information, and in return he received consideration in the form of valuable stock options").

The Confidentiality Covenants are also reasonable in scope and duration.  With some exceptions, they prohibit Vaughn from disclosing confidential corporate information that "cannot be obtained readily by third parties from outside sources," either during Vaughn's time with Plaintiffs "or at any time thereafter."  (PTX-1 at AMT 000076-000077; PTX-3 at AMT 000228-000229).  The Delaware Court of Chancery treated a confidentiality covenant covering a similar breadth of information, with indefinite duration, as reasonable in *Kan-Di-Ki*.  2015 WL at 4503210 at *4, *23 (proceeding to the remainder of the breach analysis for the confidentiality agreement).  The confidentiality provision also satisfies the third prong of the *Kan-Di-Ki* test by protecting Plaintiffs' employer confidential information from potential misuse – a "legitimate economic interest" under Delaware law.  *Id.* at *20.

The Court will not decide whether the Confidentiality Covenants satisfy the fourth prong – surviving a balancing of the equities – at this stage of the inquiry.  Plaintiffs have requested injunctive relief, (D.I. 1-1 at 22-23), which requires a separate balance-of-the-equities showing.  *See Kan-Di-Ki*, 2015 WL 4503210 at *25.  When Delaware courts have decided whether to enforce restrictive covenants in post-trial opinions, they have addressed the balance-of-the-equities question after finding a breach and determining whether to grant an injunction.  *See id.* at *20, *27; *see also Tristate Courier*, 2004 WL 835886 at *11 ("The final task of this Court in determining whether the Covenant is valid is a balance of the equities.  Because [the case's plaintiff] seeks injunctive relief, I perform this analysis in a separate section.").  Because Plaintiffs have satisfied the first three elements of the enforceability inquiry, the Court must proceed to determining whether Vaughn breached the Confidentiality Covenants.

   **b.**  **Plaintiffs Have Not Proved That Vaughn Breached these Covenants**

  Plaintiffs argue that three email communications sent by Vaughn show that she breached the Confidentiality Covenants.  (PTX-26; PTX-27; PTX-28).  Therese Hernandez, President of AMT's Acute Division, stated on direct examination that "anything that we develop internally in my view, is considered confidential, and the organization takes that approach as well."  (Tr. at 55:2-55:4).  Although the Court has no reason to doubt Hernandez's credibility overall, it cannot conclude, based on such general testimony, that the email communications disclosed Plaintiffs' confidential information – or, by extension, that Vaughn breached these covenants.

  The first communication (PTX-26) is an email that Vaughn sent on February 9, 2022 to several other Curitec employees.  In that email, Vaughn discussed a former AMT client who had cancelled AMT accounts.  (PTX-26 at 1).  According to Plaintiffs, this email contained information that Vaughn "would only have from working at AMT."  (Tr. at 161:6-161:7).  Yet Vaughn, whom the Court found credible, testified that this email contained no confidential, trade secret, or proprietary information, that the information discussed was "relatively common knowledge within a large group of people," and that she had recently been reminded of it by another former AMT employee who had gone to Curitec, Yvette Monteleone.  (Tr. at 202:14-202:16).  In contrast, Plaintiffs offered no testimony from any witness that the information disclosed as to the former client or its reasons for leaving AMT was, in fact, confidential.  The Court finds that Plaintiffs have not met their burden of proving that this email contained confidential information, or that Vaughn breached her Confidentiality Agreement by sharing it.

  In the second communication, also an email sent on February 9, 2022, Vaughn provided Nick Percival, Curitec's Chief Executive Officer, with certain AMT statistics referred to as "healing benchmarks."  (Tr. at 162:1- 163:12; PTX-27 at 1).  She testified that AMT widely

publicized these "healing benchmarks" through marketing materials and statements by leadership. (Tr. at 204:7-205:22). No AMT witness testified to the contrary. In light of the evidence adduced at trial, the Court again finds that AMT has not met its burden of showing that this email contained confidential information or amounted to a breach of the Confidentiality Covenants.

The third communication was an email that Vaughn sent on March 9, 2022 to two colleagues, Nancy McNally and Brian Harmon. In response to previous messages that mentioned so-called "PACE" programs, (PTX-28 at 3), Vaughn wrote,

> Those PACE programs – those are independent facilities and they often have patients with wounds. They usually have funds to help pay the Medicare allowables. We would just have to convince them why we would be able to help heal their wounds and why using our company would be better different than others. I know that AMT has a number of PACE programs but there are still plenty of them around the country that AMT is not in. We could just focus on those if anyone was up for it.

(PTX-28 at 2).

The evidence at trial was that the general fact that AMT was involved in PACE programs was "widely held information, that people [were] aware of." (Tr. at 166:23-167:17). Once again, none of Plaintiffs' witnesses testified to the contrary or asserted that the information about PACE programs was confidential. During closing arguments, the Court asked Plaintiffs for evidence that these programs are confidential. (Tr. at 291:21-292:3). Plaintiffs' attorney replied that Vaughn had marked the information as confidential when producing it in discovery and argued that "the fact [Vaughn] consider[ed] it confidential demonstrates the confidential value of the pace [*sic*] programs." (*Id.*). In light of the other evidence at trial, however, the Court finds that to be insufficient to demonstrate that the AMT information addressed was confidential (as opposed to, for example, the additional information in the emails related to Curitec). The Court

27

cannot find that Plaintiffs have satisfied their burden as to the PACE programs or that Vaughn breached the Confidentiality Covenants with this email either.

Because Plaintiffs have not shown that any of these emails violated the Confidentiality Covenants, the Court need not determine whether the disclosures of the emails caused Plaintiffs damage. *See Kan-Di-Ki*, 2015 WL 4503210 at *19. Furthermore, because Plaintiffs have not shown "actual success on the merits," the Court cannot enjoin Vaughn from violating the confidentiality provision. *See id. at* *25.[16]

### 2.    The Non-Competition Covenants Are Not Enforceable

Under *Kan-Di-Ki*, the Non-Competition Covenants are not enforceable. The Non-Competition Covenants satisfy the inquiry's first step, meeting general contract law requirements. *See Kan-Di-Ki*, 2015 WL 4503210, at *19. As discussed in § III.B, *supra*, the Court has found that both agreements were signed and supported by consideration.

To satisfy the second and third steps, however, the covenants must be reasonable in duration and scope and advance a legitimate business interest. *Kan-Di-Ki*, 2015 WL 4503210, at *19.[17] Both covenants prohibit Vaughn from employment in the wound-care field, anywhere in the United States or another country where Plaintiffs operated during her employment, for two years after leaving her employment with Plaintiffs. (PTX-1 at AMT 000077-000078; PTX-3 at

---

[16]    Having decided Vaughn has not breached the confidentiality covenant, the Court need not decide, as both parties request, (D.I. 123 at 9, 13) whether Plaintiffs have suffered irreparable harm because of Vaughn's actions. This question would only become relevant if the Court had found a breach and needed to decide if injunctive relief were warranted. *See Kan-Di-Ki*, 2015 WL 4503210 at *25.

[17]    Plaintiffs focus their arguments to enforce the non-compete on the fact that the 2021 Employment Agreement contains an acknowledgment by Vaughn that the restrictive covenants are reasonable. (PTX-1, at 12, ¶ 9(g)). As previously addressed (§ III.A.2, *supra*), contractual assertions of reasonableness are not binding, and the Court must still review the reasonableness of the restrictive covenants irrespective of such provisions. *Kodiak*, 2022 WL 5240507, at *5-7.

AMT 000229).  The non-compete provision in the 2021 Employment Agreement purports to prevent Vaughn from "be[ing] employed by . . . or render[ing] services to any person, firm, corporation or other entity, in whatever form, engaged in the business of providing wound care supplies or related wound care evaluation, treatment and management services, ostomy, urological or tracheostomy services and training and education in any setting, whether in a facility, a clinic, in home-based care or otherwise."  (PTX-1, at 9, ¶ 9(b)). Under the express terms of this provision, Vaughn could not even work as a school nurse or as a paramedic for a county EMS Department, because she would be "engaged in the business of providing . . . related wound care evaluation [and] treatment," which would fall within the proscriptions of the Agreement.  Indeed, Plaintiffs implied at trial that Vaughn could not even work in an area such as flower arranging, *i.e.,* an area wholly unrelated to her work with wound care at AMT, if that work were for business that fit within the broad definition of the provision.  (*See* Tr. 137:2-16). Plaintiffs cannot establish any legitimate business interest in preventing Vaughn from participating in such a broad class of work for two years.[18]

Moreover, although the Delaware Court of Chancery has recognized that competitiveness may be a legitimate economic interest, that interest is not advanced by a non-competition covenant like Vaughn's that generally bans working in a similar business; the covenant must specifically ban working for the employer's competitors.  *See Lyons Insurance Agency, Inc., v. Wilson*, C.A. No. 2017-0092-SG, 2018 WL 4677606 at *7 n. 91 (Del. Ch. Sept. 28, 2018); *Delaware Express Shuttle, Inc. v. Older*, No. 19596, 2002 WL 31458243 at *13 (Del. Ch. Oct. 13, 2002).  Here, the Non-Competition Covenants are not nearly so limited, prohibiting work for

---

[18]     Delaware courts, as Plaintiffs note, (D.I. 134 at 15 (D.I. 134 at 15), have limited authority to edit (or "blue pencil") unreasonable restrictive covenants to make them reasonable. *Kodiak*, 2022 WL 5240507 at *4 n.49.  Plaintiffs do not, however, suggest how the Court should go about doing so.  The Court, thus, declines Plaintiffs' invitation.

any "person, firm, corporation or other entity, in whatever form, engaged in the business of providing wound care supplies or related wound care evaluation, treatment and management services, ostomy, urological or tracheostomy services and training and education in any setting, whether in a facility, a clinic, in home-based care or otherwise."

Other '"legitimate interests' recognized by Delaware law [for this purpose] include protection of employer goodwill, and protection of employer confidential information from misuse." *Kan-Di-Ki*, 2015 WL 4503210 at *20.  Plaintiffs have not shown that the Non-Competition Covenants advanced either interest.  Indeed, on cross-examination, AMT witness, Hernandez, testified that Vaughn "built up a lot of good will" while employed at AMT, (Tr. at 79:12-79:13), but also acknowledged that this good will would be lost when Vaughn left AMT, regardless of whether she went to a competitor (Tr. at 79:18-79:22).  Plaintiffs have thus not proved by a preponderance of the evidence that the Non-Competition Covenants helped protect their goodwill.

Regarding the other "legitimate interest" noted in *Kan-Di-Ki* – protection of confidential information – Hernandez testified that Vaughn's going to a competitor would pose "the risk and potential of her working against us and taking that information to benefit another company." (Tr. at 79:22-79:24).  Yet Plaintiffs must show that the non-competition provisions advanced the protection of confidential information.  *See Kan-Di-Ki,* 2015 WL 4503210 at *19.  They have not shown that the Non-Competition Covenants guarded against the risk Hernandez noted any more than the separate Confidentiality Covenants already did.  The Court cannot find that the Non-Competition Covenants advanced the protection of confidential information.

For a similar reason, the Non-Competition Covenants do not advance the legitimate interest of "preventing employees who leave the Company from taking with them clients with

whom they worked while employed there." *Singh v. Batta Environmental Associates*, No. 19627, 2003 WL 21309115 at *8 (Del. Ch. May 2003).  As discussed in Section III.C.3, *infra*, the Agreements each have Non-Solicitation Covenants that bar Vaughn from soliciting Curitec customers, (PTX-1 at AMT 000306; PTX-3 at AMT 000230), and the Court is not convinced that the Non-Competition Covenants provide any additional safeguards against the risk of Vaughn taking Curitec's customers.

The Court thus finds that Plaintiffs have not shown that the broad scope of the Non-Competition Covenants advanced any legitimate economic interests.  These covenants are therefore unenforceable and the Court need not proceed to the breach inquiry.

### 3.   The Non-Solicitation Covenants

The Employment Agreement and the Equity Agreement also contain nearly-identical Non-Solicitation Covenants stating that Vaughn shall not "solicit, aid or induce" any recent customer of Plaintiffs to purchase from a different entity, or any employee of Plaintiffs to leave and work for a different entity.  (PTX-1 at AMT 000306; PTX-3 at AMT 000229-000230).  They also prohibit Vaughn from interfering with, or supporting interference with, "the relationship between [Plaintiffs] and any of their respective vendors, joint venturers, or licensors which causes harm" to Plaintiffs.  *Id*.

Plaintiffs acknowledged at trial that they had not introduced any evidence that Vaughn solicited any of Plaintiffs' employees to leave, as could violate those portions of the agreements. (Tr. at 267:22-268:5).  The Court, thus, only addresses the Non-Solicitation Covenants with respect to former customers and business relationships.

a.     **The Non-Solicitation Covenants are Enforceable with Respect to Customers and Business Relationships**

The Non-Solicitation Covenants satisfy the first two steps of the enforceability inquiry. As discussed in Section III.B, *supra*, they satisfy the first step by virtue of being supported by consideration.  These provisions are also reasonable in duration and scope.  They last two years after the end of Vaughn's employment with Plaintiffs, (PTX-1 at AMT 000306; PTX-3 at AMT 000229), and "Delaware courts have routinely found restrictive covenants with a duration of two years to be reasonable in duration." *TP Group–CI*, 2016 WL 5864030, at *2.  They lack a set geographic scope, instead prohibiting: (1) solicitation of any entity that was a customer or employee of Plaintiffs at the time of Vaughn's departure or within the past 18 months; and (2) interference with any business relationship.  (PTX-1 at AMT 000306; PTX-3 at AMT 000229-000230).

This is reasonable, given the scope of Plaintiffs' operations.  Hernandez testified that AMT has a "national presence."  (Tr. at 49:9).[19]  In *Kan-Di-Ki*, the Delaware Court of Chancery found that if an employer's "market or the customer base of the business 'extends throughout the nation, or indeed even internationally, and the employee would gain from the employment some advantage in any part of that market,' then the employer and the business may enter into an enforceable contract prohibiting the employee from soliciting those customers on behalf of a competitor regardless of their geographic location." *Kan-Di-Ki*, 2015 WL 4503210 at *20 (quoting *Research & Trading Corp. v. Pfuhl*, Civ. A. No. 12527, 1992 WL 345465 at *12 (Del. Ch. Nov. 18, 1992)).  The Court of Chancery proceeded to find all of the restrictive covenants at issue in the case, including the non-solicitation and non-interference clauses, reasonable.  *Kan-*

---

[19]     Vaughn's testimony did not contradict this point.  (Tr. at 123:23-261:18).

*Di-Ki*, 2015 WL 4503210 at *5, *20.  This Court will do the same for the Non-Solicitation Covenants at issue here.

Both the non-interference and non-solicitation clauses meet the third requirement for enforceability, "advanc[ing] a legitimate economic interest" of Plaintiffs.  *Id.* at *19.  The Court of Chancery found that the plaintiffs in *Kan-Di-Ki* had a "legitimate economic interest in maintaining the business relationships it or its predecessor had with the various skilled nursing facilities it provided services to."  *Id*. at *20.  The parties here have stipulated that AMT provides wound-care solutions for long-term care facilities.  (D.I. 123 at 5, ¶ 2).  Hernandez testified that AMT has relationships with nursing facilities.[20]   (Tr. at 49:2-50:2).   The non-interference provision advanced Plaintiffs' legitimate interest in protecting these relationships.

The ban on soliciting customers also advances a legitimate economic interest: preventing the appropriation of Vaughn's goodwill by competitors.  As discussed in § III.C.2, *supra*, the non-competition covenant did not advance AMT's interest in merely protecting its goodwill, because the goodwill that Vaughn built there would have been lost regardless of whether she went to a competitor.  Hernandez also testified, however, that once Vaughn was gone, her customer relationships could be used to benefit a competitor.  (Tr. at 79:18-79:24).  Preventing this specific risk is also a legitimate economic interest that a ban on soliciting customers can advance.  *See Tristate Courier,* 2004 WL 835886 at *10-*11 ("'[A]n employer has an interest in the goodwill created by its sales representatives and other employees, which is vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs.' This holds true especially here, where testimony showed that the courier

---

[20]     Vaughn's testimony did not contradict this point either.  (Tr. at 123:23-261:18).

business [at issue in the case] is a competitive business and that personal contacts are critical")
(quoting *Research & Trading Corp.*, 1992 WL 345465 at \*12).

Having found that the portions of the non-solicitation covenant concerning customers and
existing business relationships meet the first three prongs of the enforceability test, the Court will
examine whether Vaughn has breached either of these covenants.

### b.    Plaintiffs Have Not Proved That Vaughn Breached the Non-Solicitation Covenants

Plaintiffs must prove by a preponderance of the evidence that Vaughn breached the Non-Solicitation Covenants and that damages resulted.  *See Kan-Di-Ki*, 2015 WL 4503210 at \*19.
They have not done so.

Vaughn confirmed that she worked with former AMT customers while at Curitec.  (Tr. at
156:8-156:10).  Vaughn testified that with one of these customers, Prestige Group, she trained
both Curitec staff and providers regarding use of the "formularies" that Prestige Group had
selected for its patients.  (Tr. at 156:8-157:7).  Plaintiffs argue that this action amounted to a
"violation of the no-aid-inducement covenants, which were designed to protect Plaintiffs'
legitimate interest in preventing competitors from gaining a competitive advantage using key
employees such as Vaughn to enhance back-end sales" in the wound-care sector.  (D.I. 134 at
16-17).  Plaintiffs, however, have shown that Vaughn worked with a former AMT client after
that client switched to Curitec but gave no evidence that this action actually "enhance[d] back-end sales" for Curitec, at AMT's expense, afterwards.  (Tr. at 156:8-156:10).  Holden-Mount,
AMT's former Senior Vice President of Acute Sales, testified that she could not recall any
instance where "someone doing follow-up," as was standard practice after AMT lost a client,
"saying, 'Yes, that's a Misty Vaughn client, we have an issue.'"  (Tr. at 44:4-44:9).  Neither
Hernandez nor Newton directly attributed any loss of AMT's business to Vaughn either.  (Tr. at

90:3-90:6, 117:11-117:3).   On at least two occasions, Vaughn refused to participate in discussions regarding AMT accounts.  (PTX-42; Tr. at 173:18-175:8; PTX-33; Tr. at 199:21-201:1).  The weight of the evidence shows that Vaughn neither solicited AMT's customers nor interfered with its business relationships while employed by Curitec.

### D.   Request for Discovery-Related Sanctions

Plaintiffs request discovery-related sanctions pursuant to Rule 37(b).  (D.I. 130 at 31-34).  Specifically, Plaintiffs ask the Court to draw "strong adverse inferences" regarding certain unproduced documents mentioned in Magistrate Judge Fallon's April 4, 2023 Oral Discovery Order ("the April 4 order").  (D.I. 83).  The Court addresses each of these documents in turn.

Plaintiffs first seek adverse inferences concerning "documents reflecting or concerning any presentations [Vaughn has] made or given to any Curitec employee or agent at any Curitec corporate sales retreat or sales related meeting."  (D.I. 130 at 31 (quoting PTX-54)).  At trial, Vaughn acknowledged she had made a presentation in January of 2023, (Tr. at 176:14-176:19), and the Court ordered the presentation produced for *in camera* review.  (Tr. at 263:18-263:21, 265:19-265:20).  The Court has completed this review and found no content that could violate any of the Restrictive Covenants.  Vaughn's failure to produce these documents does not warrant the sanction of an adverse inference.

Plaintiffs also ask this Court to draw adverse inferences regarding other sets of documents covered by the April 4 order: (1) "documents reflecting or concerning any training or education [Vaughn has] provided to any Curitec employee or agent" regarding wound care (D.I. 130 at 31 (quoting PTX-54)); and (2) "e-mails . . . between [Vaughn] and any person or entity that was a client, vendor or customer of AMT within the two years leading up to January 12, 2022."  (D.I. 130 at 32 (quoting PTX-053)).  They stated that Vaughn had "failed to produce" any training-related documents (D.I. 130 at 31), and that she had responded to the

35

request for emails by "produc[ing] a mere eleven email exchanges from her Curitec email account in discovery . . . This production was facially deficient."  (D.I. 130 at 32 (quoting Tr. at 162:3-6, 184:7-20)).

To support their request for adverse inferences, Plaintiffs cite a Middle District of Pennsylvania ruling that "discovery sanctions under Rule 37(b)(2) are appropriate for any non-compliance with this Court's order and no willfulness, contumacy, or design need be shown." *Beau Prod., Inc. v. Permagrain Prod., Inc.*, 97 F.R.D. 50, 53 (M.D. Pa. 1983) (quoted in D.I. 130 at 34).  Since this ruling, however, the Third Circuit has held "the decision to impose sanctions for discovery violations and any determination as to what sanctions are appropriate are matters generally entrusted to the discretion of the district court . . . a district court abuses its discretion in imposing sanctions when it 'base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'"  *Bowers v. Nat'l Collegiate Athletic Ass'n,* 475 F.3d 524, 538 (3d Cir. 2007) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) and citing *Nat'l Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 642 (1976)).  *See also Terramar Retail Centers, LLC v. Marion #2-Seaport Trust U/A/D June 21, 2002*, C.A. No. 12875-VCL, 2018 WL 6331622 at *9 n.53 (Del. Ch. Dec. 4, 2018) ("Because the [Delaware] Court of Chancery Rules are patterned on the Federal Rules of Civil Procedure, it is appropriate to look to federal authorities for guidance" on a Delaware Court of Chancery Rule 37(b)(2) issue.).

The unique circumstances of this case counsel against drawing adverse inferences. Vaughn's attorney stated that he failed to inform Vaughn of the April 4 order until after Curitec had cut off Vaughn's access to her files and emails.  (Tr. at 264:14-264:25).  Vaughn testified that since the April order, Curitec has kept these documents on a secure drive that she can only

access with Curitec's permission when needed for her job duties; she can also access "current emails from a certain time going forward, but I don't have past information." (Tr. at 191:24-193:8). As stated at trial (Tr. at 199:4-199:7), the Court finds Curitec's conduct in this case highly offensive, but Curitec is no longer a party to this case. The Court sees no reason to doubt Vaughn's testimony or penalize her for Curitec's questionable actions. Plaintiffs have not cited, and the Court has not located, any caselaw to suggest that it would abuse its discretion by denying Plaintiffs' request. The Court will therefore not draw any adverse inferences regarding Vaughn's failure to produce certain discovery.

## IV.   CONCLUSION

For the foregoing reasons, the Court concludes that: (1) both the Employment Agreement (PTX-1) and the Equity Agreement (PTX-3) are binding and enforceable contracts; (2) Section 9(a) of the Employment Agreement and Annex A, Section 1 of the Equity Agreement are enforceable, but those provisions have not been breached by Vaughn; (3) Section 9(b) of the Employment Agreement and Annex A, Section 2 of the Equity Agreement are unenforceable; and (4) that Section 9(c) of the Employment Agreement and Annex A, Section 3 of the Equity Agreement are enforceable, but those provisions have not been breached by Vaughn. An appropriate order follows.